# SUPPLEMENTAL ADDENDUM

# TABLE OF CONTENTS

Document — Page Number

Doc. 1: Indictment of Gautam S. Adani, Sagar R. Adani, Vneet S. Jaain, Ranjit Gupta, Cyril Cabanes, Saurabh Agarwal, Deepak Malhotra, and Rupesh Agarwal …………………………………………………………………………..1

Doc. 35: June 24, 2026 Letter from Andrey Spektor, Timothy D. Sini, and Robert J. Giuffra, Jr. ……………………………………………………………………….56

Doc. 37: July 4, 2026 Letter from R. Trent McCotter (with attachments) ….……………………..71

Doc. 38: July 8, 2026 Order regarding "Non-Considerations" ………………………………...113

Doc. 40: July 15, 2026 Letter from Robert J. Giuffra, Jr. …………………………………...117

Doc. 45: July 15, 2026 Order regarding Nocella and Giuffra Declarations …………………...129

Doc. 46: July 15, 2026 Letter from Robert J. Giuffra, Jr. …………………………..……….135

Doc. 47: July 17, 2026 Declaration of Joseph Nocella, Jr. ……………………………….……138

August 12, 2026 Docket Entry Order regarding R. Trent McCotter's Letter ………………….140

FILED
IN CLERK'S OFFICE U.S.
DISTRICT COURT
E.D.N.Y.
*OCTOBER 24, 2024 *
BROOKLYN OFFICE

HDM:SME/MRG/SJ/AT
F. #2022R00935

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

GAUTAM S. ADANI,
SAGAR R. ADANI,
VNEET S. JAAIN,
RANJIT GUPTA,
CYRIL CABANES,
SAURABH AGARWAL,
DEEPAK MALHOTRA and
RUPESH AGARWAL,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

I N D I C T M E N T

Cr. No. 24-CR-433
(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(2)(A), 982(b)(1), 1349, 1512(k), 2, 3238 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

Judge Nicholas G. Garaufis
Magistrate Judge James R. Cho

THE GRAND JURY CHARGES:

At all times relevant to this Indictment, unless otherwise stated:

I. Background

A. Overview

1. In or about and between 2020 and 2024, senior executives of (i) an Indian renewable-energy company, which was a portfolio company of an Indian conglomerate; (ii) an issuer company that operated in the renewable-energy sector whose securities were traded on a United States exchange; and (iii) that issuer's largest shareholder, a Canadian institutional investor, participated in a scheme to bribe Indian government officials to ensure the execution of lucrative solar energy supply contracts with Indian government entities. During the same period, senior executives of the Indian renewable-energy company (i) conspired to misrepresent the

company's anti-bribery practices to United States-based investors and international financial institutions and (ii) concealed from those same investors and institutions their bribery of Indian government officials to obtain billions of dollars in financing for green energy projects, including the corrupt solar energy supply contracts. In addition, senior executives of the issuer company and its Canadian institutional investor conspired to obstruct the United States government's investigations into the bribery scheme.

B. Entities Associated with the Defendants

2. The "Conglomerate"[1] was a diversified, multinational organization, which had its corporate offices in India. The Conglomerate was one of India's largest business organizations and was comprised of portfolio companies, including the "Indian Energy Company."

3. The "Indian Energy Company" was a renewable-energy company operating and headquartered in India. The Indian Energy Company was a portfolio company of the Conglomerate, and its securities were publicly traded in India.

4. The "U.S. Issuer" was a renewable-energy company incorporated in Mauritius. The U.S. Issuer had securities that were registered pursuant to Section 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, Section 78l) and traded on the New York Stock Exchange until approximately November 2023. The U.S. Issuer was required to file periodic reports with the United States Securities and Exchange Commission ("SEC")

[1] The identity of the Conglomerate and all other anonymized entities and individuals discussed herein are known to the Grand Jury.

until approximately April 2024. The U.S. Issuer was an "issuer," as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1(a).

5. The "U.S. Issuer's Subsidiary" was a majority-owned and controlled subsidiary of the U.S. Issuer headquartered in India that built and operated renewable-energy projects in India. The U.S. Issuer's Subsidiary was an "agent" of an issuer, the U.S. Issuer, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a), until approximately April 2024. For purposes of sections IV through V of this Indictment only, the term "U.S. Issuer" encompasses the "U.S. Issuer," the "U.S. Issuer's Subsidiary" and the other wholly or majority-owned subsidiaries of the two entities.

6. The "Canadian Investor" was an institutional investor headquartered in Canada that managed funds for Canadian public retirement and insurance plans.

7. The "Canadian Investor's Subsidiary" was a wholly-owned subsidiary of the Canadian Investor. The Canadian Investor's Subsidiary was the U.S. Issuer's majority stockholder.

C. <u>The Defendants</u>

8. The defendant GAUTAM S. ADANI was a citizen of India who resided in India. GAUTAM S. ADANI was the Founder of the Conglomerate. The Conglomerate included numerous portfolio companies, including the Indian Energy Company. GAUTAM S. ADANI served as the Chairman and as a Non-Executive Director of the Indian Energy Company's Board of Directors.

9. The defendant SAGAR R. ADANI was a citizen of India who resided in India and was the defendant GAUTAM S. ADANI's nephew. From approximately October

2018 through the present, SAGAR R. ADANI was the Executive Director of the Indian Energy Company's Board of Directors.

10. The defendant VNEET S. JAAIN was a citizen of India who resided in India. From approximately July 2020 through May 2023, JAAIN was the Chief Executive Officer ("CEO") of the Indian Energy Company. From approximately July 2020 through the present, JAAIN was the Managing Director of the Indian Energy Company's Board of Directors.

11. The defendant RANJIT GUPTA was a citizen of India who resided in India. From approximately July 2019 through April 2022, GUPTA was the CEO of the U.S. Issuer and the CEO and Managing Director of the U.S. Issuer's Subsidiary. GUPTA was an "officer," "employee" and "agent" of an issuer, the U.S. Issuer, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

12. The defendant CYRIL CABANES was a citizen of Australia and France who resided in Singapore. From approximately February 2016 through October 2023, CABANES was employed by a company associated with the Canadian Investor and, from approximately January 2017 through October 2023, was a Non-Executive Director of the Boards of Directors of the U.S. Issuer and the U.S. Issuer's Subsidiary. CABANES was a "director" of an issuer, the U.S. Issuer, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

13. The defendant SAURABH AGARWAL was a citizen of India who resided in India. From approximately May 2017 through July 2023, SAURABH AGARWAL was employed by a company associated with the Canadian Investor and reported to the defendant

CYRIL CABANES. SAURABH AGARWAL was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

14. The defendant DEEPAK MALHOTRA was a citizen of India who resided in India. From approximately September 2018 through October 2023, MALHOTRA was employed by a company associated with the Canadian Investor and, from approximately November 2019 through October 2023, was a Non-Executive Director of the Boards of Directors of the U.S. Issuer and the U.S. Issuer's Subsidiary. MALHOTRA was a "director" of an issuer, the U.S. Issuer, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

15. The defendant RUPESH AGARWAL was a citizen of India who resided in India. From approximately the spring of 2022 to July 2022, RUPESH AGARWAL was a consultant for the U.S. Issuer and the U.S. Issuer's Subsidiary. From approximately July 2022 to August 2022, RUPESH AGARWAL was the Chief Strategy and Commercial Officer for the U.S. Issuer and the U.S. Issuer's Subsidiary. From approximately August 2022 through July 2023, RUPESH AGARWAL was the acting CEO of the U.S. Issuer and the U.S. Issuer's Subsidiary. RUPESH AGARWAL was an "officer," "employee" and "agent" of an issuer, the U.S. Issuer, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

D. <u>Relevant Individuals and Entities</u>

16. Co-Conspirator #1 was a citizen of the United Kingdom who resided in Hong Kong. From approximately October 2021 through October 2023, Co-Conspirator #1 was the Non-Executive Chairman of the U.S. Issuer's and the U.S. Issuer's Subsidiary's Boards of

Directors. Co-Conspirator #1 was a "director" and "agent" of an issuer, the U.S. Issuer, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

17. Co-Conspirator #2 was a citizen of India who resided in India. From approximately July 2019 through April 2022, Co-Conspirator #2 held high-ranking executive positions at the U.S. Issuer and the U.S. Issuer's Subsidiary. Co-Conspirator #2 was an "officer," "employee" and "agent" of an issuer, the U.S. Issuer, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

18. Foreign Official #1 was a citizen of India who resided in India. From approximately May 2019 through June 2024, Foreign Official #1 served as a high-ranking government official of Andhra Pradesh, India. Foreign Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

19. The Solar Energy Corporation of India ("SECI") was a company of the Ministry of New and Renewable Energy under the central government of India whose mission was, among other things, to increase the use of renewable-energy in India. SECI was state-owned and state-controlled and performed a function that India treated as its own. SECI was an "instrumentality" of the Indian government, and SECI's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

20. The country of India was comprised of numerous states and regions (also referred to as union territories), including Chhattisgarh, Tamil Nadu, Odisha, Jammu and Kashmir and Andhra Pradesh, which were governed by their own respective state and union

governments. Generally, the governing bodies of the states and union territories included a chief minister and council of ministers. These governing bodies were "department[s]" and "agenc[ies]" of the Indian government, and the officers and employees of these governing bodies were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

21. The Chhattisgarh State Power Distribution Company Limited, Tamil Nadu Generation and Distribution Corporation Limited, GRIDCO Limited, Jammu Kashmir Power Corporation Limited, Andhra Pradesh Central Power Distribution Corporation Limited, Andhra Pradesh Eastern Power Distribution Company Limited and Andhra Pradesh Southern Power Distribution Company Limited (collectively, the "State Distribution Companies") were electricity distribution companies in India that were state-owned and state-controlled and performed functions that the state governments in India treated as their own. The State Distribution Companies were "instrumentalities" of the Indian government, and their officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

II. Terms and Definitions

22. A Power Sale Agreement ("PSA") was an agreement between an electricity distribution company and SECI, pursuant to which the electricity distribution company agreed to purchase solar power from SECI at certain negotiated rates.

23. A Power Purchase Agreement ("PPA") was an agreement between SECI and an energy producer, pursuant to which the energy producer agreed to supply energy to SECI at certain negotiated rates.

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (10 of 142)

24. The Indian rupee ("INR") was the domestic currency of India.

25. A "lakh" was equivalent to 100,000 under Indian numbering conventions.

26. A "crore" was equivalent to 10 million, or 100 lakhs, under Indian numbering conventions.

27. A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

28. A "syndicated loan" was a loan arranged by one or more banks on behalf of a group of lenders, referred to as a syndicate, who worked together to provide funds for a single borrower.

29. A "facility agreement" was a loan agreement between a borrowing company and a lender or group of lenders that allowed the borrowing company to take out money from the loan periodically over an extended period of time.

30. A "bond" was a fixed-income instrument and investment product where investors lent money to a government or company at a certain interest rate for an amount of time. The entity repaid investors interest in addition to repaying the original face value of the bond.

31. Rule 144A of the Securities Act of 1933 provided a mechanism for the sale of securities, such as bonds ("Rule 144A Bonds"), that were privately placed to qualified institutional buyers ("QIBs") in the United States and elsewhere.

32. An "offering circular" was a detailed document provided by an issuer of securities to potential investors containing important information about the issuer, its affiliates and the offered securities.

33. A "bookrunner" was a financial institution responsible for managing and coordinating the issuance and sale of securities. In the context of Rule 144A Bonds, a bookrunner, among other things, collaborated with the issuer to determine the appropriate price and structure of the securities being offered, helped the issuer market the offering to potential investors, including through roadshows, and participated in allocating the securities to investors. Multiple bookrunners on a transaction were referred to as "joint bookrunners."

34. A "subscription agreement" was a legal document used in the process of issuing securities. In the context of Rule 144A Bonds, a subscription agreement served as a contract between an issuer and a bookrunner or joint bookrunners, outlining the terms and conditions under which the bookrunners agree to market and distribute the issuer's securities.

35. An "integrated annual report" was a comprehensive report that included financial and non-financial information about an organization to provide an overall view of the organization's performance, strategy, governance and future prospects. Investors and potential investors used annual reports to evaluate a company's financial performance and to make investment decisions.

III. The Foreign Corrupt Practices Act

36. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

IV. Overview of the Criminal Schemes

A. The Bribery and Obstruction Schemes

37. Beginning in or about 2020, defendant RANJIT GUPTA and Co-Conspirator #2, while acting within the scope of their employment as officers, employees and agents of the U.S. Issuer, knowingly and willfully conspired and agreed with each other and others, including but not limited to the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, to corruptly offer, authorize, promise to pay and to pay bribes to and for the benefit of government officials in India to cause Indian state electricity distribution companies to enter into contracts with SECI in order for the Indian Energy Company, the Indian Energy Company's subsidiaries and the U.S. Issuer to obtain and retain business. At various times in or about and between 2021 and 2022, other individuals, including but not limited to the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1, knowingly and willfully joined the conspiracy.

38. To accomplish the objectives of the then ongoing illegal bribery scheme, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1, together with others, also agreed knowingly and corruptly to conceal the scheme from the United States government, including by obstructing an investigation by a grand jury in the Eastern District of New York (the "Grand Jury Investigation"), an investigation by the Federal Bureau of Investigation (the "FBI Investigation") and an investigation by the SEC (the "SEC Investigation") (collectively, the "Government Investigations"). As part of that scheme, beginning in approximately 2022, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 agreed

with each other and others to destroy and suppress documents and communications and provide false information to the United States government in connection with the Government Investigations.

B. The Securities Fraud and Wire Fraud Schemes

39. In or about and between 2020 and 2024, in order to fund its operations, the Indian Energy Company and certain of its subsidiaries engaged in a series of financial transactions, including: (i) obtaining more than $2 billion of United States-dollar denominated bank loans from international financial institutions and United States-based asset management companies; and (ii) offering more than $1 billion in securities underwritten by international financial institutions and marketed and sold to investors in the United States, among other places. In connection with these financial transactions, investors irrevocably committed themselves in the United States to invest millions of dollars in the securities of the Indian Energy Company.

40. In connection with these transactions, the Indian Energy Company and its directors, management team and employees, including the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, made or caused others to make false and misleading statements, and omitted material facts that rendered certain statements misleading, to investors, joint bookrunners and lenders regarding the Indian Energy Company's anti-bribery commitments and practices and the bribery scheme described herein.

41. The Indian Energy Company and its directors, management team and employees, including the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, relied on the United States financial system to perpetuate this fraudulent scheme by, among other things, seeking and securing investors and potential investors physically located in

the United States and causing wires to be sent and received that passed through the United States, including through the Eastern District of New York.

V. The Conspiracies to Violate the FCPA and Obstruct Justice

A. The Corrupt Solar Project

42. In or about and between December 2019 and July 2020, the U.S. Issuer and the Indian Energy Company's subsidiary won and were issued letters of award ("LOAs") for a manufacturing-linked solar tender offered by SECI (the "Manufacturing Linked Project"). As part of that award, the U.S. Issuer agreed to supply four gigawatts of solar power to SECI, and the Indian Energy Company's subsidiary agreed to supply eight gigawatts of solar power to SECI. SECI, in turn, was responsible for finding state electricity distribution companies that would purchase the 12 gigawatts of power that the Indian Energy Company's subsidiary and the U.S. Issuer had agreed to supply.

43. The terms of the LOAs and amended LOAs obligated SECI to purchase solar power from the U.S. Issuer and the Indian Energy Company's subsidiaries at a fixed rate.

44. At the time of its award, the size and scope of the Manufacturing Linked Project was among the largest global solar energy projects. The Manufacturing Linked Project more than doubled the capacity of renewable-power under the Indian Energy Company's and the U.S. Issuer's portfolios. After the award, the Indian Energy Company issued a media release titled, "[the Indian Energy Company] Wins the World's Largest Solar Award," which included a statement from the defendant GAUTAM S. ADANI that the Indian Energy Company was "honoured to be selected by SECI for this landmark solar award." Similarly, following the award, the U.S. Issuer published a media release announcing its four-gigawatt award as a part of

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (15 of 142)

"one of the largest solar projects ever awarded globally," which included a statement from the defendant RANJIT GUPTA that "[w]ith this award, [the U.S. Issuer] will have a large pipeline of over 4 GW for an extended period of time."

45. The Manufacturing Linked Project was anticipated to generate considerable profits for its energy producers. For example, the U.S. Issuer anticipated that, over approximately 20 years, the Manufacturing Linked Project would generate more than $2 billion in profits after tax.

B. The Mechanics of the Bribery Scheme

i. GAUTAM S. ADANI, SAGAR R. ADANI, VNEET S. JAAIN, RANJIT GUPTA and Co-Conspirator #2 Promise to Pay Bribes to Government Officials

46. The high energy prices contemplated in the LOAs made it difficult for SECI to find Indian state buyers of energy under the Manufacturing Linked Project. After the award of the Manufacturing Linked Project, SECI unsuccessfully sought out Indian state and union governments to purchase the 12 gigawatts of solar power pursuant to PSAs. Without PSAs to sell the energy to a state buyer, SECI would not enter into corresponding PPAs to purchase power from the Indian Energy Company's subsidiaries or the U.S. Issuer.

47. SECI's inability to find purchasers jeopardized the lucrative LOAs, and corresponding revenue, that the Indian Energy Company's subsidiary and the U.S. Issuer anticipated receiving from the Manufacturing Linked Project. As a result, in or about 2020, the defendants GAUTAM S. ADANI, SAGAR R. ADANI, VNEET S. JAAIN, RANJIT GUPTA and Co-Conspirator #2, among others, devised a scheme to offer, authorize, make and promise to make bribe payments to Indian government officials in exchange for the government officials

causing state electricity distribution companies to enter into PSAs with SECI, which would allow the Indian Energy Company's subsidiaries and the U.S. Issuer to secure PPAs with SECI (the "Bribery Scheme"). GUPTA and Co-Conspirator #2 agreed that the U.S. Issuer would pay for a portion of the promised bribes.

48. During the course of the Bribery Scheme, the co-conspirators undertook extensive efforts to corruptly persuade government officials to cause state electricity distribution companies to execute PSAs and frequently discussed those efforts amongst themselves, including through the use of an electronic messaging application. In addition, the defendant GAUTAM S. ADANI personally met with Foreign Official #1 in Andhra Pradesh to advance the execution of a PSA between SECI and Andhra Pradesh's state electricity distribution companies, including on or about August 7, 2021, on or about September 12, 2021 and on or about November 20, 2021.

49. In furtherance of the Bribery Scheme, the co-conspirators, through GAUTAM S. ADANI, SAGAR R. ADANI, VNEET S. JAAIN and others, had offered and promised to Indian government officials approximately 2,029 crore rupees (approximately $265 million)[2] in bribes in exchange for Indian government officials causing the state electricity distribution companies to execute PSAs under the Manufacturing Linked Project, which would benefit the Indian Energy Company's subsidiaries and the U.S. Issuer. Approximately 1,750 crore rupees (approximately $228 million) of the corrupt payments was offered to Foreign Official #1 in exchange for Foreign Official #1 causing Andhra Pradesh's state electricity

[2] Unless otherwise noted, all U.S. Dollar conversions from INR are based on the approximate value of the INR to the U.S. Dollar in or about April 2022.

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (17 of 142)

distribution companies to agree to purchase seven gigawatts of solar power from SECI under the Manufacturing Linked Project.

50. Following the promise of bribes to Indian government officials, in or about and between July 2021 and February 2022, electricity distribution companies for the states and regions of Odisha, Jammu and Kashmir, Tamil Nadu, Chhattisgarh and Andhra Pradesh entered into PSAs with SECI under the Manufacturing Linked Project. Andhra Pradesh's electricity distribution companies entered into a PSA with SECI on or about December 1, 2021, pursuant to which the state agreed to purchase approximately seven gigawatts of solar power—by far the largest amount of any Indian state or region.

51. With executed PSAs under the Manufacturing Linked Project, SECI could enter into corresponding PPAs to purchase solar power from the Indian Energy Company's subsidiaries and the U.S. Issuer. In or about and between October 2021 and February 2022, the U.S. Issuer and the Indian Energy Company, through subsidiaries, executed PPAs with SECI. Pursuant to the PPAs, the U.S. Issuer agreed to supply SECI with approximately 650 megawatts of solar power for the Indian states and region of Chhattisgarh, Tamil Nadu, Odisha and Jammu and Kashmir (collectively, the "650 MW PPAs") and approximately 2.3 gigawatts of solar power for the Indian state of Andhra Pradesh (the "2.3 GW PPAs"). Subsidiaries for the Indian Energy Company, likewise, executed their own PPAs with SECI under which the subsidiaries agreed to supply SECI with solar power for the Indian states and region of Chhattisgarh, Tamil Nadu, Odisha, Jammu and Kashmir and Andhra Pradesh. Following the execution of the Andhra Pradesh-linked PPAs by the Indian Energy Company's subsidiaries, the Indian Energy Company

issued a press release quoting GAUTAM S. ADANI, who touted the signing of "the world's largest PPA with SECI."

52. During and in furtherance of the Bribery Scheme, the defendant SAGAR R. ADANI used his cellular phone to track specific details of the bribes offered and promised to government officials (the "Bribe Notes"). The Bribe Notes identified: (i) the state or region for which government officials had been offered a bribe; (ii) the total amount of the offered bribe; and (iii) the approximate amount of solar power the state or region would agree to purchase in exchange for the bribe. In most instances, the Bribe Notes also identified the per megawatt rate for the total bribe amount offered, the abbreviated titles of the government officials who would receive the bribes, and/or the allocation of the total bribe amount among government officials within each state and region.

ii. CYRIL CABANES, SAURABH AGARWAL and DEEPAK MALHOTRA Learn of the Bribery Scheme

53. Before the U.S. Issuer entered into the 2.3 GW PPAs to supply solar power for Andhra Pradesh, during a meeting in India, the defendants SAURABH AGARWAL and DEEPAK MALHOTRA learned from the defendant RANJIT GUPTA and Co-Conspirator #2 about payments to be made to secure the Andhra Pradesh-linked PPAs for the U.S. Issuer and subsidiaries of the Indian Energy Company. SAURABH AGARWAL and MALHOTRA shared that information with the defendant CYRIL CABANES.

54. Approximately five days later, on or about December 16, 2021, the U.S. Issuer executed the 2.3 GW PPAs.

iii. The Co-Conspirators' Corrupt Efforts to Pay the Indian Energy Company

55. On or about April 25, 2022, the defendants GAUTAM S. ADANI, VNEET S. JAAIN, RANJIT GUPTA and Co-Conspirator #2 were scheduled to meet in New Delhi, Delhi, India to discuss the Bribery Scheme. In anticipation of the meeting, JAAIN used his cellular phone to photograph a document summarizing the amounts the U.S. Issuer owed the Indian Energy Company for its respective portion of the bribes promised by the Indian Energy Company on behalf of the U.S. Issuer. The summary reflected that the U.S. Issuer owed the Indian Energy Company: (i) 55 crore rupees (approximately $7 million) for the bribes that were promised to secure the 650 MW PPAs; and (ii) 583 crore rupees (approximately $76 million) for the bribes that were promised to secure the 2.3 GW PPAs.

56. However, also on or about April 25, 2022, the U.S. Issuer's Board of Directors asked the defendant RANJIT GUPTA and Co-Conspirator #2 to resign from their positions, which they did. The next day, on or about April 26, 2022, the U.S. Issuer publicly announced RANJIT GUPTA's and Co-Conspirator #2's resignations from their executive positions.

57. On or about April 27, 2022, the defendant GAUTAM S. ADANI contacted the defendant SAURABH AGARWAL to request a meeting with the U.S. Issuer's new leadership. Following his communications with GAUTAM S. ADANI, the defendants CYRIL CABANES and SAURABH AGARWAL directed the defendant RUPESH AGARWAL and Co-Conspirator #1 to attend a meeting with GAUTAM S. ADANI in Ahmedabad, Gujarat, India on behalf of the U.S. Issuer.

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (20 of 142)

58. On or about April 29, 2022, the defendant RUPESH AGARWAL and Co-Conspirator #1 met with the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN at the Conglomerate's corporate office in Ahmedabad, Gujarat, India. During the meeting, GAUTAM S. ADANI detailed aspects of the Bribery Scheme, including, among others: (i) the corrupt agreement with the defendant RANJIT GUPTA and Co-Conspirator #2 to secure relevant contracts under the Manufacturing Linked Project through bribe payments to Indian government officials; (ii) that the Canadian Investor had approved the corrupt agreement; (iii) that, for its share of the bribe payments, the U.S. Issuer owed GAUTAM S. ADANI 25 lakh rupees per megawatt of power for securing the 2.3 GW PPAs and 55 crore rupees for securing the 650 MW PPAs; and (iv) steps GAUTAM S. ADANI personally took to offer bribes to Indian government officials. In addition, GAUTAM S. ADANI presented multiple options by which the U.S. Issuer could conceal satisfaction of its portion of the bribe payments, including by transferring the 2.3 GW PPAs from the U.S. Issuer to the Indian Energy Company or its subsidiaries.

59. Following the April 29, 2022 meeting, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 planned how the U.S. Issuer would pay for the portion of bribe payments that the Indian Energy Company had promised to make on the U.S. Issuer's behalf. As discussed further below, to further the Bribery Scheme, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 also agreed to hide their own involvement in the Bribery Scheme.

60. To help the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 determine which corrupt payment option was best, RUPESH AGARWAL prepared multiple analyses using PowerPoint and Excel. One of the PowerPoints prepared by RUPESH AGARWAL summarized the options, described as "Commercial proposal[s]," that the defendant GAUTAM S. ADANI had suggested, including the U.S. Issuer: (i) directly paying the Indian Energy Company the amounts owed to GAUTAM S. ADANI, described as a "Development Fee"; (ii) transferring all of its Manufacturing Linked Project PPAs to the Indian Energy Company; (iii) transferring only the 2.3 GW PPAs to the Indian Energy Company; and (iv) entering into a joint venture with the Indian Energy Company whereby the Indian Energy Company would build and operate the U.S. Issuer's projects. That PowerPoint also contemplated transferring the 2.3 GW PPAs to the Indian Energy Company and paying the Indian Energy Company a $7.3 million "fee" in connection with the 650 MW PPAs, which PPAs the U.S. Issuer would continue to retain and develop under the Manufacturing Linked Project.

61. The corrupt payment analyses prepared by the defendant RUPESH AGARWAL described a coordinated effort by the Indian Energy Company and the U.S. Issuer to facilitate the transfer of the 2.3 GW PPAs to the Indian Energy Company and stated that, where regulatory approval was required from SECI, the defendant GAUTAM S. ADANI would obtain the approval.

62. During the course of the Bribery Scheme, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, regularly communicated about and in furtherance of the corrupt scheme,

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (22 of 142)

including via electronic messaging, some of which communications occurred while CABANES, SAURABH AGARWAL and Co-Conspirator #1 were in the United States.

63. When communicating about the Bribery Scheme, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 often referred to the defendants GAUTAM S. ADANI and VNEET S. JAAIN by code names. Specifically, among other things, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 referred to GAUTAM S. ADANI as "SAG," "Mr[.] A," "Numero uno" and "the big man," and referred to JAAIN as "V," "snake" and "Numero uno minus one."

64. On or about June 14, 2022, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN met with the defendant RUPESH AGARWAL and Co-Conspirator #1 at the Conglomerate's corporate office in Ahmedabad, Gujarat, India. Prior to the meeting, Co-Conspirator #1 discussed with the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL a plan to return the 2.3 GW PPAs to SECI as a way to transfer value to the Indian Energy Company to satisfy a portion of the U.S. Issuer's bribes. As a result, at the meeting, Co-Conspirator #1 told GAUTAM S. ADANI that the U.S. Issuer would return the 2.3 GW PPAs to SECI, with the understanding that the Indian Energy Company or its subsidiary would acquire the project for itself, thereby satisfying a portion of the U.S. Issuer's bribes. Co-Conspirator #1 also agreed that the U.S. Issuer would pay the Indian Energy Company its portion—approximately $7 million—of the bribe payments promised by the Indian Energy Company to Indian government officials to secure the 650 MW

PPAs, which corrupt payment would facilitate the U.S. Issuer's retention of the remaining portions of the Manufacturing Linked Project.

65. Thereafter, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, worked to implement the transfer of the 2.3 GW PPAs to the Indian Energy Company and to identify a means to transfer millions of dollars to the Indian Energy Company while the U.S. Issuer retained the 650 MW PPAs.

iv. <u>The Corrupt Transfer of the 2.3 GW PPAs to the Indian Energy Company's Subsidiary</u>

66. The defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, needed approval from the U.S. Issuer's Boards of Directors to transfer the valuable 2.3 GW PPAs to the Indian Energy Company and/or its subsidiary. To do so, they contrived pretextual reasons to return the 2.3 GW PPAs to SECI, which they presented to the U.S. Issuer's Boards of Directors. Specifically, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator # 1 claimed that the need to return the 2.3 GW PPAs to SECI was based on then-ongoing litigation regarding the project and deteriorating economics, which reasons were meant to obfuscate the true reason the U.S. Issuer was returning the projects to SECI. CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 also concealed from the Boards of Directors and others to whom they reported the corrupt monies they had agreed to pay to the Indian Energy Company for the bribes promised to secure the 650 MW PPAs. On or about November 22, 2022, the U.S. Issuer's Board of Directors authorized

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (24 of 142)

sending a letter to SECI to begin discussions about the U.S. Issuer withdrawing from the 2.3 GW PPAs.

67. The defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, who were secretly directing the U.S. Issuer's return of the 2.3 GW PPAs to SECI, kept each other apprised of the progress on the project's return. The same day that the U.S. Issuer's Board of Directors authorized the letter to SECI, on or about November 22, 2022, SAGAR R. ADANI sent an electronic message to GAUTAM S. ADANI stating that "24th (Thursday) there is [a] board meeting in [the U.S. Issuer] where they are expected to approve the final letter to be sent to SECI. We will keep close track and chase it up properly." GAUTAM S. ADANI responded to the message, "Ok."

68. On or about December 7, 2022, the U.S. Issuer sent a letter to SECI requesting a meeting with SECI to discuss the 2.3 GW PPAs.

69. The following day, on or about December 8, 2022, SAGAR R. ADANI sent an electronic message to GAUTAM S. ADANI stating that the U.S. Issuer "has finally submitted letter to SECI today . . . . Will follow for next steps closely."

70. The defendants SAGAR R. ADANI and VNEET S. JAAIN and other Indian Energy Company personnel also secretly influenced the SECI process for reallocation of the 2.3 GW PPAs to the Indian Energy Company's subsidiary, including by directing the U.S. Issuer's submissions to SECI and by obtaining and revising internal SECI documents.

71. On or about March 18, 2024, SECI sent letters to the U.S. Issuer terminating the 2.3 GW PPAs, authorizing reallocation of the 2.3 GW PPAs to the Indian Energy

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (25 of 142)

Company's subsidiary and affirming the U.S. Issuer's obligation to continue developing the 650 MW PPAs.

72. On or about March 28, 2024, as of which time the defendants RANJIT GUPTA, CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, and RUPESH AGARWAL and Co-Conspirator #1 and Co-Conspirator #2 were no longer employed by the U.S. Issuer and companies associated with the Canadian Investor, the U.S. Issuer publicly announced, among other things, that it was withdrawing from the 650 MW PPAs.

C. The Obstruction Scheme

73. On or about March 17, 2022, as part of the SEC Investigation, the SEC sent a "general inquiry" request to the U.S. Issuer, which included requests for information about all contracts the U.S. Issuer had bid on and/or won since 2018, FCPA complaints and investigations and the solicitation of anything of value by or on behalf of foreign government officials.

74. On or about March 25, 2022, Co-Conspirator #1 sent an electronic message to the defendants CYRIL CABANES, SAURABH AGARWAL and DEEPAK MALHOTRA alerting them that the U.S. Issuer had received an "SEC enquiry . . . about what we have bid for/ won/ agents/ any compliance enquiry and any FCPA enquiry." Several days later, on or about March 29, 2022, the defendant RANJIT GUPTA also sent an electronic message to MALHOTRA attaching the SEC's inquiry to the U.S. Issuer, which letter MALHOTRA then sent to CABANES and SAURABH AGARWAL. SAURABH AGARWAL responded to the message, in part, "We need the management to confirm the FCPA related statements that will be released as a response."

75. To accomplish the objectives of the ongoing Bribery Scheme, beginning in or about 2022, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, agreed to suppress documents, conceal information and provide false information to the United States government for the purpose of obstructing, influencing and interfering with the Government Investigations (the "Obstruction Scheme").

76. To create the false appearance of transparency and good governance, in or about August 2022, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, caused the U.S. Issuer's Board of Directors to initiate an internal investigation run by a law firm headquartered in the United States and supervised by a sub-committee of the Board of Directors. Part of the Obstruction Scheme was to withhold key information about the Bribery Scheme, including the plan to pay millions of dollars to the Indian Energy Company in connection with the 650 MW PPAs that were to be retained by the U.S. Issuer, from the internal investigation and the Government Investigations. In addition, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 made and agreed to make certain selective disclosures in connection with the internal investigation and the Government Investigations—namely, revealing the defendants GAUTAM S. ADANI's, SAGAR R. ADANI's and VNEET S. JAAIN's requests for bribe money but concealing their own participation in the Bribery Scheme. This strategy was designed to create the appearance that the co-conspirators were reporting misconduct rather than perpetrating misconduct, which, in turn, aided the co-conspirators'

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (27 of 142)

continued efforts to further the ongoing Bribery Scheme and to conceal the true nature of the Bribery Scheme from the Board of Directors and the Government Investigations.

77. In or about and between 2022 and the present, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, took numerous additional steps to conceal their participation in the Bribery Scheme and interfere with the Government Investigations. Specifically, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 destroyed and otherwise concealed evidence, including a PowerPoint analysis and electronic communications, thereby impairing the availability of records, documents, objects and other things for use in the Government Investigations. In furtherance of the Obstruction Scheme:

(a) In or about June 2022, SAURABH AGARWAL and CABANES agreed to delete electronic messages they had exchanged about what they would report to the Canadian Investor and the Canadian Investor's Subsidiary about the Bribery Scheme.

(b) In or about early August 2022, Co-Conspirator #1 discussed with MALHOTRA and RUPESH AGARWAL the deletion of incriminating electronic materials, including emails, electronic messages and a PowerPoint analysis detailing options for how the U.S. Issuer could compensate the Indian Energy Company for its portion of the bribes.

(c) On or about September 30, 2022, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 agreed to conceal their agreement to pay the defendant GAUTAM S. ADANI in connection with Bribery Scheme.

78. In or about and between March 2023 and July 2023, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 met

with representatives from the FBI, Department of Justice ("DOJ"), and SEC in Brooklyn, New York and, in furtherance of the Bribery Scheme, falsely denied their participation in the Bribery Scheme.

VI. The Fraud Scheme

79. In or about and between 2020 and 2024, while engaged in the Bribery Scheme, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN were simultaneously engaged in a scheme to obtain United States dollar-denominated financing for the Indian Energy Company and its subsidiaries, including from investors located in the United States, on the basis of false and misleading statements, as well as material omissions that rendered certain statements misleading, regarding the Indian Energy Company's involvement in the Bribery Scheme and its anti-bribery commitments and practices (the "Fraud Scheme").

80. To obtain such financing, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN approved financial transactions entered into by the Indian Energy Company and its subsidiaries, including: (i) United States dollar-denominated syndicate loans from lender groups comprised of international financial institutions and United States-based investors; and (ii) Rule 144A bond offerings underwritten by international financial institutions, which were marketed and sold to investors in the United States, among other places. Necessary documents for each of these financings contained false and misleading statements about whether the Indian Energy Company engaged in bribery and the Indian Energy Company's overall commitment to anti-corruption principles and good governance.

81. The false statements, misrepresentations and material omissions that the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN made and caused

others to make induced investors to purchase bonds and financial institutions to lend money pursuant to terms and at prices that did not account for the true risk associated with the transactions, among other potential consequences of providing capital to the Indian Energy Company or its subsidiaries, when the Indian Energy Company and its principals were engaged in the Bribery Scheme.

82. The defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN had direct control over the Indian Energy Company's ability to raise capital. On or about July 10, 2020, the Board of Directors of the Indian Energy Company passed a resolution reconstituting its "Management Committee" and vesting certain powers in the Management Committee (the "Indian Energy Company Board Resolution"). The four-member Management Committee included GAUTAM S. ADANI, SAGAR R. ADANI and JAAIN. Powers vested in the Management Committee included, among others, the powers to borrow funds from banks and/or other financial institutions, make investments in subsidiary or joint venture companies and issue securities.

83. In addition to authorizing fraudulent financial transactions, the defendants GAUTAM S. ADANI and SAGAR R. ADANI took other actions in furtherance of the Fraud Scheme. For example, in or about and between 2020 and 2023, GAUTAM S. ADANI and SAGAR R. ADANI traveled to the United States to meet with prospective financial partners and investors for the purpose of maintaining and improving the Conglomerate's and the Indian Energy Company's access to United States-based capital.

84. Additionally, in connection with the publication of news articles regarding the United States government's investigation into the Bribery Scheme, the defendants GAUTAM

S. ADANI and SAGAR R. ADANI made or caused others to make false and misleading statements publicly and privately to financial institutions about the Bribery Scheme and the Indian Energy Company's knowledge and awareness of the United States government's investigation into the Bribery Scheme.

A. The 2021 Fraudulent Financial Transactions

i. The 2021 Syndicate Loan

85. On or about March 5, 2021, four wholly-owned subsidiaries of the Indian Energy Company ("the 2021 Project Companies"), which were established to develop certain of the Indian Energy Company's renewable-energy projects, raised a total of $1.35 billion in a United States-dollar denominated senior secured debt facility (the "2021 Syndicate Loan") from the international branches of a group of global financial institutions (the "2021 Lenders").

86. In connection with the 2021 Syndicate Loan, on or about March 5, 2021, the 2021 Project Companies entered into a facility agreement with the 2021 Lenders (the "2021 Facility Agreement"). The 2021 Facility Agreement contained false and misleading statements about the Indian Energy Company's anti-bribery practices and policies. For example, the 2021 Facility Agreement included a false and misleading representation that neither the 2021 Project Companies, nor any affiliates, which included the Indian Energy Company, or their representatives had taken or would take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any government official to influence official action or secure an improper advantage.

87. The defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN authorized the 2021 Syndicate Loan while engaged in the Bribery Scheme, which, as described above, included promises to pay government officials to influence official action and/or secure an improper advantage. On or about March 1, 2021, just prior to finalizing the 2021 Syndicate Loan, Individual #1, the company secretary of the Indian Energy Company, certified a copy of the operative July 2020 Indian Energy Company Board Resolution, demonstrating that GAUTAM S. ADANI, SAGAR R. ADANI and JAAIN maintained the authority to approve the 2021 Syndicate Loan, which resolution was provided to the 2021 Lenders in connection with the loan.

88. On or about December 6, 2021, one of the 2021 Lenders ("Financial Institution #1") sold from its Hong Kong branch approximately $70 million of its $325 million commitment of the 2021 Syndicate Loan through two asset management companies, one of which was headquartered in New York (the "Asset Managers").

89. Prior to the sale, the Asset Managers undertook a due diligence process, which included a review of the 2021 Facility Agreement containing the false and misleading statements about the Indian Energy Company's anti-bribery practices and policies described above.

90. Access to the U.S. dollar-denominated loan funds required collecting, sending and receiving wires within and through the United States, including through the Eastern District of New York. To access the 2021 Syndicate Loan funds, the 2021 Project Companies issued utilization requests to a financial institution designated as the "agent" bank among the 2021 Lenders ("Financial Institution #2"). Financial Institution #2 collected loan funds from the

2021 Lenders in a bank account at the New York branch of Financial Institution #2 and subsequently wired the funds to another financial institution in the United States for onward remittance to the 2021 Project Companies.

ii. The 2021 144A Bond

91. On or about September 8, 2021, the Indian Energy Company issued $750 million in senior secured notes due 2024 (the "2021 144A Bond"). The 2021 144A Bond was marketed and offered to QIBs in the United States pursuant to Rule 144A of the Securities Act of 1933. In connection with the 2021 144A Bond, potential investors electronically received an offering circular ("the 2021 Bond Circular"), a document that included information about, among other things, the Conglomerate, the Indian Energy Company, the 2021 144A Bond, identified risk factors, the 2021 Syndicate Loan, the Indian Energy Company's Board of Directors and senior management, the Indian Energy Company's principal shareholders and a description of the Indian Energy Company's approximate 20 gigawatt portfolio, eight gigawatts of which was the corrupt Manufacturing Linked Project.

92. The 2021 144A Bond raised money for the Indian Energy Company's ongoing projects, including the corrupt Manufacturing Linked Project. In the 2021 Bond Circular and in marketing materials, the Indian Energy Company identified to investors the use of proceeds for the 2021 144A Bond as capital expenditure requirements for the Indian Energy Company's under-construction projects at various stages of development, including the corrupt Manufacturing Linked Project.

93. The defendants SAGAR R. ADANI and VNEET S. JAAIN reviewed and approved the 2021 Bond Circular, which contained false and misleading assurances about the

Indian Energy Company's anti-bribery practices and policies and its commitment to such principles, purportedly backed by robust internal compliance measures. For example, the 2021 Bond Circular touted the Indian Energy Company's risk management committee's oversight of anti-corruption and anti-bribery related matters. SAGAR R. ADANI and JAAIN, who at the time of the 2021 144A Bond offering were engaged in the Bribery Scheme, were members of the Indian Energy Company's risk management committee and were senior directors of the Indian Energy Company.

94. To market and sell the 2021 144A Bond to investors, the Indian Energy Company engaged a group of global financial institutions as joint bookrunners (the "2021 Joint Bookrunners"). The Indian Energy Company and the 2021 Joint Bookrunners entered into a subscription agreement dated September 1, 2021 (the "2021 Subscription Agreement"). That 2021 Subscription Agreement included false and misleading representations regarding the Indian Energy Company's anti-bribery practices, including the false statement that the Indian Energy Company and its representatives had not taken and would not take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any government official to influence official action or secure an improper advantage. In the leadup to the bond pricing, the defendant SAGAR R. ADANI was included on multiple emails containing the draft and execution versions of the 2021 Subscription Agreement, as well as an email confirming the Indian Energy Company's signoff on the execution version of the 2021 Subscription Agreement.

Case: 26-2730, 10/30/2026, DktEntry: 22.1, Page 34 of 142

95. While actively engaged in the Bribery Scheme, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN authorized the Indian Energy Company to issue the 2021 144A Bond and make use of the proceeds.

96. On or about August 26, 2021, the defendants SAGAR R. ADANI and VNEET S. JAAIN, as members of the Management Committee of the Indian Energy Company, passed a resolution authorizing the Indian Energy Company to issue securities in the amount of $750 million. This resolution also set forth certain authorized signatories, including SAGAR R. ADANI and JAAIN, who were permitted to, among other things, execute all relevant transaction documents in furtherance of the 2021 144A Bond offering on behalf of the Indian Energy Company.

97. Following the 2021 144A Bond issuance, in or about November 2021, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN each approved a formal Indian Energy Company "Note for Approval" authorizing the Indian Energy Company to make use of the 2021 144A Bond proceeds and pass any necessary Board of Director resolutions.

98. The defendant SAGAR R. ADANI also played a key role in managing the 2021 144A Bond offering process and concealed the ongoing Bribery Scheme from the 2021 Joint Bookrunners and investors. For example, on or about July 30, 2021, the 2021 Joint Bookrunners conducted a due diligence session with the Indian Energy Company management to assist in the preparation of the 2021 Bond Circular and ensure that all material disclosures were made. The 2021 Joint Bookrunners emailed a due diligence questionnaire in advance of the session to SAGAR R. ADANI, among others. The questionnaire included queries about FCPA compliance and whether the Indian Energy Company and its directors or officers, among others,

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (35 of 142)

had made any unlawful payments to government officials. Following the session, the 2021 Joint Bookrunners concluded that the 2021 144A Bond posed no anti-bribery-related issues and proceeded with the 2021 144A Bond issuance. Additional due diligence sessions were conducted on or about August 27, 2021 and on or about September 1, 2021.

99. On or about September 8, 2021, in connection with final pre-launch due diligence efforts, counsel for the 2021 Joint Bookrunners emailed the defendant SAGAR R. ADANI, among others, seeking confirmation that none of the responses to the questions discussed during the due diligence sessions had changed and that the 2021 Bond Circular contained all information regarding the Indian Energy Company that was material. On the same day, Individual #1 responded affirmatively, copying the defendant SAGAR R. ADANI, and further noting that there was "nothing else that the [2021 Joint Bookrunners], legal counsels or investors in the Notes should know that is not disclosed in the [2021 Bond Circular]."

100. The defendant SAGAR R. ADANI was also involved in the marketing of the bond to investors. He received draft roadshow presentations, represented the Indian Energy Company during telephonic roadshow meetings with investors and otherwise participated in the Indian Energy Company's engagement with potential investors in the United States and elsewhere.

101. Numerous wires, such as electronic messages and financial wires, passed within and through the United States, including through the Eastern District of New York, in connection with the 2021 144A Bond. For example, salespeople employed by the 2021 Joint Bookrunners and located in New York City sent and received electronic messages in connection

with marketing the bond. Ultimately, approximately one quarter of the $750 million 2021 144A Bond was allocated to United States-based investors.

B. GAUTAM S. ADANI and SAGAR R. ADANI Learn of the United States Government's Investigation

102. In or about March 2023, FBI special agents took steps in furtherance of the FBI Investigation and the Grand Jury Investigation that revealed the existence of those investigations, as well as certain crimes and individuals under investigation, to the defendant SAGAR R. ADANI, which information was shared with the defendant GAUTAM S. ADANI. Thereafter, in furtherance of the Fraud Scheme, SAGAR R. ADANI and GAUTAM S. ADANI made or caused others to make false and misleading statements regarding the Bribery Scheme to investors, potential investors and financial institutions.

103. Specifically, on or about March 17, 2023, FBI special agents approached the defendant SAGAR R. ADANI in the United States and, pursuant to a judicially authorized search warrant, took custody of electronic devices in his possession. At the same time, FBI special agents provided SAGAR R. ADANI with a copy of the search warrant and served him with a grand jury subpoena. The search warrant identified offenses, individuals and entities under investigation by the United States government, specifically: violations of the FCPA, securities fraud, wire fraud and related conspiracies involving SAGAR R. ADANI and the defendants GAUTAM S. ADANI and VNEET S. JAAIN, as well as the Indian Energy Company. The search warrant further described certain evidence subject to seizure, including evidence "related to the payment of or an offer to pay, bribes, kickbacks or provide or offer to provide any other thing of value to Indian government officials in order to obtain or retain business advantages."

104. On or about March 18, 2023, the defendant GAUTAM S. ADANI emailed himself photographs of each page of the search warrant executed and grand jury subpoena served on the defendant SAGAR R. ADANI.

105. Thereafter, as discussed further below, despite knowing certain of the subject offenses and individuals under investigation by the United States government, the defendants GAUTAM S. ADANI and SAGAR R. ADANI not only concealed the Bribery Scheme from financial institutions and investors in the United States and elsewhere but also caused others to make false and misleading statements regarding their awareness and knowledge of the United States government's investigation and its subjects.

C. The 2023-2024 Fraudulent Transactions

i. The 2023 Syndicate Loan

106. On or about December 5, 2023, five project companies, wholly-owned by the Indian Energy Company through a subsidiary ("the 2023 Project Companies"), which were established to develop certain of the Indian Energy Company's renewable-energy projects, raised a total of $1.36 billion in a United States dollar-denominated senior secured debt facility (the "2023 Syndicate Loan") from international branches of a group of global financial institutions (the "2023 Lenders"). The 2023 Project Companies were developing some of the solar projects for the corrupt Manufacturing Linked Project described above.

107. In connection with the 2023 Syndicate Loan, the 2023 Project Companies entered into a facility agreement with the 2023 Lenders (the "2023 Facility Agreement"). The 2023 Facility Agreement contained false assurances about the Indian Energy Company's anti-bribery practices and policies, similar to those in the 2021 Facility Agreement described above.

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (38 of 142)

108. In or about and between November and December 2023, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN authorized the 2023 Syndicate Loan. Specifically, GAUTAM S. ADANI, SAGAR R. ADANI and JAAIN each approved a formal "Note for approval" authorizing the terms of the 2023 Syndicate Loan, which stated that a breach of anti-corruption covenants would constitute a "Major Event of Default."

109. To access the 2023 Syndicate Loan funds, the 2023 Project Companies issued utilization requests to Financial Institution #2, which served as the "agent" bank. Financial Institution #2 collected loan funds from the 2023 Lenders in a bank account at the New York branch of Financial Institution #2 and subsequently wired the funds to another financial institution for onward remittance to the 2023 Project Companies.

ii. <u>The 2024 144A Bond</u>

110. On or about March 12, 2024, three special purpose vehicles (the "2024 Project Companies")—each a wholly-owned subsidiary of a joint venture equally owned by the Indian Energy Company and another energy company—issued $409 million in senior secured notes due 2042 (the "2024 144A Bond"). The Indian Energy Company had management control over the joint venture and the 2024 Project Companies. The 2024 144A Bond was marketed and offered to QIBs in the United States pursuant to Rule 144A of the Securities Act of 1933. In connection with the 2024 144A Bond, potential investors electronically received an offering circular ("the 2024 Bond Circular"), a document that included information about, among other things, the Conglomerate, the Indian Energy Company, the 2024 Project Companies, the 2024 144A Bond, identified risk factors, the 2024 Project Companies' principal shareholders, the

Manufacturing Linked Project and a description of the Indian Energy Company's approximate 21 gigawatt portfolio, eight gigawatts of which was the corrupt Manufacturing Linked Project.

111. The 2024 Bond Circular contained false and misleading assurances about, among other things, the Indian Energy Company's "corporate governance" and touted "maintaining transparency and compliance in every aspect of [the company's] operations." Additionally, the 2024 Project Companies entered into a subscription agreement with the joint bookrunners (the "2024 Joint Bookrunners") for the 2024 144A Bond (the "2024 Subscription Agreement"). The 2024 Subscription Agreement included false and misleading representations regarding the Indian Energy Company's anti-bribery and anti-corruption practices, similar to the 2021 Subscription Agreement described above.

112. Moreover, the 2024 Project Companies provided written answers to a management due diligence questionnaire similar to the one used in connection with the 2021 144A Bond in advance of the issuance of the 2024 144A Bond. The answers contained false and misleading representations about the Indian Energy Company's anti-bribery practices.

113. Numerous wires, such as electronic messages and financial wires, passed within and through the United States, including through the Eastern District of New York, in connection with the 2024 144A Bond. For example, salespeople employed by the 2024 Joint Bookrunners and located in New York City sent and received electronic messages in connection with marketing the bond. Ultimately, approximately one quarter of the $750 million 2024 144A Bond was allocated to United States-based investors.

D. The False Statements in the Indian Energy Company Annual Reports

114. Each year, from at least 2021 through 2024, the Indian Energy Company publicly released integrated annual reports (the "Reports"). As described above, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN served as executives and directors of the Indian Energy Company during this time. The Reports included false and misleading statements regarding the Indian Energy Company's anti-bribery practices.

115. For example, the 2020 through 2023 Reports falsely stated that the Indian Energy Company had a "zero tolerance" policy for bribery and corruption, which policy was reviewed by its Board of Directors, when in fact defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, all of whom were members of the Indian Energy Company's Board of Directors, were personally engaged in the Bribery Scheme.

116. In or about July 2024, the Indian Energy Company publicly released its integrated annual report for the 2023 through 2024 fiscal year (the "2023-2024 Report"), which also included false and misleading statements regarding the Indian Energy Company's anti-bribery practices. The 2023-2024 Report repeatedly expressed a commitment to "zero-tolerance" for bribery and corruption, including stating that the company's "Code of Conduct and Policy Commitment" included "Anti-Bribery & Anti-Corruption" commitments, namely that: "We maintain a zero-tolerance stance towards all forms of bribery and corruption, whether in government or government dealings. We shall cooperate with the governmental authorities in efforts to eliminate all forms of bribery, fraud, and corruption. Our employees, contractors and business partners are expected to refuse any request/any offer for a bribe or kickback and report such instances immediately to the concerned authorities within the organisation."

E. The False Statements Relating to the United States Government's Investigation

117. In furtherance of the Fraud Scheme, in connection with the publication of a news article regarding the United States government's investigation of the Bribery Scheme, the defendants GAUTAM S. ADANI and SAGAR R. ADANI made or caused other Conglomerate personnel to make false and misleading statements about the Indian Energy Company's awareness of the United States government's investigation and the Indian Energy Company's anti-bribery practices, including in: (i) public statements to the media and market; (ii) public statements to Indian stock exchanges; and (iii) private communications with financial institutions.

118. Specifically, on or about March 15, 2024, a news organization published an article titled "US Probing Indian Billionaire Gautam Adani and His Group Over Potential Bribery," which, among other things, reported that the United States government was investigating "whether an Adani entity, or people linked to the company, were involved in paying officials in India for favorable treatment on an energy project . . . ." (the "2024 News Article"). As described above, the defendants GAUTAM S. ADANI and SAGAR R. ADANI were aware of the FBI Investigation and the Grand Jury Investigation, including because of the service of a grand jury subpoena and execution of a search warrant for electronic devices on SAGAR R. ADANI that permitted seizure of evidence of criminality by GAUTAM S. ADANI, SAGAR R. ADANI and the defendant VNEET S. JAAIN, among others. Despite GAUTAM S. ADANI's and SAGAR R. ADANI's knowledge of the investigations, and despite their orchestration of the Bribery Scheme, the 2024 News Article contained a quote from the Conglomerate that "[w]e are not aware of any investigation against our Chairman [GAUTAM S.

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (42 of 142)

ADANI]" and that "[a]s a business group that operates with the highest standards of governance, we are subject to and fully compliant with anti-corruption and anti-bribery laws in India and other countries."

119. On or about March 17, 2024, Individual #2, the head of corporate finance for the Conglomerate, sent an email to an employee of a financial institution ("Financial Institution #3"), which was both a lender for the 2021 Syndicate Loan and a joint bookrunner for the 2024 144A Bond, copying the defendant SAGAR R. ADANI, and writing that that the 2024 News Article was "baseless," "malicious," "defamatory" and that the Conglomerate "operates with the highest standards of governance," and is "subject to and fully compliant with anti-corruption and anti-bribery laws in India and other countries." On or about the same day, Individual #2 sent more than a dozen emails to other financial institutions and investors with similar or identical false statements, copying SAGAR R. ADANI.

120. On or about March 19, 2024, Individual #2 emailed employees of Financial Institution #2, Financial Institution #3 and Financial Institution #4 letters that the Indian Energy Company had sent to the National Stock Exchange of India and BSE Limited, both Indian stock exchanges. The letters falsely stated, among other things, that the Indian Energy Company "has not received any notice from the Department of Justice of U.S. in respect of the allegation referred to in the [2024 News Article]" and that the Indian Energy Company was "aware of an investigation" into potential violations of United States anti-corruption laws by a "third party." Also included in the email were written responses to questions posed by the financial institutions about the subject matter of the 2024 News Article. The written responses falsely claimed that the Conglomerate and the Indian Energy Company had not received notice

of the United States government's investigation and included other false and misleading statements about the Bribery Scheme and the Indian Energy Company's and the Conglomerate's knowledge and awareness of the United States government's investigation.

121. On or about March 20, 2024, employees of Financial Institution #3 participated in a due diligence call with outside legal counsel for the Conglomerate, during which call counsel further reiterated the false statements described above pertaining to the 2024 News Article. During the call, employees of Financial Institution #3 asked whether the Indian Energy Company had knowledge of inquiries or investigations into the alleged bribery and corruption and specifically inquired as to whether language in the 2024 Bond Circular indicating that the Indian Energy Company was "subject to or exposed to present inquiries and investigations under the anti-bribery or anti-corruption laws of other countries" was intended to disclose facts about a United States government investigation into the Bribery Scheme. In response, counsel for the Conglomerate made the following false and misleading statements, among others: (i) risk factor disclosures are "generally drafted widely"; (ii) the Indian Energy Company was aware of an investigation relating to a third party, but was unaware of the nature of that investigation or whether it impacted the Indian Energy Company; (iii) the Indian Energy Company had included the disclosure because it was in the same industry as the third party under investigation and had joined/adjacent land parcels; (iv) the Indian Energy Company had not received notice or communication from the DOJ with respect to an investigation into the Indian Energy Company; and (v) the DOJ had not sought to interview any company personnel.

122. On or about July 25, 2024, employees of Financial Institution #3 had a follow-up call with Individual #2 regarding the 2024 News Article and the 2024 Bond Circular.

Case: 26-2730, 10/30/2026, DktEntry: 22.1, Page 44 of 142

During the call, Individual #2 falsely stated, among other things, that: (i) no entity or individual within the Conglomerate had been approached by any United States authority in connection with any investigation into the Conglomerate or its affiliates; (ii) the Conglomerate was not aware of any such investigation; (iii) the Conglomerate was not aware of any misconduct; and (iv) the 2024 News Article was "behind them." Individual #2 indicated that the Conglomerate was not willing to provide further written representations about the same topic.

123. These false statements concealed both the United States government's investigation and the Bribery Scheme from investors and financial institutions, all to ensure the Conglomerate's and the Indian Energy Company's continued access to capital in the United States and elsewhere, in furtherance of the Fraud Scheme.

## COUNT ONE
(Conspiracy to Violate the FCPA)

124. The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

125. In or about and between 2020 and 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants RANJIT GUPTA, CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, together with Co-Conspirator #1, Co-Conspirator #2 and others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a) being an officer, director, employee and agent of an issuer, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift,

promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person, while knowing that all or a portion of such money and thing of value would be offered, given and promised, directly and indirectly, to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof, to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof, to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the U.S. Issuer in obtaining and retaining business for and with, and directing business to the Indian Energy Company, the Indian Energy Company's subsidiaries, the U.S. Issuer, the U.S. Issuer's Subsidiary, subsidiaries of the U.S. Issuer's Subsidiary, the Canadian Investor, the Canadian Investor's Subsidiary and others, contrary to Title 15, United States Code, Section 78dd-1; and

(b) while in the territory of the United States, corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person, while knowing that all or a portion of such money and thing of value would be offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of:

(i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist CABANES, SAURABH AGARWAL, Co-Conspirator #1 and others in obtaining and retaining business for and with, and directing business to the Indian Energy Company, the Indian Energy Company's subsidiaries, the U.S. Issuer, the U.S. Issuer's Subsidiary, subsidiaries of the U.S. Issuer's Subsidiary, the Canadian Investor, the Canadian Investor's Subsidiary and others, contrary to Title 15, United States Code, Section 78dd-3.

126. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants RANJIT GUPTA, CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, together with others, committed and caused the commission of, among others, the following:

<u>OVERT ACTS</u>

(a) On or about November 24, 2020, GUPTA exchanged electronic messages with the defendant SAGAR R. ADANI regarding efforts to convince states to purchase power under the Manufacturing Linked Project, as a part of which GUPTA wrote, "the advantage we have is that the discoms are being motivated."

(b) On or about March 30, 2021, GUPTA sent an electronic message to SAGAR R. ADANI asking, "any progress on our PSAs ??"

(c) On or about April 29, 2022, RUPESH AGARWAL and Co-Conspirator #1 met with the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN in India, during which meeting they discussed the Bribery Scheme.

(d) On or about May 6, 2022, CABANES, while in the United States, exchanged electronic messages with Co-Conspirator #1 about the Bribery Scheme, as a part of which CABANES asked Co-Conspirator #1 if there was "a commercially doable deal."

(e) On or about May 6, 2022, SAURABH AGARWAL exchanged electronic messages with Co-Conspirator #1 about the Bribery Scheme, as a part of which SAURABH AGARWAL asked, "when do you think [RUPESH AGARWAL] is completing analysis?"

(f) On or about May 12, 2022, SAURABH AGARWAL, while in the United States, exchanged electronic messages with Co-Conspirator #1, as a part of which Co-Conspirator #1 informed SAURABH AGARWAL that RUPESH AGARWAL had a meeting with the defendant VNEET S. JAAIN that same day and "Views exchanged. No resolution. Ball with [JAAIN] to review for next [meeting]." SAURABH AGARWAL responded with a thumbs-up emoji and "K."

(g) On or about May 17, 2022, GUPTA sent an electronic message to SAURABH AGARWAL that stated, among other things, "Just wanted to let you know that since [Co-Conspirator #2] & i [sic] are not part of [the U.S. Issuer] any more, Adani would like to take up discussions related to the SECI Manufacturing [Linked Project] directly with you. We are

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (48 of 142)

always available to help with the successful execution of this prestigious ppa for which, as you already know, close coordination with Adani will be required."

(h) On or about May 28, 2022, SAURABH AGARWAL, while in the United States, had a call with the defendant GAUTAM S. ADANI about the Bribery Scheme.

(i) On or about May 31, 2022, Co-Conspirator #1 exchanged electronic messages with CABANES, as a part of which Co-Conspirator #1 told CABANES that RUPESH AGARWAL had a "BAD" meeting with the defendants GATAUM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN and that RUPESH AGARWAL and MALHOTRA were "fleshing out our options."

(j) On or about May 31, 2022, in response to the message referred to above in paragraph 126(i), CABANES sent an electronic message to Co-Conspirator #1 asking, "[s]o we have a potential deal on the table?"

(k) On or about June 13, 2022, RUPESH AGARWAL used his personal email account to send a PowerPoint titled "1 SLIDE.pptx" that outlined a proposal to satisfy a portion of the corrupt payment to the Indian Energy Company by returning the 2.3 GW PPAs to SECI for ultimate "re-allocation" to the Indian Energy Company.

(l) On or about June 14, 2022, RUPESH AGARWAL and Co-Conspirator #1 met with the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN in India, during which meeting RUPESH AGARWAL and Co-Conspirator #1 agreed that the U.S. Issuer and/or its subsidiaries would return the 2.3 GW PPAs to SECI to facilitate the Indian Energy Company's subsidiary's acquisition of the valuable 2.3 GW PPAs and, in

addition, that the U.S. Issuer and/or its subsidiaries would pay the Indian Energy Company, directly or indirectly, 550 million INR (approximately $7 million).

(m) On or about June 23, 2022, CABANES sent an electronic message to Co-Conspirator #1, who was then located in the United States, about the return of the 2.3 GW PPAs to SECI, stating "Hi [Co-Conspirator #1], what's the plan with regards to the board decision on the PPAs?"

(n) On or about September 30, 2022, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 had a virtual meeting, during which meeting they agreed to withhold information and provide false information related to the Bribery Scheme to investigators and the U.S. Issuer's Boards of Directors.

(o) On or about March 29, 2023 and on or about May 18, 2023, Co-Conspirator #1 met with representatives of the United States government in Brooklyn, New York and made false statements about the Bribery Scheme.

(p) On or about June 28, 2023, CABANES met with representatives of the United States government in Brooklyn, New York and made false statements about the Bribery Scheme.

(Title 18, United States Code, Sections 371, 3238 and 3551 et seq.)

COUNT TWO
(Securities Fraud Conspiracy)

127. The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

128. In or about and between 2021 through the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing one or more devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in the 2021 144A Bond and 2024 144A Bond, in connection with the purchase and sale of investments in the 2021 144A Bond and 2024 144A Bond, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

129. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, together with others, did commit and cause the commission of, among others, the following:

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (51 of 142)

OVERT ACTS

(a) On or about August 26, 2021, the Management Committee of the Indian Energy Company, which included SAGAR R. ADANI and JAAIN, passed a resolution authorizing the Indian Energy Company to issue securities in the amount of $750 million.

(b) In or about August 2021, SAGAR R. ADANI participated in a recorded roadshow presentation marketing the 2021 144A Bond, which recording was replayed for investors, including United States-based investors.

(c) In or about November 2021, GAUTAM S. ADANI, SAGAR R. ADANI and JAAIN each approved a formal "Note for Approval" authorizing the Indian Energy Company to make use of the 2021 144A Bond proceeds and pass any necessary Board of Directors resolutions.

(d) On or about December 27, 2022, JAAIN executed a Compliance Certificate on behalf of the Indian Energy Company in connection with the 2021 144A Bond.

(Title 18, United States Code, Sections 371, 3238 and 3551 et seq.)

COUNT THREE
(Wire Fraud Conspiracy)

130. The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

131. In or about and between 2021 through the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud current and prospective lenders and investors in

Case: 26-2730, 10/30/2026, DktEntry: 22.1, Page 52 of 142

financial transactions, including the 2021 Syndicate Loan, 2021 144A Bond, 2023 Syndicate Loan and 2024 144A Bond, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349, 3238 and 3551 et seq.)

COUNT FOUR
(Securities Fraud – the 2021 144A Bond)

132. The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

133. In or about and between 2021 through the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing one or more devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in the 2021 144A Bond, in connection with

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (53 of 142)

the purchase and sale of investments in the 2021 144A Bond, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2, 3238 and 3551 et seq.)

COUNT FIVE
(Conspiracy to Obstruct Justice)

134. The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

135. In or about and between 2022 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, together with others, did knowingly and intentionally conspire to corruptly alter, destroy, mutilate, and conceal a record, document, and other object with intent to impair the object's integrity and availability for use in an official proceeding and obstruct, influence and impede official proceedings, to wit: the Grand Jury Investigation, the FBI Investigation and the SEC Investigation, contrary to Title 18, United States Code, Sections 1512(c)(1) and (2).

(Title 18, United States Code, Sections 1512(k), 3238 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE, TWO, FOUR, AND FIVE

136. The United States hereby gives notice to the defendants charged in Counts One, Two, Four and Five that, upon their conviction of any of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

137. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p), Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT THREE

138. The United States hereby gives notice to the defendants charged in Count Three that, upon their conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(2)(A), which requires any person convicted of such offense, to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

139. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

Case: 26-2730, 10/30/2026, DktEntry: 22.1, Page 56 of 142

property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(2)(A) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

s/

FOREPERSON

*Breon Peace*

BREON PEACE
United States Attorney
Eastern District of New York

GLENN S. LEON
Chief, Fraud Section
Criminal Division
United States Department of Justice

FILED
IN CLERK'S OFFICE U.S.
DISTRICT COURT
E.D.N.Y.
*OCTOBER 24, 2024 *
BROOKLYN OFFICE
24-CR-433
Judge Nicholas G. Garaufis
Magistrate Judge James R. Cho

# INFORMATION SHEET

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

1. Title of Case: United States v. Gautam S. Adani, et al.

2. Related Magistrate Docket Number(s): ______________________________

3. Arrest Date: ______

4. Nature of offense(s): ☒ Felony
   ☐ Misdemeanor

5. Related Cases - Title and Docket No(s). (Pursuant to Rule 50.3.2 of the Local E.D.N.Y. Division of Business Rules):______________________________

6. Projected Length of Trial: Less than 6 weeks ☐
   More than 6 weeks ☒

7. County in which crime was allegedly committed: Kings County
   (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8. Was any aspect of the investigation, inquiry and prosecution giving rise to the case pending or initiated before March 10, 2012.[1] ☐ Yes ☒ No

9. Has this indictment/information been ordered sealed? ☒ Yes ☐ No

10. Have arrest warrants been ordered? ☒ Yes ☐ No

11. Is there a capital count included in the indictment? ☐ Yes ☒ No

BREON PEACE
United States Attorney

By: /s/
Jessica K. Weigel
Assistant U.S. Attorney
Jessica.weigel@usdoj.gov
718-254-6157

[1] Judge Brodie will not accept cases that were initiated before March 10, 2012.

Rev. 12/14/23

SULLIVAN & CROMWELL LLP

NIXON PEABODY

NORTON ROSE FULBRIGHT

June 24, 2026

Via ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States* v. *Gautam Adani et al.*, No. 24-cr-00433 (E.D.N.Y.); *SEC* v. *Adani et al.*, No. 24-cv-08080 (E.D.N.Y.)

Dear Judge Garaufis:

On behalf of Gautam Adani, Sagar Adani, and Vneet Jaain, we write in connection with the pending resolutions of the above-captioned cases. We respectfully ask the Court to grant the Department of Justice's motion to dismiss the Indictment with prejudice and the Securities and Exchange Commission's motion to enter the pending Consent Judgments resolving its claims. For the Court's convenience and consideration, we set forth below some background regarding the allegations and pending resolutions in each case, along with the law governing the standard of review for such motions.

On November 20, 2024, the DOJ unsealed its Indictment (DOJ Action, Dkt. No. 1) against Gautam Adani, Sagar Adani, and Vneet Jaain (the "Adani DOJ Defendants"), among others. In its Indictment, the DOJ alleged that the Adani DOJ Defendants conspired to and did commit securities fraud and conspired to commit wire fraud in connection with 2021 and 2024 bond offerings and 2021 and 2023 syndicated bank loans. That same day, the SEC filed its Complaint (SEC Action, Dkt. No. 1) against Gautam Adani and Sagar Adani (the "Adani SEC Defendants") alleging that the Adani SEC Defendants violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder by approving or making false or misleading statements in connection with the 2021 bond offering.

The Indictment and Complaint do not allege any U.S. bribery offenses against the Adani DOJ Defendants. They also do not allege any investor losses arising from any of the four transactions. Both the 2021 and 2024 bond offerings were issued pursuant to Regulation S and Rule 144A, promulgated under the Securities Act of 1933. *See* 17 C.F.R. §§ 230.144A, 230.901-230.905. As relevant here, under Rule 144A, those offerings were available only to Qualified Institutional Buyers ("QIBs"), which are large and sophisticated institutions that own or invest more than $100 million in securities. *Id.* § 230.144A(a)(1). The 2021 bond offering has matured, and all interest payments have been made. The 2024 bond offering has missed no interest payments. The 2021 loan has been repaid in full, and the 2023 loan is not in default.

**1. Pending Dismissal in the DOJ Action**

On May 18, 2026, the DOJ filed a motion under Federal Rule of Criminal Procedure 48(a) seeking dismissal of the Indictment with prejudice. DOJ Action, Dkt. No. 23. In its motion, the DOJ stated that it "has reviewed this case and has decided, in its prosecutorial discretion, not to devote further resources to these criminal charges against individual defendants." *Id.*[1]

Rule 48(a) authorizes the DOJ, "with leave of court," to "dismiss an indictment." As Judge Chen recently recognized when granting the DOJ's motion to dismiss in the FIFA case, the "leave of court" requirement confers on the Court "very little authority" to deny the DOJ's motion under Rule 48(a). *United States* v. *Webb*, No. 15-cr-00252, May 27, 2026 Arg. Tr. 10:23 (E.D.N.Y.)[2]; *see United States* v. *Blaszczak*, 56 F.4th

---

[1] Also on May 18, Adani Enterprises Limited ("AEL") agreed with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") to settle for $275 million its potential civil liability related to apparent violations of OFAC's Iran sanctions. OFAC, Settlement Agreement at 4 (May 18, 2026), https://ofac.treasury.gov/media/935636/download?inline. The Settlement Agreement stated that "AEL extensively cooperated with OFAC's investigation, including by proactively disclosing the findings of its investigation, producing large volumes of documentation, meaningfully answering all the agency's questions, and promptly resolving its potential liability." *Id.* AEL produced almost 30,000 pages to OFAC. Sullivan & Cromwell lawyers have spent thousands of hours working on the DOJ, SEC, and OFAC matters.

[2] Orders of dismissal were entered on June 5, 2026. *United States* v. *Webb*, No. 15-cr-00252 (E.D.N.Y. June 5, 2026), Dkt. Nos. 2102, 2103.

230, 240 (2d Cir. 2022) ("The Executive remains . . . presumptively the best judge of whether a pending prosecution should be terminated. The exercise of its discretion with respect to the termination of pending prosecutions should not be judicially disturbed unless clearly contrary to manifest public interest.") (quotation omitted); *see also United States* v. *Fokker Servs. B.V.*, 818 F.3d 733, 742 (D.C. Cir. 2016) ("[T]he 'leave of court' authority gives no power to a district court to deny a prosecutor's Rule 48(a) motion to dismiss charges based on a disagreement with the prosecution's exercise of charging authority.").

Similarly, as Judge Ho recently explained, a district court's decision to grant a Rule 48(a) motion does not amount to an "opinion as to the merits of the case or whether the prosecution . . . 'should' move forward," and the district court "has no authority to require that [the prosecution] continue." *United States* v. *Adams*, 777 F. Supp. 3d 185, 237 (S.D.N.Y. 2025). The DOJ "may elect to eschew or discontinue prosecutions for any of a number of reasons," and "[r]arely will the judiciary overrule the Executive Branch's exercise of these prosecutorial decisions." *Blaszczak*, 56 F.4th at 238. Because a district court's discretion under Rule 48(a) "involves the constitutional issue of the Separation of Powers Doctrine," the DOJ remains "presumptively the best judge of whether a pending prosecution should be terminated." *Id.* at 240 (quotation omitted).

As to the scope of the Court's limited discretion, "the primary purpose of [Rule 48(a)] is protection of a defendant's rights." *United States* v. *Salinas*, 693 F.2d 348, 351 (5th Cir. 1982). The Supreme Court has recognized that "[t]he principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Rinaldi* v. *United States*, 434 U.S. 22, 29 n.15 (1977) (citation omitted); *see, e.g.*, *Salinas*, 693 F.2d at 353 (finding that the Government's "true reason for dismissal was in derogation of defendant Salinas' rights"). For this reason, "it appears that no appellate court has upheld a denial of a motion to dismiss, *where the defendant has consented to the dismissal*, grounded on a finding of 'bad faith' or action 'contrary to the public interest' alone." *United States* v. *KPMG LLP*, 2007 WL 541956, at *6 (S.D.N.Y. Feb. 15, 2007) (emphasis added) (citation omitted). Here, the DOJ has moved to dismiss the Indictment "with prejudice" and with consent of the Adani DOJ Defendants, and so there is no prospect of prosecutorial harassment. *See* DOJ Action, Dkt. No. 23.

The DOJ's decision reflects its careful consideration of the Indictment's legal and factual weaknesses. The DOJ seeks to dismiss the Indictment after months of

detailed and extensive communications and meetings with counsel for the Adani DOJ Defendants regarding the law and facts governing this case—including numerous written submissions and oral presentations by counsel, the production of documents, and the consideration of reports prepared by prominent experts in the United States and India. Those submissions included: (i) a 118-page letter submission to DOJ, accompanied by a nine-page cover letter and approximately 200 pages of expert reports by a securities law professor at Harvard Law School, a former SEC Commissioner and Acting Chairman, a former Chief Justice of India, and a former Chairperson of the Central Electricity Authority in India and Member of the Central Electricity Regulatory Commission, (ii) a 12-page supplemental submission, (iii) a 95-page slide deck presented in February 2026, and (iv) an additional 35-page slide deck presented in April 2026. In total, the Adani DOJ Defendants submitted nearly 500 pages of facts, law, expert testimony, and argument to the DOJ between February 3, 2026 and April 17, 2026. As explained in those submissions, the Indictment suffers from four primary flaws.

*First*, the predominantly foreign aspects of this case place it beyond the reach of U.S. law because there was no relevant domestic transaction as required by *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247, 267 (2010). The underlying transactions in this case were conducted solely by non-U.S.-based issuers and lenders to fund renewable energy projects in India. All offering documents in connection with the 2021 and 2024 bond offerings were drafted, reviewed, and approved outside the United States, and both offerings were governed by English law. For Section 10(b) to apply to a transaction, that transaction must, at the very least, involve the transfer of title "within the United States" or parties that "incur[] irrevocable liability [to buy or sell the security] within the United States." *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). Here, in both the 2021 and 2024 bond offerings, Indian issuers sold bonds outside the United States to initial purchasers, which were all non-U.S. banks. To the extent that the initial purchasers eventually sold some of the notes to U.S. QIBs in secondary transactions, the non-U.S. issuers were not a party to any of those transactions. Moreover, even if a domestic transaction occurred (it did not), the alleged conduct was nevertheless "so predominantly foreign as to be impermissibly extraterritorial." *Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014).

*Second*, under settled Second Circuit law, none of the challenged statements is legally actionable because statements regarding Adani Green's compliance efforts and anti-bribery and anti-corruption policies were puffery. In Adani Green's annual reports,

the 2021 and 2024 Offering Circulars, the 2021 and 2023 Facility Agreements, and other public disclosures, Adani Green described the company's aspirations to implement strong internal risk management procedures and touted its anti-bribery and anti-corruption policies. It is hornbook law that such generic statements, which contain no concrete benchmarks or measurable standards, are "too general to cause a reasonable investor to rely upon them." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (internal quotation marks and citation omitted).[3] The Indictment also asserts that Adani Green's vague "assurances" about its anti-bribery practices in its offering circulars and annual reports were "false and misleading." Ind. ¶¶ 93, 111. But the Second Circuit has made clear that reasonable investors do not interpret such cautionary language "as representations of satisfactory compliance," since it "suggests caution (rather than confidence)." *Singh*, 918 F.3d at 63-64; *see also Bos. Ret. Sys.* v. *Telefonaktiebolaget LM Ericsson*, 2024 WL 4023842, at *4 (2d Cir. Sep. 3, 2024) (explaining that generalized statements about ethics and compliance contain "no such specificity that would transform any of [these] generalized statements from mere puffery to an actionable material misrepresentation" and that an explicit warning that the company "may fail to comply with [its] corporate governance standards" apprises investors of the risk of imperfect compliance).

*Third*, the Indictment fails to point to sufficient involvement in the alleged misstatements on the part of any of the Adani DOJ Defendants for Rule 10b-5 liability to attach under *Janus Capital Group* v. *First Derivative Traders*, 564 U.S. 135, 141 (2011).

---

[3] *See also Plumbers & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021) (stating that "[g]eneral declarations about the importance of acting lawfully and with integrity" cannot form the basis of a securities fraud claim) (citation omitted); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) (explaining that "[v]ague positive statements regarding a corporate entity's risk management strategy . . . are precisely the type of puffery that this and other circuits have consistently held to be inactionable") (citation and internal quotation marks omitted); *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'") (citation omitted); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (finding that the statement "[we] set the standard for integrity" was puffery) (internal quotation marks omitted); *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 468 (E.D.N.Y. 2020) (Garaufis, J.) (finding a simple, generic assertion about the success of a compliance task force is mere puffery), *aff'd*, 828 F. App'x 747 (2d Cir. 2020).

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (63 of 142)



To be the maker of any given statement—as is necessary to sustain a Rule 10b-5 claim—one "must have *actually exercised* control over" the statement. *Colbert* v. *Rio Tinto PLC*, 2019 WL 10960490, at *6 (S.D.N.Y. July 29, 2019) (emphasis added) (quoting *Glickenhaus & Co.* v. *Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015)) (internal quotation marks omitted). Gautam Adani did not "make" any challenged statement because there is no evidence that he reviewed, approved, or even was aware of such statements. As Chairman of a sprawling and diverse conglomerate of multiple businesses, Gautam Adani was far removed from subsidiaries' day-to-day efforts to raise capital, and there is no evidence that he exercised control over even one challenged statement. The Indictment fails to attribute any specific alleged misstatement to Sagar Adani and Vneet Jaain and does not describe any other relevant indicia of control over any alleged misstatement.

*Finally*, the DOJ would not be able to prove the alleged bribery in India that underpins all the charges. In meetings with the DOJ, counsel presented expert evidence from a former Chairperson of the Central Electricity Authority in India and Member of the Central Electricity Regulatory Commission, demonstrating that the allegedly illegal payments supposedly took place at or around the same time as documented, lawful, and transparent price reductions that Adani Green and Azure Power Global Ltd. ("Azure") indisputably provided to incentivize Indian state power companies to sign solar energy contracts. The expert report explained that those price reductions were ordinary, lawful concessions that Adani Green offered to Indian state government power agencies to incentivize them to finalize these energy deals. The primary evidence in the Indictment appears to have been gathered from Azure, Adani Green's competitor. But Azure is a troubled company, with a history of alleged misconduct and witnesses who have limited, if any, firsthand knowledge of material facts and are of dubious credibility.

Accordingly, the DOJ now acts within its considerable discretion in moving for dismissal.

**2. Pending Consent Judgments in the SEC Action**

As explained in their April 7, 2026 pre-motion conference letter, a copy of which is attached here, the Adani SEC Defendants believe that, for multiple, independent reasons, the Complaint fails as a matter of law. On May 14, 2026, the SEC filed a consent motion requesting that this Court approve proposed Consent Judgments it had executed with each of the Adani SEC Defendants following extensive negotiations. SEC Action, Dkt. 34; *see also* SEC Action Dkt. 34-1, Dkt. 34-2. In those proposed Consent Judgments, Gautam Adani and Sagar Adani agreed to pay civil penalties of $6,000,000 and $12,000,000, respectively, and to be enjoined from certain future U.S. securities law violations, among other settlement commitments. SEC Action, Dkt. 34 at 1. On May 30, 2026, the SEC filed revised proposed Consent Judgments, which it modified to align with the SEC's recent rescission of Rule 202.5(e), which previously required defendants to agree not to publicly deny complaint allegations as a condition of settlement. SEC Action, Dkt. 37.

District courts review proposed SEC consent judgments to confirm they are "fair and reasonable" and, where injunctive relief is sought, must ensure that the "public interest would not be disserved." *SEC* v. *Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 294 (2d Cir. 2014) (citation and internal quotation marks omitted). When evaluating a proposed consent judgment for fairness and reasonableness, a court assesses (1) the consent judgment's "basic legality," (2) whether the proposed terms and enforcement mechanisms are "clear," (3) whether the consent judgment resolves "the actual claims" at issue, and (4) whether there is a taint of "improper collusion or corruption." *Id.* at 294-95 (citations omitted). Because the court's "primary focus" is to "ensur[e] the consent decree is procedurally proper," it must "tak[e] care not to infringe on the S.E.C.'s discretionary authority to settle on a particular set of terms." *Id.* at 295; *see also SEC* v. *Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 168 (2d Cir. 2012) ("We are bound in such matters to give deference to an executive agency's assessment of the public interest. . . . This does not mean that a court must necessarily rubber stamp all arguments made by such an agency. It does mean at least that a court should not reject the agency's assessment without substantial reason for doing so."); *SEC* v. *Caledonian Bank Ltd.*, 317 F.R.D. 358, 369, 374 (S.D.N.Y. 2016) (emphasizing courts' limited "circumscribed" discretion to deny consensual settlement agreements with the SEC) (citation omitted).

Here, the Consent Judgments clearly satisfy these factors because the proposed final judgments "are legal" and consistent with final judgments submitted and

approved in hundreds of prior SEC actions; the "terms and enforcement mechanisms are clear"; those terms fully resolve the allegations in the Complaint; and they reflect arm's-length negotiations, as they arose from extensive dialogue, substantive engagement, and negotiations between the SEC staff and counsel for the Adani SEC Defendants. SEC Action, Dkt. 34 at 2. Nor do the respective injunctions "disserve the public interest," because they require the Adani SEC Defendants to comply with relevant U.S. securities laws. *Id.*

* * *

For the foregoing reasons, Defendants respectfully request that this Court grant the pending motion to dismiss the Indictment with prejudice and enter the proposed Consent Judgments in the SEC Action. If the Court has questions about the pending resolutions of these cases, Defendants stand ready to respond to those questions in writing or at a hearing.[4]

Respectfully,

*/s/ Andrey Spektor*
Andrey Spektor
NORTON ROSE
FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 318-3000

*Counsel for Vneet S. Jaain*

*/s/ Timothy D. Sini*
Timothy D. Sini
NIXON PEABODY LLP
55 West 46th Street
New York, NY 10036
(212) 940-3000

*Counsel for Sagar R. Adani*

Robert J. Giuffra, Jr.
Nicolas Bourtin
Suhana S. Han
Andrew J. DeFilippis
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Gautam Adani*

[4] To the extent that the Court wishes to schedule a hearing, Robert J. Giuffra, Jr., counsel for Gautam Adani, is lead counsel in an ICC arbitration outside the United States from June 25 to July 2.

SULLIVAN & CROMWELL LLP

NIXON PEABODY

Hecker Fink LLP

April 7, 2026

Via ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *SEC* v. *Adani et al.*, No. 24-cv-08080-NGG-JRC (E.D.N.Y.)

Dear Judge Garaufis:

On behalf of Defendants Gautam Adani and Sagar Adani, and pursuant to Rules IV(A)(2) and IV(A)(3) of Your Honor's Individual Rules, we write in connection with Defendants' upcoming motion to dismiss.

On November 20, 2024, Plaintiff Securities and Exchange Commission filed the Complaint (ECF No. 1) against Defendants, alleging securities fraud under the Securities Act of 1933 and Securities Exchange Act of 1934. On January 30, 2026, the parties stipulated to a schedule for Defendants' motion to dismiss, which the Court so-ordered on the same day. (ECF No. 25.) Defendants' motion to dismiss is due on April 30, 2026, the SEC's opposition is due no later than June 29, 2026, and Defendants' reply is due no later than August 13, 2026.

The allegations in the Complaint can be summarized briefly.[1] In September 2021, Adani Green, which is not a U.S. registrant, conducted a $750 million bond offering

---

[1] The defined terms "Adani Green," "Offering," "Notes" and "Subscription Agreement" have the same meaning as in the Complaint. (*See* Compl. ¶¶ 1, 3, 116.) The Complaint defines "Preliminary Offering Circular" together with "Final Offering Circular" as the "Offering Circulars," but also refers to a single "Offering Circular." (*See id.* ¶¶ 96, 98, 104.) For simplicity, we also refer to it as the "Offering Circular."

pursuant to SEC Rule 144A and SEC Regulation S, which are registration exemptions for private resales to qualified institutional buyers ("QIBs") and for non-U.S. sales, respectively. (Compl. ¶¶ 94 & n.2, 18, 33, 127.) Adani Green sold all of the Notes from the Offering outside the United States, via a Subscription Agreement, to non-U.S. underwriters, who later resold the Notes to QIBs. (*Id.* ¶ 116.) A fraction of those resales—in transactions to which Adani Green was *not* a party—are alleged to have been made to "investors in the United States." (*Id.* ¶ 127.)

The SEC claims that certain general ESG and anti-bribery statements in the Offering Circular and Subscription Agreement were materially false and misleading because Defendants failed to disclose an alleged scheme to bribe Indian state government officials in India. (*Id.* ¶¶ 89, 101-26.) Because the SEC could not charge Defendants under the Foreign Corrupt Practices Act, *see* 15 U.S.C. § 78dd-1(a), it instead recast its charges as a securities fraud case. Although not relevant to this motion, Defendants dispute that there is any credible evidence supporting the purported bribery scheme. Notably, the SEC does not allege that there were any investor losses, and there were none. The bonds have matured, and Adani Green repaid all principal and interest in full to investors in 2024.

For multiple, independent reasons, the SEC's Complaint fails as a matter of settled law.

## I. MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

At the threshold, this Court should dismiss the claims against Defendants under Rule 12(b)(2) for lack of personal jurisdiction. As relevant here, the SEC must plead that Defendants had sufficient "minimum contacts" with the United States—that is, they "purposefully directed" their activities at the United States—and that the claims against them arose out of those activities. *Gucci Am., Inc.* v. *Weixing Li*, 768 F.3d 122, 136 (2d Cir. 2014) (internal quotation marks and citation omitted); *see also Fuld* v. *Palestine Liberation Org.*, 606 U.S. 1, 16 (2025) (holding that "a more flexible jurisdictional inquiry" applies under the Fifth Amendment). With respect to Gautam Adani, the Complaint does not come close. As Chairman of India's largest integrated infrastructure group, Gautam Adani was not involved in Adani Green's Offering. Fatally, the Complaint does not allege that Gautam Adani authorized the issuance of the bonds or otherwise personally directed *any* relevant conduct at the United States.

Instead, the Complaint impermissibly relies on Gautam Adani's position as Chairman of Adani Green and his membership on its Management Committee. (Compl.

¶¶ 15, 30.) But personal jurisdiction must be predicated on "his activities," not those of a company. *Gucci*, 768 F.3d at 136 (internal quotation marks omitted). As such, the alleged conduct of Adani Green's Management Committee, including that it "reviewed and approved" the Offering Circular (*see* Compl. ¶¶ 92-100), is not sufficient to establish personal jurisdiction over Gautam Adani. *See SEC* v. *Sharef*, 924 F. Supp. 2d 539, 545 n.52 (S.D.N.Y. 2013) ("Jurisdiction over the representative of a corporation may not be predicated on jurisdiction over the corporation itself . . . .") (internal quotation marks and citation omitted). In fact, Gautam Adani did not attend a single Management Committee meeting of Adani Green from 2020 to 2024 at which the Offering or any statement made in the Offering Circular was discussed or approved, and he did not otherwise approve the Offering or any statement made in the Offering Circular.

Similarly, the Complaint's general allegations (Compl. ¶¶ 16, 95, 112, 117) that Sagar Adani was authorized to take action with respect to the Offering documents, chaired certain Adani Green committees, and received drafts of the Subscription Agreement purport to show a connection to the challenged statements that is too attenuated to demonstrate purposeful availment of a U.S. forum. The Complaint fails to tie Sagar Adani to a single allegedly false or misleading statement, much less one directed at U.S. investors.

## II. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Beyond not establishing personal jurisdiction over either Gautam or Sagar Adani, the Complaint fails to state a claim and must be dismissed under Rule 12(b)(6).

### A. The SEC's Claims Are Impermissibly Extraterritorial.

As the Supreme Court has made clear, Section 10(b) and Rule 10b-5 do not apply extraterritorially. *Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010). Thus, to invoke Section 10(b), the SEC must plausibly allege a "domestic transaction[]" involving the Notes. *Id.* at 267. In the Second Circuit, the SEC must plead that "irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). The SEC has not done so. The Complaint claims that "Adani Green sold at least $175 million [in] Notes to investors in the United States." (Compl. ¶ 127.) But that allegation says nothing about where irrevocable liability was incurred. The mere fact, taken as true, that some downstream investors were located "in the United States" is "irrelevant" to this inquiry. *Loginovskaya* v. *Batratchenko*, 764 F.3d 266, 274 (2d Cir. 2014) (citation

omitted). Relatedly, the Complaint alleges that the Notes were "deposited with the Depository Trust Company ('DTC')[,]" and that "title to the Notes [was] registered in the name of Cede & Co. . . . as nominee for DTC . . . . in New York." (Compl. ¶ 129.) Writing for the Second Circuit, Your Honor "reject[ed] [the] argument that a securities transaction is 'domestic' . . . if it settles through the DTC." *In re Petrobras Sec.*, 862 F.3d 250, 272 n.24 (2d Cir. 2017).

Moreover, a domestic transaction alone "would not suffice" if, as the Complaint alleges, there is a "dominance of . . . foreign elements." *Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 216-17 (2d Cir. 2014) (emphasis omitted). The SEC's claims here solely involve Indian Defendants, an Indian issuer, securities not registered with the SEC and not traded on any U.S. exchange, and underlying conduct alleged to have occurred exclusively in India. (*See, e.g.*, Compl. ¶¶ 15-16, 18, 71, 94.[2]) Tellingly, the Complaint does not allege that the underwriters who purchased the Notes from Adani Green were U.S. institutions (they were not), or that the Subscription Agreement underlying the purchases was governed by U.S. law (it was not). (*See id.* ¶ 116.) This case is thus conclusively beyond the reach of the U.S. securities laws. Indeed, we are aware of just one other litigated case brought by the SEC challenging a Rule 144A offering, which, unlike this one, involved a U.S. issuer and, in any event, ended with no finding of liability.[3]

**B. None of the Alleged Misstatements Is Actionable.**

The Complaint also challenges statements that the Second Circuit has repeatedly held are inactionable as a matter of law. These include statements about Adani Green's ESG and anti-bribery commitments, reputation and competitive strengths, and risk factor disclosures acknowledging potential exposure to anti-corruption laws. (*See* Compl. ¶¶ 104-05, 108-15.) In this Circuit, it is "well-established" that aspirational, "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery.'" *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173,

---

2 The alleged bribery scheme relates to a solar energy project in India for the provision of renewable power in India. There is no allegation that any U.S. company bid on the project, or that any U.S. customer purchased energy in the project. In fact, there was no such U.S. involvement.

3 *See SEC* v. *Volkswagen AG et al.*, No. 19-cv-01391 (N.D. Cal. 2019).

183 (2d Cir. 2014) (citation omitted). To be material, a statement "must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *Id.* at 185. That is especially true where, as in this case, the only U.S. purchasers of the Notes were a limited number of sophisticated QIBs, which must own and invest at least $100 million in securities. Here, the general ESG-related statements—such as that "Adani Green's major objectives . . . included . . . 'to integrate Sustainability and ESG . . . aspects into [its] business'" and about adopting an "ESG Framework"—provided no such concrete, measurable benchmarks. (*See* Compl. ¶¶ 108-10.)

The Second Circuit has repeatedly rejected similar statements as inactionable puffery. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) ("Vague positive statements regarding . . . risk management strategy . . . are precisely the type of puffery that . . . [is] inactionable.") (internal quotation marks and citation omitted). The same is true of the challenged statements about competitive strengths, such as that "[Adani Green] benefit[s] from the support, vision, resources and experience of Adani Group . . . [and its] strong track record of executing large-scale projects." (Compl. ¶ 115.) These vague claims are inactionable. *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (finding reputational statements "so general that a reasonable investor would not depend on [them] as a guarantee that [the company] would never take a step that might adversely affect its reputation").

Similarly, the challenged risk factor disclosures, such as that Adani Green's "employees might take actions that could expose us to liability under anti-bribery laws," are inactionable. (Compl. ¶ 104 (emphasis omitted).) Indeed, those disclosures "expressly cautioned" that compliance measures could fall short and, therefore, could not have been misleading, let alone material. *Bos. Ret. Sys.* v. *Telefonaktiebolaget LM Ericsson*, 2024 WL 4023842, at *3-4 (2d Cir. Sep. 3, 2024) (company's "generalized statements about ethics and compliance" not actionable because of their generality and cautionary language disclaiming "perfect compliance") (internal quotation marks and citation omitted).

### C. Defendants' Lack of Involvement in the Offering Bars the SEC's Claims Against Them.

Nor can the SEC show that Defendants were responsible for the challenged statements. Under *Janus Capital Group* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011), Defendants "must have *actually exercised* control over" a challenged statement in order for them to have "made" it and thus be held liable for such a statement. *Colbert* v.

*Rio Tinto PLC*, 2019 WL 10960490, at *6 (S.D.N.Y. July 29, 2019) (emphasis added and citation omitted). The Complaint contains no plausible allegation that Gautam Adani was involved in drafting, reviewing, or approving any document containing any alleged misstatement. Indeed, the SEC does not allege that Gautam Adani even knew these statements were being made. Although the Complaint alleges that the Adani Green Management Committee approved versions of the Offering Circular (*see* Compl. ¶¶ 96, 98, 100), the SEC fails to allege (because it cannot) that Gautam Adani attended the relevant meetings or approved the statements in the Offering Circular. Because there are no allegations tying him to any alleged misstatement, the SEC's claims against Gautam Adani fail as a matter of law. *See Noto* v. *22nd Century Grp., Inc.*, 35 F.4th 95, 104 (2d Cir. 2022) (affirming dismissal of civil securities claims on *Janus* grounds where "[t]he complaint d[id] not adequately allege that [the defendant] directly wrote the [challenged] articles, controlled what the authors put into the articles, or even saw them before their publication"). And any argument that he had "ultimate authority" over the statements by virtue of his position with Adani Green similarly fails. *See Xu* v. *Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 362 (S.D.N.Y. 2022) (high-ranking position within a company does not, standing alone, confer maker status).

The allegations against Sagar Adani are also deficient. Even if "multiple drafts" of the Offering Circular "were provided to [him]" (Compl. ¶ 117), these allegations do not tie him to specific misstatements, much less show that he had "ultimate authority" over their content, *Janus*, 564 U.S. at 142.

For similar reasons, the SEC fails to state a claim under Rule 10b-5(a) and (c)'s scheme liability provisions. Under those provisions, Defendants must have "(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *SEC* v. *Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 478 (S.D.N.Y. 2023) (internal quotation marks and citation omitted). In this Circuit, scheme liability requires the SEC to plead "something extra" beyond mere misstatements. *SEC* v. *Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022). Here, the SEC relies merely on misstatements. That fails. As this Court explained in *Eden Alpha CI LLP* v. *Polished.com Inc.*, "where the core misconduct alleged is in fact a misstatement, it is improper to impose liability by designating the alleged fraud a manipulative device rather than a misstatement." 763 F. Supp. 3d 270, 317 (Garaufis, J.) (internal quotation marks and citation omitted and alteration accepted).

The SEC also fails to adequately plead that Defendants acted with the requisite intent. Besides conclusory allegations (*see* Compl. ¶ 100), the SEC makes no plausible allegation that Defendants acted with knowledge or recklessness, *see SEC* v. *Hwang*, 692 F. Supp. 3d 362, 377 (S.D.N.Y. 2023), or aided and abetted any violation. Indeed, the SEC has not even sued the alleged primary violator, Adani Green. And the SEC's negligence-based theories brought under Sections 17(a)(2) and (a)(3) fare no better. The SEC alleges no facts demonstrating that Defendants failed to use "the degree of care that a reasonably careful person would use under like circumstances" with respect to the Offering. *SEC* v. *Laura*, 680 F. Supp. 3d 204, 231 (E.D.N.Y. 2023) (internal quotation marks and citation omitted).

* * *

For the foregoing reasons, Defendants will seek dismissal of the Complaint by April 30, 2026, and stand ready to attend a pre-motion conference if the Court wishes to schedule one.

Respectfully,



Robert J. Giuffra, Jr.
Nicolas Bourtin
Suhana S. Han
James M. McDonald
Andrew J. DeFilippis
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Gautam Adani*

*/s/ Timothy D. Sini*
Timothy D. Sini
NIXON PEABODY LLP
55 West 46th Street
New York, NY 10036
(212) 940-3000

*/s/ Sean Hecker*
Sean Hecker
HECKER FINK LLP
350 Fifth Avenue
New York, NY 10118
(212) 763-0883

*Counsel for Sagar R. Adani*

**U.S. Department of Justice**

July 4, 2026

By ECF

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Gautam S. Adani et al.
Criminal Docket No. 24-433 (NGG)

In its Order dated June 26, the Court directed the Department of Justice to provide the bases for seeking dismissal with prejudice of all charges against all defendants in this case. The Department responds as follows.

I. Judicial Inquisitions Into the Bases for Dismissal with Prejudice Will Tend to Cause Serious Unintended Consequences and Trigger Constitutional Concerns.

The June 26 Order stated that the Department's dismissal motion was "terse, bland, and conclusory." Fair, but there are a host of reasons—both legal and pragmatic—why the Department's dismissal motions are typically terse. Although perhaps not imminently apparent, demanding more detailed explanations threatens a variety of harms to all involved, including the Court, and raises serious constitutional concerns.

A. Judicial Inquisitions Hurt Those Facing Criminal Charges.

Demanding the rationales for dismissal will hurt defendants—not just the defendants here, but untold other defendants in future cases—by potentially chilling the Department from seeking dismissal of criminal charges it determines are not in the interests of justice.

Charges are often dropped because the evidence is weaker than expected, which can happen for any number of reasons, often implicating information that would reveal a cooperating witness's identity, something that is privileged, or something that is sensitive or even classified. Sometimes the evidence has not changed at all but is instead reevaluated—exactly what a prosecutor should be encouraged to do. Sometimes the legal theory isn't as strong as initially believed, either because of developments in the law or reevaluations of existing law. Sometimes a case simply does not merit the time and resources as other cases, but the office does not want to undermine deterrence by publicly suggesting a larger shift in priorities. Sometimes the office might have staffing issues. Sometimes

charges against a set of defendants should be dismissed, but not against other defendants, and the government would have to reveal internal evaluations to differentiate the two. Sometimes dismissal is for some combination of these reasons, or other reasons altogether.

Further, whatever reason is given, defendants in other cases will start claiming—wrongly or rightly—that their case meets those same considerations, too, resulting in a wave of requests for dismissal in other cases, consuming significant Department resources.

Requiring the Department to explain to the Court why a case is not worthy of further resources thus almost certainly makes it less likely the Department seeks dismissal in future cases. If that happens, it will be to the detriment of criminal defendants. From their perspective, at worst, the prosecutors will not seek to dismiss at all, lest they have to expose weaknesses or internal debates to the Court. At best, the defendants' dismissals are held hostage while the Court conducts an inquisition. Those pending criminal charges impose significant restraints not only on defendants who have appeared and are thus subject to confinement or the restrictions of pretrial release, but also on defendants who have not appeared: those defendants are typically barred from traveling internationally, and they face significant familial and business strains while remaining under a cloud of suspicion. Those are expected and reasonable limitations on a defendant when there is an indictment—but there is no conceivable basis for continuing those restrictions when the Department wishes to dismiss the charges with prejudice, and the defendants agree.

Either way, defendants are the primary ones who suffer when Courts demand explanations for dismissal.

B. Demanding the Reasons for Dropping Charges Will Expose Internal Department Debates, Which Are Almost Always Privileged.

Judicial inquisitions into the bases for dismissal will also expose privileged internal debates. Some Department lawyers may believe a case is worthy of continued pursuit, either in whole or in part; others may disagree. That is natural, and the internal debate is helpful and should be encouraged. But judicial inquisitions will chill those debates. That hurts defendants, as explained above, because it will discourage prosecutors from discussing whether to seek dismissal. But it also injures the Department and violates the separation of powers.

The ability to freely discuss the bases for making prosecutorial decisions—without those grounds being revealed outside the Executive Branch—is so important that it is recognized as an inherent aspect of Article II of the Constitution. The Supreme Court has held that executive privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." United States v. Nixon, 418 U.S. 683, 708 (1974). Although there is no "absolute, unqualified Presidential privilege" to prevent the disclosure of all privileged information, id. at 706, criminal charging and dismissal decisions fall in the heartland of information that the Executive Branch must be able to protect. The deliberative process component of executive privilege encompasses "advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated"—i.e., opinions and statements often made in the course of bringing and dropping criminal prosecutions. Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001).

As the Supreme Court has explained, "the valid need for protection" of such communications is "too plain to require further discussion." Nixon, 418 U.S. at 705. Forcing prosecutors to disclose

their deliberative rationale could compromise other ongoing investigations or reveal sensitive information. "[T]he Executive's ability to enforce the law would be seriously impaired … if the Executive were forced to disclose sensitive information on case investigations and strategy from open enforcement files." Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101, 117–18 (1984). The Executive Branch accordingly has an Article II right to avoid disclosing "unpublished details of allegations against particular individuals and details that would reveal confidential sources, and investigative techniques and methods." Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act, 10 Op. O.L.C. 68, 77 (1986).

The only thing that can limit this Article II authority is another constitutional provision, not a statute or rule of criminal procedure. "[I]t is entirely clear," therefore, that the legal reasoning underlying a refusal to prosecute "cannot be the subject of judicial review," ICC v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 283 (1987), unless there is a basis to conclude there is a competing constitutional right, such a defendant's due process rights.

But all of this is lost when a Court launches an inquisition into the internal debates and reasoning of the Department. This would be akin to the Department demanding details about the underlying reasons why judges on an appellate panel denied discretionary relief with only a passing sentence. Those judicial discussions are protected by Article III. A rule of procedure—whether it addresses dismissals or subpoenas—can never trump constitutional privilege, and attempts to do so risk chilling honest discussions.

Relatedly, these judicial inquisitions put certain Department officials in an untenable position. The U.S. Attorney may feel compelled to defend the initial decision to bring a case, even if it was done by a predecessor, because the line attorneys who worked on it are still in the office, or because those attorneys were told by former leadership to bring the case. But the U.S. Attorney also answers to the Office of the Deputy Attorney General, which may view a case in a new and clearer light. When forced to respond to a judicial inquisition, should the U.S. Attorney come in and criticize the case his line attorneys brought, in accordance with the direction of his supervisors? Should he defend it, in accordance with the preferences of the attorneys who brought the case? Oftentimes the only workable solution is a "terse, bland, and conclusory" dismissal.[1]

Courts should recognize and accept those "terse" statements as the product of extensive internal review, rather than assuming irregularity and launching judicial inquisitions.

C. Judicial Inquisitions Risk Giving the Impression the Court Is Performing Executive Functions.

Forcing an explanation for dismissal may also reflect poorly upon the Court by drawing it into an exclusively Executive determination.

Rule 48(a) provides that "[t]he government may, with leave of court, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a). The Supreme Court has held that "[t]he principal object of the 'leave of court' requirement" is "to protect a defendant against prosecutorial harassment."

[1] For that reason, and also because I was the final and sole decisionmaker to seek dismissal of the charges here, I have not asked the U.S. Attorney or any other attorney to sign this submission. Mr. Nocella and his team have been exceedingly professional and supportive throughout this process.

Rinaldi v. United States, 434 U.S. 22, 29 n.15 (1977); see United States v. HSBC Bank USA, N.A., 863 F.3d 125, 140–41 (2d Cir. 2017); see also Blackledge v. Perry, 417 U.S. 21, 25–27 (1974) (discussing prosecutorial vindictiveness as a potential due process violation). In other words, the proper role for the judiciary here is exceedingly narrow and focused on the defendant's constitutional rights. That makes sense given that, as discussed above, the Executive's bases for dismissal are privileged under the Constitution, meaning only another constitutional provision can possibly limit it.

Reading a broader "public interest" standard into Rule 48(a) so that the Court can grade or second-guess the prosecutorial discretion of the Executive would be unconstitutional under Article II of the Constitution. "Judicial supervision in this area … entails systemic costs of particular concern" given that the decision to pursue a prosecution turns on factors only a politically accountable branch can determine, like "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." Wayte v. United States, 470 U.S. 598, 607–08 (1985). "The Presidential power of prosecutorial discretion is rooted in Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause." In re Aiken County, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J.). Under our Constitution, "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." Nixon, 418 U.S. at 693. That includes the "indubitable" power to "direct that the criminal be prosecuted no further." Aiken County, 725 F.3d at 263 (Kavanaugh, J.); see Trump v. United States, 603 U.S. 593, 620 (2024) ("Investigation and prosecution of crimes is a quintessentially executive function. And the Executive Branch has exclusive authority and absolute discretion to decide which crimes to investigate and prosecute….") (cleaned up).

Thus, "settled constitutional understandings" provide that "authority over criminal charging decisions resides fundamentally with the Executive, without the involvement of—and without oversight power in—the Judiciary." United States v. Fokker Servs. B.V., 818 F.3d 733, 741 (D.C. Cir. 2016) (emphasis added). "[T]he Supreme Court has declined to construe Rule 48(a)'s 'leave of court' requirement to confer any substantial role for courts in the determination whether to dismiss charges," and accordingly a court should not deny the government's motion to dismiss "based on a disagreement with the prosecution's exercise of charging authority" or with the prosecution's determination that further proceedings "would not serve the public interest." Id. at 742-43.

Given all this, respectfully the Court's June 26 Order incorrectly frames the Rule 48(a) inquiry. It is not a "sunshine" provision requiring that information be provided simply for judicial interest or grading (notably, the June 26 Order does not cite any Second Circuit or Supreme Court case holding to the contrary). The Court cannot inquire into whether the basis for dismissal was "good enough." That is a determination entrusted exclusively to the Article II Executive. At most, in appropriate cases, the Court can inquire only into whether the ground for dismissal is among one of the very few disallowed grounds—primarily, whether dismissal would affect defendants' due process rights—but anything further will inevitably draw the Court into an Article II determination it lacks authority to make.

But even that narrow test is narrower still where the defendant does not oppose dismissal. A district court may deny an unopposed motion to dismiss, if at all, only in an extraordinary case where a rogue prosecutor appears to be acting without "the approval of the Justice Department." In re United States, 345 F.3d 450, 453–54 (7th Cir. 2003). The Second Circuit has likewise indicated that it may inquire into whether "the prosecutor appears motivated by bribery, animus towards the victim, or a

desire to attend a social event rather than [the] trial," i.e., indications of a prosecutor acting without authority. HSBC Bank, 863 F.3d at 141. That is not a substantive inquiry about the reasons for the Executive's dismissal, but rather to determine whether the prosecutor "is acting alone rather than at the direction or with the approval of the Justice Department." United States, 345 F.3d at 454. Of course, that concern does not exist when the dismissal is signed by senior Department leadership.

That ultra-narrow inquiry is further constricted—likely to the point of being foreclosed altogether—where dismissal is both unopposed *and* with prejudice. No game is possibly being played when all charges are dismissed with prejudice. The government isn't waiting for key defense evidence to grow stale. There can be no cat-and-mouse ploy to keep a defendant constantly under indictment. And there is not even the prospect of *future* related charges being held over the defendants' heads. In such cases, a Court's refusal to swiftly grant dismissal imposes far more injury on the defendants than anything the Department has done or could do.

* * *

This explains why the Department typically files short dismissal motions, which Courts typically accept without controversy.[2] That is even more obvious when dismissal is with prejudice, where there is no conceivable basis on which dismissal could injure the defendant.

## II. In a Limited Waiver of Privilege, the Department Will Explain Why the Charges Were Dropped.

As explained above, the rationales for dismissing the charges in this case are protected by privileges of a constitutional dimension. The Department is constitutionally entitled not to provide those bases, especially given that the charges here are sought to be dismissed with prejudice, and there is no conceivable countervailing constitutional interest held by any defendant in this case. Indeed, they all readily consent to dismissal.

The Court's June 26 Order suggests that granting dismissal based on the as-filed motion could be an abuse of discretion. That is wrong. Judges of this Court have routinely granted dismissals on similar or even shorter motions, as noted above. Further, as explained above, it is an encroachment on the separation of powers for the Court to demand further information about the dismissal, and it is likewise problematic to hold defendants' dismissals hostage while the Court questions an outcome all parties have agreed is appropriate and from which no party can possibly be harmed. In other words, respectfully, the only risk of committing an abuse of discretion would arise from launching an inquiry into a consent dismissal motion with prejudice, rather than simply granting it.

But because the Court has demanded an explanation, and because the dismissal motion has been pending for far too long, I am hereby granting a limited waiver of the relevant privileges to explain why I moved to dismiss all charges. The waiver extends only to the remarks in this filing and does not in any way extend to or imply any other waivers, either in this case or others.

---

[2] E.g., United States v. Al Malik Alshahhi, No. 21-cr-371 (BMC) (E.D.N.Y. Nov. 26, 2025) (Dkt. 397) ("The Department of Justice has determined that it will not commit further resources to the prosecution of the one remaining defendant in this case"); United States v. Sindzingre, No. 2:17-cr-464 (JS) (E.D.N.Y. Mar. 29, 2023) (Dkt. 41) (no rationale given at all for dismissal); United States v. Angwang, 20 Cr. 442 (EK) (E.D.N.Y. Jan. 13, 2023) (Dkt. 138).

I ardently strove for months to avoid criticizing the case publicly, which could inevitably come across as criticism of the line attorneys who worked on the case. Almost all of them have been professionals who should not have their work publicly criticized by Department leadership. And that is a key reason I insisted that we file a "terse, bland, and conclusory" dismissal motion. But the Court apparently views things differently and has demanded that we go down this alternative path.

A. Overlapping Bases for All Charges.

This white-collar case was indicted in late 2024 without first hearing from defense counsel. Before I began in the Office of the Deputy Attorney General in January 2026, I had never heard of any of the defendants in this case. Some of the defense counsel requested a meeting to discuss the case and why it should be dismissed. I made the decision to dismiss these charges after conducting numerous meetings with defense counsel (two of which featured a dozen-plus attorneys) and also separate meetings with only Department counsel, after reviewing hundreds of pages of materials prepared both by defense counsel and by Department counsel in response to questions I raised, and after conducting my own research and analysis.

The charges in this case can be put into two buckets: (a) the securities and related fraud charges against three defendants; and (b) the Foreign Corrupt Practices Act and related charges against the other five defendants. Both buckets share numerous important bases warranting dismissal, any one of which would have been sufficient but taken together made clear the entire case must be dismissed. The decision to seek dismissal was not a close call.

The overlapping bases are:

(1) This is a foreign case. The first two pages of the indictment tell the story: several **Indians** (with maybe a European or two) allegedly tried to bribe other **Indians** by paying the **Indian** government via complex **Indian** rebate programs to get **Indian** contracts to provide **Indian** electricity to **Indians** in **India**. Ctrl-F "India" in the indictment, and it'll show well over 200 hits. The United States pretending to be the world police can cause diplomatic strife and also wastes resources better spent on domestic concerns. India can better manage its internal systems than can prosecutors in Brooklyn and Washington.

(2) On that topic, India has investigated many of the allegations in this case and in several reports and decisions issued in 2026 has found no actionable misconduct. See attached documents from India, which I reviewed before filing the dismissal motion. So the country with by far the strongest interest here seems to have concluded nothing inappropriate happened.

(3) Not a single penny has ever been lost on the securities at issue. Two of the notes are fully paid back, and the other two notes are currently paid up, with no indication of any change ahead.

(4) The indictment was unsealed in the final days of the prior Administration, apparently as a "name and shame" designed to levy accusations without any realistic prospect of a trial ever occurring. Department leadership at the time was surely aware they were dropping a potential quagmire of a case into the lap of the incoming Administration, and perhaps that was an intentional choice.

(5) There would have been extraordinary proof problems in this case, not least because significant evidence and key witnesses are in India, which—as explained above—has found no actionable misconduct.

(6) The defendants have never appeared and probably never would. They are all foreign nationals who live abroad in locations that offer no reasonable prospect of arrest. That also means that, 18 months after indictment, no proceedings have taken place. There should have been no judicial concern about dismissing a case that has never proceeded past an indictment.

Any of these bases was enough to dismiss all charges. But there's more. As explained below, there were also charge-specific bases for dismissal.

B. Group A: Securities Charges against G. Adani, S. Adani, and Jaain.

Where to begin. The securities charges should never have been brought. They are failed FCPA claims (which could not be brought against these three particular defendants on these facts) that were spun into securities charges.

As explained above, the alleged misconduct in this case occurred almost entirely in India. That raised significant legal risks for the securities charges in particular given the jurisdictional limitations of the relevant securities laws. Setting aside securities traded on a domestic exchange, a transaction can qualify as "domestic" only if "either (1) the purchaser must have incurred irrevocable liability within the United States to take and pay for a security, or the seller must have incurred irrevocable liability within the United States to deliver a security, or (2) legal title to the security must have transferred in the United States." In re Petrobras Sec., 862 F.3d 250, 262 (2d Cir. 2017) (cleaned up). Neither of those happened here. The alleged bribery scheme was carried out by Indian nationals on behalf of an Indian company listed on the Indian stock exchange to Indian government officials for Indian contracts. The alleged false statements in securities filings were made outside the United States, and the securities were sold in the first instance to purchasers outside the United States. The limited connections to the United States would pose a substantial risk both at trial and on appeal. The cases I relied upon in forming that conclusion include: Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010); In re Petrobras Sec., 862 F.3d 250 (2d Cir. 2017); Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings, 763 F.3d 198 (2d Cir. 2014); Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60 (2d Cir. 2012).

Further, the legal theory for fraud here is so broad that it arguably turns any undisclosed corporate misconduct into criminal securities fraud. Of course, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014). And the allegedly false statements here consisted primarily—perhaps exclusively—of platitudes about following laws, not being bribers, and being upstanding. The Second Circuit has agreed that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to reply upon them." Boston Retirement Sys. v. Telefonaktiebolaget LM Ericsson, 2024 WL 4023842, at *3 (2d Cir. Sept. 3, 2024) (quotations and citations omitted). In fact, in the Boston Retirement System case, the Second Circuit focused in particular on whether a company's participation in a bribery scheme rendered its statements about the efficacy of its

compliance program materially misleading, and held that generalized statements about "the effectiveness of [a company's] compliance program" are "non-actionable expressions of puffery and corporate optimism that do not give rise to securities violations." Id. at *6.

Also, because the alleged "victims" here were some of the most sophisticated financial entities on Earth, the prosecution would likely have to prove not that any ordinary investor would have found the alleged misrepresentations material, but that these sophisticated investors would have found the alleged misrepresentations material. The financial instruments were first transferred to highly sophisticated foreign-owned underwriters, which in turn sold them to qualified institutional buyers ("QIBs"), which are super-majority foreign-owned and also extremely sophisticated. The QIBs then allegedly resold some portion to sophisticated U.S. investors. It would have been difficult to prove that those ultra-sophisticated investment entities were tricked by what were platitudes in the offering materials, let alone to the point of this being a criminal securities case. And even if those uber-sophisticated investment entities were misled, they ultimately never lost a penny, because the notes have all been repaid (or are still being repaid) in full.

Given all this, the allegations here would be appropriate for a civil resolution at the very most. The prior Administration brought a civil case based on the same facts. That case was settled earlier this year. Again, by that time I had already resolved to dismiss the securities charges no matter what. But given that there were no victims who suffered any losses, the resolution of that civil case made it even more obvious that there was no point in pursuing criminal securities charges for the same conduct. Even if the criminal case were to continue, no victim would stand to recover any restitution, because there were no losses to recover.

The Department should be credited for ending these criminal security charges before having to endure a likely loss on the merits, perhaps after years of trials and appeals (assuming there ever was a trial—an admittedly remote prospect). Again, for all the reasons above, these are the sorts of determinations that the Department should be entitled to keep privileged rather than bare for public inspection.

C. Group B: FCPA Charges Against Gupta, Cabanes, S. Agarwal, Malhotra, and R. Agarwal

Once I determined the security charges should be dropped, I turned to the FCPA charges. Before I could undertake a full review, however, a Department attorney unethically leaked to the media that the Department planned to dismiss the securities charges. Once that story broke, I was contacted by defense counsel for the FCPA defendants, contending they would oppose any dismissal of the securities charges if the FCPA charges were not also dismissed. Their professed opposition played no role in my decision to dismiss either set of the charges; that decision would be made based on the merits, not on whether it would prompt opposition or scrutiny. I continued my review of the FCPA charges and engaged in several meetings with defense counsel to discuss them.

It became clear that the FCPA charges must be dismissed because they do not satisfy the Blanche Memorandum, which was issued by Deputy Attorney General (now also Acting Attorney General) Todd Blanche on June 9, 2025. *See Guidelines for Investigations and Enforcement of the Foreign Corrupt Practices Act (FCPA)*. The Blanche Memorandum set a Department-wide policy that FCPA prosecutions, including those already pending, focus on "targeting enforcement actions against conduct that directly undermines U.S. national interests." In particular, the Blanche Memorandum directed prosecutors to focus on cases involving payments to drug cartels and transnational criminal

organizations, cases that safeguarded fair opportunities for U.S. companies, cases that advanced U.S. national security interests, and cases involving serious misconduct. As part of their considerations, "FCPA prosecutors should also consider the likelihood (or lack thereof) that an appropriate foreign law enforcement authority is willing and able to investigate and prosecute the same alleged misconduct."

But here, the alleged conduct did not involve criminal organizations, did not have any effect on U.S. companies, did not in any way implicate national security, was not egregious, and has been the subject of investigations in India. The alleged "payments" in this case were made by Indian nationals, working for Indian companies, to the Indian government, with no U.S. interests implicated in any way. The FCPA charges here therefore do not plausibly satisfy any of the bases given in the Blanche Memorandum for FCPA charges worthy of proceeding. Under the Blanche Memorandum, the FCPA charges should have been dismissed a year ago.

Further, it is entirely unclear that the prosecution could prove that the alleged payments in this case were not legitimate commercial transactions. The payments could be characterized as customer rebates, which are a common and acceptable commercial practice.

As for the tagalong obstruction charges, the indictment's theory makes little sense. The indictment (paragraph 76) alleges that some of the defendants who allegedly committed obstruction also hired extremely expensive law firms to conduct thorough investigations that implicated the most high-profile defendants while downplaying the role of lower-profile individuals. Not exactly the most obvious way to commit obstruction, to say the least.

D. Non-Considerations

There have been stories in the media about the Department's motion to dismiss the securities charges in this case. I assume the Court would never give credence to breathless reporting relying on anonymous sources. But in an abundance of caution, I address them here.

The current or former Department attorneys who unethically fed those stories have suggested that I sought dismissal of the securities charges at least in part because of some promise by those defendants to invest money in the United States. That is false. Before that topic first arose, I had already firmly concluded I would seek dismissal of the securities charges no matter what, because they were so indefensible. To put a finer point on it: I would have sought dismissal of the securities charges regardless of any mentions of investments, regardless of whether the civil case (or any other matter) was settled or otherwise resolved, regardless of whether the other defendants consented, and regardless of what leakers might try to spin up in the media.

Also, even setting that aside, it is risible to suggest that the Managing Partner of Sullivan & Cromwell, who is perhaps the most respected and experienced securities attorney in the country, would propose any kind of improper resolution, let alone one crafted in a meeting with over a dozen attorneys present, including from other law firms. In a pitch to have charges dismissed, it would have been entirely fair to point out that the defendants have been effectively frozen out of the United States and its financial system for 18 months because of the pending indictment, and also that they had publicly and expressly indicated a desire to invest in the United States even before the prior Administration publicly unveiled its name-and-shame indictment. But again, although such a factor would be entirely fair to consider, I had already resolved beforehand to dismiss the securities charges, and accordingly the mention of potential investments could not have played any role.

Some current or former Department attorneys may disagree with the decision to drop these charges. But it is improper and unethical to leak about the case and thereby attempt to affect its disposition before the Court. Whether to drop a prosecution is not a game—it is an important decision that affects people's lives. The debate should not be fought through the media in a proxy battle designed to influence the Court. In the end, however, the anonymous leakers stepped on their own landmine: the only thing they have achieved was the submission of this public rejoinder explaining in detail the numerous catastrophic flaws with their case.

* * *

The Constitution vests the prosecutorial power in the Executive, not the Judiciary. The Department should be commended for professing that a criminal case is unworthy of further resources, without having to publicly catalogue the reasons why. Thus, despite spending well over a hundred hours reviewing and debating this case, I insisted the dismissal motion be "terse, bland, and conclusory" to protect the interests of the Department, of the line attorneys who worked on the case, of the defendants here and in future cases, and of this Court, too, because providing an explanation of the reasons for dismissal gives the public the misimpression that the Court is authorized to undertake the exclusively Article II task of determining whether this prosecution should continue.

In short, there was absolutely nothing improper with the Department's as-filed dismissal motion, which has now been pending for six weeks, during which time the defendants have been held in limbo on charges that should have been dropped a year ago—or never brought in the first place. Nor was there anything improper about the underlying decision to dismiss these charges. It would, however, be a grave mistake to rely on media reports citing anonymous sources desperately hoping to give their flawed case one last gasp before it's buried.

FILED: July 4, 2026

Respectfully submitted,

/s/

R. TRENT MCCOTTER
Principal Associate Deputy Attorney General[3]

cc: Counsel of Record (by ECF)
Joseph Nocella (by E-mail)
Winston Paes (by E-mail)
Paul Schoeman (by E-mail)
Stephen Best (by E-mail)
Michael Kendall (by E-mail)
Iris Bennett & Patrick Linehan (by E-mail)

[3] As explained above, I have not asked the U.S. Attorney or any other attorney to sign this submission, given that (a) the dismissal decision was ultimately mine, and (b) the U.S. Attorney's office should not unnecessarily be put in the position of criticizing, even indirectly, the work of the line attorneys simply to justify the exercise of the Executive's prerogative power to dismiss these charges. I thank Mr. Nocella and his team for their professionalism.

सत्यमेव जयते

Fair Competition
For Greater Good

**COMPETITION COMMISSION OF INDIA**

**Case No. 36 of 2024**

***In Re:***

**Ravi Sharma** — **Informant**
C- 128, 2nd Floor
Lajpat Nagar – I
New Delhi – 110 024

**And**

**Adani Enterprises Ltd.** — **Opposite Party-1/OP-1**
Shantigram, Near Vaishnodevi Circle
SG Highway, Ahmedabad- 382421
Gujarat, INDIA

**M/s Adani Green Energy Four Limited** — **Opposite Party-2/OP-2**
4th floor-South Wing
Shantigram, SG Highway, Ahmedabad- 382421
Gujarat, INDIA

**Mr. Gautam S. Adani** — **Opposite Party-3/OP-3**
Adani House, near Mithakhali Crossing,
Navrangpura, Ahmedabad – 380 009

**Mr. Sagar R. Adani** — **Opposite Party-4/OP-4**
Shantigram, Near Vaishnodevi Circle
SG Highway, Ahmedabad- 382421
Gujarat, INDIA

**M/s Azure Power India Private Limited** — **Opposite Party-5/OP-5**
3rd Floor, Asset 301-304 & 307 World Mark 3, Aerocity
New Delhi – 110 037

**Solar Energy Corporation of India** — **Opposite Party-6/OP-6**
Block Tower 2, NBCC Tower Block B
East Kidwai Nagar Kidwai Nagar New Delhi – 110 023

**Andhra Pradesh Central Power Distribution Corporation Limited** — **Opposite Party-7/OP-7**
Beside Polytechnic College, ITI Road
Vijaywada, Krishna

Andhra Pradesh – 520 008

**Andhra Pradesh Eastern Power Distribution Company Limited** — **Opposite Party-8/OP-8**
P & T Colony,
Seethammadhara, Visakhapatnam
Andhra Pradesh - 530 013

**Andhra Pradesh Southern Power Distribution Company Limited** — **Opposite Party-9/OP-9**
19-13-65/A, Srinivaspuram
Tiruchanoor Road
Andhra Pradesh,
Tirupati – 517 501

**Government of Andhra Pradesh** — **Opposite Party-10/OP-10**
Energy Department
A.P. Secretariat
Velagapudi, Amravati
Andhra Pradesh – 522 237

**GRIDCO Limited** — **Opposite Party-11/OP-11**
Janpath Bhubaneshwar
Khurda Odisha – 751 002

**Tamil Nadu Generation and Distribution Corporation** — **Opposite Party-12/OP-12**
144, Anna Salai
Chennai - 600 002

**CORAM:**

**Ms. Ravneet Kaur**
**Chairperson**

**Mr. Anil Agrawal**
**Member**

**Ms. Sweta Kakkad**
**Member**

**Mr. Deepak Anurag**
**Member**

**Order under Section 26(2) of the Competition Act, 2002**

1. Information in the present matter was filed by Shri Ravi Sharma (‘**Informant**’), under Section 19(1)(a) of the Competition Act, 2002 (the ‘**Act**’), against Adani Enterprises Ltd. (‘**OP-1**’), Adani Green Energy Limited (‘**OP-2**’), Shri Gautam S. Adani (‘**OP-3**’), Shri Sagar R. Adani (‘**OP-4**’), Azure Power India Private Limited (‘**OP-5**’), Solar Energy Corporation of India Ltd. (‘**OP-6**’/‘**SECI**’), Andhra Pradesh Central Power Distribution Corporation Ltd. (‘**OP-7**’), Andhra Pradesh Eastern Power Distribution Company Limited (‘**OP-8**’), Andhra Pradesh Southern Power Distribution Company Limited (‘**OP-9**’), Government of Andhra Pradesh, Energy Department (‘**OP-10**’), GRIDCO Ltd. (‘**OP-11**’), and Tamil Nadu Generation and Distribution Corporation (‘**OP-12**’/‘**TANGEDCO**’), alleging contravention of the provisions of the Act.

2. In the Information, OP-1 to OP-4 are stated to be members of the Adani Group. It is stated that OP-1 is their flagship company owned by OP-3. OP-4 is the nephew of OP-3 and is an Executive Director in OP-2. OP-2 is a 100% subsidiary of OP-1 and is in the business of renewable energy. The Informant has stated that OP-1 and OP-2 collectively hold a substantial market share of approx. 16% of India’s total power generation capacity. OP-5 is stated to be a subsidiary of a United States (‘**US**’) based company and is also involved in the business of renewable energy generation. OP-6 is stated to be a company under the Ministry of New and Renewable Energy (‘**MNRE**’), Government of India, whose mission is, *inter alia*, to promote increase of renewable energy in India. OP-7 to OP-12 are stated to be State owned power distribution companies who have signed agreements to purchase power from OP-6.

3. It is stated that on 25.06.2019, OP-6 issued a Request for Selection (‘**RfS**’) document along with standard Power Purchase Agreement (‘**PPA**’/‘**PPAs**’) and Power Sales Agreement (‘**PSA**’/‘**PSAs**’) for selection of solar power developers for setting up of 7 GW ISTS connected Solar PV Power Plant linked with setting up of 2 GW (per annum) Solar Manufacturing Plant. Package A of the same included setting up of Solar Manufacturing Plants related to Cell (500 MW) and Modules (500 MW), while Package B included setting up of Solar Manufacturing Plants related to Ingots (500 MW) and Wafers (500 MW). Two Blocks were to be allocated under each package. The successful bidders were assured PPAs up to 2000 MW against 500 MW Solar Manufacturing Plants under Bidding Package A and

up to 1500 MW against 500 MW manufacturing capacity under Package B. It is alleged by the Informant that OP-6 has designed the RfS documents to favor top players like OP-1, OP-2 and OP-5 that if no bidders come forward for any of the bid capacity under aforesaid packages, OP-6 will automatically award remaining capacity to the successful bidders, through the 'Transferred Capacity' namely underbidding/undersubscribed capacity under either of the packages. The maximum ceiling under the RfS was ₹2.93 per kilowatt hour ('**KwH**') for 25 years. The last date of bid submission was 13.11.2019.

4. It is further stated that the techno-commercial bids were opened on 14.11.2019 and the financial bids were opened on 21.11.2019. 3 bidders qualified *namely,* OP-2, OP-5 and one Navayuga Engineering Co. Ltd. Thereafter, e-Reverse Auction was held on 22.11.2019 and pursuant to the same, Letter of Awards ('**LoAs**') dated 10.12.2019 were awarded to 2 successful bidders *viz.* OP-2 and OP-5 @ ₹2.92/KwH.

5. As per the Information, the LoA awarded to OP-2 was for cumulative capacity of 2GW towards manufacturing facilities and 8GW towards solar power projects, while the LoA awarded to OP-5 was for 1GW towards manufacturing facilities and 4GW towards solar power projects. It was a part of the Addendum to the LoAs that "*... in the event, for any reason, there is no willing Buying Utility(ies) to enter into a Power Supply Agreement ('PSA') and procure the power from SECI fully or in part, then to the extent of such quantum for which the Buying Utility(ies) are not forthcoming, the PPA shall not be entered into with ... and there shall not be any legal or financial implication to SECI in relation to such quantum including associated quantum of manufacturing facilities. ... Further, ... shall be entitled to sell power generated from solar power plants setup under the scheme to any party or exchange under intimation to SECI for the capacity for which capacity corresponding PSA(s) are not entered into with buying utilities.*"

6. With regard to specific clauses of the RfS and the entire chain of events subsequent to issue of RfS, the Informant has *inter-alia* alleged that: (a) RfS document was designed in a manner to ensure participation of only big players in the market; (b) RfS document was prepared in contravention of the Ministry of Power ('**MoP**') guidelines in as much that the said guidelines do not allow clubbing of solar power plants with solar manufacturing plants; (c) 'Green Shoe Option' was provided by OP-6 in contravention of MoP guidelines to favour top players like OP-1, OP-2 and OP-5; (d) LoAs and Addendum to LoAs were issued to OP-2 and OP-5; (e)

undertakings were given by OP-2 *vide* letter dated 08.06.2020 and by OP-5 *vide* letter dated 16.07.2020 to OP-6 stating that in case there is no buying utility willing to enter into a PSA with OP-6, they will continue to perform their obligations as per LoAs without creating any binding obligation on OP-6; (f) *Vide* letter dated 02.02.2021 and letter dated 18.02.2021. OP-2 and OP-5 respectively unilaterally reduced the quoted bid price to 2.54 kWh from 2.92 kWh against the spirit of MoP guidelines; (g) *Vide* letters dated 22.07.2021, OP-2 and OP-5 unilaterally gave undertaking for waiver of Basic Customs Duty for the capacity awarded under package 1; (h) Subsequently, OP-6 started signing PSAs with OP-7 onwards; (i) Subsequently, OP-6 signed 42 PPAs with OP-2 and subsidiaries of OP-1 and OP-2 and 24 PPAs with Special Purpose Vehicles of OP-5; (j) OP-5 has not even commenced the basic activities related to awarded project capacity and OP-6 has not cross checked the development of project activities on the part of OP-5; (k) OP-5 sent a letter to OP-6 on 07.12.2022 informing that 2333 MW projects are commercially unavailable due to non-fulfilment of the condition precedent on account of Public Interest Litigation ('**PIL**') *vide* no 237/2021 and PIL *vide* no 76 of 2022 before Hon'ble High Court of Andhra Pradesh and conditional regulatory approval by Central Electricity Regulatory Commission ('**CERC**'). Neither any coercive actions have been taken by High Court of Andhra Pradesh against any of the parties nor any stay orders were passed against the Bidding process or against OP-6 as on date. On 19.01.2023, OP-5 and OP-6 met and discussed the letter dated 07.12.2024 and again on 21.12.2024, OP-5 sent a letter to OP-6 with new excuse that their lender's inability to finance 2333 MW projects and confirmed that they will continue with execution of 800 MW projects (package 1) along with 1 GW manufacturing facility; (l) *Vide* letter dated 02.03.2023, OP-5 has shown its intentions that 2333 MW projects capacity which was awarded to them, shall be transferred to other Bidder *i.e.* in present case is OP-2 only; (m) On 06.07.2023, OP-2, OP-5 and OP-6 had a meeting where they decided to transfer the 2333 MW projects capacity which was awarded to OP-5 to OP-2; (n) *Vide* letter dated 12.10.2023, OP-6 checked the final decision of OP-5 to clear their stand to transfer the 2333 MW Projects capacity to OP-2 by 16.10.2023. *Vide* letter dated 16.10.2023, OP-5 informed OP-6 that they are constrained to terminate the PPAs and requested to return the PBG of 116.65 Cr corresponding to 2333MW; (o) OP-6 in a hurried manner without even looking for any other person or interested party, have signed PPA for 1799 MW capacity with OP-2 which again shows that the whole bidding process was just a cover to allocate the entire bidding capacity of 2000 MW solar power plant with 2000 MG manufacturing project to OP-2; (p) On 23.02.2024, OP-6 have issued

addendum to LoA to OP-2 for transferring the entire 2333 MW Projects' capacity; (q) *Vide* letter dated 18.03.2024, OP-6 affirmed to OP-5 regarding termination of 2333 MW PPAs and transferring the same to OP-2,; (r) Finally, on 02.05.2024, OP-5 surrendered the remaining capacity of 700 MW which was awarded under package 1 and same has also been reallocated to OP-2.

7. The Informant has stated that in this regard, Department of Justice ('**DoJ**') and Securities Exchange Commission ('**SEC**') in the US filed detailed chargesheet/indictment dated 24.10.2024 showing how OP-1 to OP-4, in connivance with OP-5, abused their market dominance and while indulging in anti-competitive practices, acquired many renewable energy generation plants.

8. The Informant has stated that in terms of the US indictment, OP-3, OP-4 and their other business executives allegedly bribed the Indian government to finance lucrative contracts designed to benefit their businesses and finally, through indirect means, also acquired the 2.3 GW solar power project of OP-5 with the help of OP-6. They also defrauded investors by raising capital on the basis of false statements about bribery and corruption, while other OPs attempted to conceal the bribery conspiracy by obstructing the US government's investigation.

9. As per the Informant, beginning in or around the year 2020, affiliates of OP-1 to OP-5, while acting within the scope of their employment as officers and employees, knowingly and wilfully, conspired and agreed with each other, including but not limited to OP-3 and OP-4, to offer, authorise and to pay bribes, influenced through their market position, combination and in anti-competitive practices, to and for their benefit, caused OP-7 to OP-12 to enter into PSA with OP-6, in order for OP-1, OP-2 and OP-5 to obtain and retain business.

10. As per the Informant, since the aforesaid acts were done on Indian soil and directly impact competition therein, the present Information has been filed in larger public interest. Further, since OP-1 to OP-4 in combination with OP-5 have abused their dominant market position and were involved in anti-competitive practices, and since OP-1 and OP-2 collectively account for 16% of all power generated by private sector power plants during Financial Year 2023, the Commission has jurisdiction in the matter.

11. Regarding the RfS issued by OP-6, it is alleged that the same was issued in contravention of the guidelines issued by the MoP to favour top players like OP-1, OP-2 and OP-5. The bidding documents were designed in such a fashion that no other bidder could participate in the bid but OP-1 and OP-2, and OP-5 had participated as only the proxy of OP-1 and OP-2 to re-allocate their project capacity later on to OP-2. As such, OP-1 to OP-6, by way of their conduct, indulged in anti-competitive practices to oust other entities from participating in the bid and created a monopoly. It is alleged that OP-6's dereliction of duty to not cross-check development of 4 GW solar project and 1 GW solar manufacturing project by OP-5 further shows that bidding and award of bid was a mere cover and ultimate aim was to transfer the entire 12 GW capacity to OP-1 to OP-4 for extraneous benefits.

12. Further, it is also alleged that OP-1 and OP-2 who collectively dominate the power generation market with 16% or more market share, through this process not only abused their market dominance but also created a platform where all other interested power generation companies were ousted from competition.

13. Therefore, in light of the above, the Informant has prayed for the following reliefs: (a) Hold and declare that an act of contravention of the abuse of market dominance and anti-competitive practices has taken place due to act and conduct of the OPs; (b) Hold and declare that acts and conduct of the OPs have adverse effect on competition in the market; (c) Issue an order of restraint and impose appropriate penalty; and (d) Pass any other order or relief which is deemed fit in the interest of justice.

14. The Commission considered the Information in its ordinary meeting held on 12.02.2025 and decided to seek certain additional information from the Informant within a period of 04 (four) weeks.

15. However, no such additional information was received. The Commission, *vide* order dated 14.05.2025, in the interest of justice, granted to the Informant, one last opportunity to furnish the additional information sought by the Commission *vide* order dated 12.02.2025, within a period of 04 (four) weeks.

16. Accordingly, the Informant filed an Additional Affidavit in compliance with order dated 12.02.2025, on 06.06.2025.

17. The Commission considered the Additional Affidavit filed by the Informant in its ordinary meeting held on 09.07.2025 and noting the submissions made therein, decided to seek from the Informant, detailed information and supporting evidence in respect of his allegations regarding abuse of dominance by the Adani Group or any Adani Group entity, to be filed within a period of 04 (four) weeks

18. Accordingly, the Informant filed another Additional Affidavit on 24.07.2025.

19. In the above Affidavits, the Informant has stated that the specific conduct amounting to abuse of dominant position by the Adani Group involves OP-2's rapid and large-scale capacity expansion aimed at foreclosing competition through aggressive greenfield growth. The magnitude and pace of its expansion effectively deters market entry or expansion by smaller competitors who cannot keep up without incurring unsustainable losses. As per the Informant, the Adani Group is leveraging its broader ecosystem to gain cost and scale advantages for OP-2 that constitutes exclusionary practices in renewable energy market.

20. It is stated that OP-2's greenfield expansion is supported by advanced resource planning and supply-chain management through affiliated entities such as Adani Infra India Ltd. and Adani Infrastructure Management Services Pvt. Ltd. These Adani entities are leveraging economies of scale in PPAs to reinforce dominant position and discourage competition. It is further stated that OP-2, while positioned as a 'pure-play renewable' entity, benefits from cross-subsidisation through its association with the broader Adani Group, which includes Adani Power, Adani Transmission, and other infrastructure affiliates. It is alleged that OP-2 is not operating in financial isolation but instead draws on financing facilitated through group-level arrangements. It is supported by a capital ecosystem that includes funds from its allied companies, including Adani Power and Adani Transmission. OP-2's access to below-market capital, enabled by group affiliations, lowers its cost of capital significantly compared to other independent green energy developers, giving it an unfair competitive edge.

21. Further, the Informant also stated that OP-2 is not just a dominant entity in renewable energy sector but is also planning vertical expansion into infrastructure critical for energy delivery *i.e.*, transmission and logistics. Adani Group is also gaining control over a critical distribution market *viz.* Mumbai being one of India's largest electricity load centers. With transmission and last-mile distribution under its belt, Adani Group holds substantial gatekeeping power

over what electricity gets wheeled into this high-demand urban region. This enables self-preferencing, where OP-2's green energy is prioritised for grid access, rebate eligibility, or transmission scheduling, while independent or rival producers face delays, technical denials, or financial disincentives. This creates a barrier to entry and deters rival renewable companies from bidding or scaling up.

22. As per the Informant, such control over infrastructure, especially in renewable and thermal power, allows OP-2 to impose discriminatory terms or pricing, limiting competitors' operations, in violation of the provisions of Section 4(2)(b) and 4(2)(e) of the Act. It is stated that Adani Group's conduct qualifies as abuse under Section 4(2) of the Act in the following manner: (a) Imposition of unfair conditions in bidding through alleged cover bidding; (b) Limiting production and market access through capacity hoarding; (c) Exclusionary PPAs and long-term tie-ups with major state utilities; (d) Leveraging vertical dominance from mining to generation and transmission; (e) Creation of artificial entry barriers by monopolising land and transmission infrastructure; (f) Holding of more than 40% cumulative market shares in renewable energy and thermal (conventional and non-conventional) *etc.*

23. Further, as per the Informant, tariff data from SECI auctions during 2019–2020 show highly competitive solar bids as low as INR 2.48/kWh. However, despite the trend of falling tariffs, the structuring of impugned RfS documents and financial dominance allowed entities like OP-2 to capture disproportionate market share by potentially gaming auction mechanisms with higher tariff of INR 2.92/kWh.

24. The Informant has stated that OP-2 is dominant in the market for utility scale renewable energy generation in India which includes large-scale, grid-connected, solar power projects that supply electricity to the national grid. These projects are distinct due to their scale, technology, and operational characteristics. On the basis of its total operational capacity and its year-on-year growth, it is the largest renewable energy company in India. Further, Adani Power holds a large amount of thermal power capacity accounting for more than 25% market share in the country. Thus, if the shares of two are combined, it surges to near about 40% of India's renewable and thermal capacity.

25. Subsequently, the Commission *vide* order dated 03.09.2025, noted that the matter pertains to the generation and distribution of solar power in the country and in view of the same, the Commission decided to seek the views/ comments of MNRE, upon the issues highlighted in

the Information with a request to provide its comments thereupon within a period of 04 (four) weeks.

26. *Vide* letter dated 28.10.2025, MNRE conveyed that OP-6 is a Central Public Sector Enterprise ('**CPSE**') under the administrative control of the MNRE and has issued the tender for '*Scheme for Setting up of Solar Manufacturing Plant linked with PPAs for Solar PV Power Plant*', and forwarded the comments received from OP-6 on the Information.

27. In its comments, OP-6 stated that it has been designated as the Renewable Energy Implementing Agency ('**REIA**') for implementation of MNRE schemes having an intermediary role. It invites bids under a process of Tariff Based Competitive Bidding ('**TBCB**') based on the Guidelines floated by the MNRE and the MoP for selection of developers for wind/ solar/ hybrid/ battery projects, enters into PPAs at the discovered tariff with the developers and executes a corresponding PSA with buying entity(ies) for sale of the power purchased from the developers.

28. OP-6 has further stated that in carrying out its role as an intermediary trader, it is bound to follow the regulatory compliances provided under the Electricity Act, 2003 ('**EA**'). The tariff is discovered in a competitive bid process through a process of TBCB e- reverse auction ('the ***e-RA***').

29. OP-6 stated that as required under Clause 10.4 of the Guidelines for Tariff Based Competitive Bidding Process for Procurement of Power from Grid Connected Solar PV Power Projects of the MoP dated 28.07.2023, a conformity certificate declaring that '*the bid documents are in line with the provisions of the corresponding Guidelines*' is submitted to the CERC in the tariff adoption petition filed by OP-6 (as intermediary procurer).

30. It is stated that under the TBCB, all the techno-commercially qualified bidders who participated in the tender are invited for the process of e-RA in line with the terms and conditions of the RfS. Post the completion of e-RA, the successful bidders are selected following the bucket filling approach and by comparing the bids on the basis of the bidding criteria as specified in the RfS, *i.e.* the fixed tariff or the first-year tariff and ranking of bidders starts from the bidder quoting the "lowest tariff (L1)". The tariff so discovered is placed for adoption u/s 63 of the EA within 15 days of discovery thereof.

31. It is further stated that on the basis of the documents submitted, CERC decides the tariff adoption petition along with adopting the trading margin of SECI. While on one hand the tariff discovered under e-RA is adopted by CERC, on the other hand, the PSA executed between SECI and the buying entities (usually the Distribution Companies ('**DISCOMS**'), are approved by the State Electricity Regulatory Commissions ('**SERC**') u/s 86 1(b) of the EA.

32. OP-6 has further stated that the position of competition law in India is that it is the prerogative of the procurer to decide the tender conditions/ technical specifications/ conditions and clauses in the tender document as per its requirements. In this regard, it has referred to Case No. 22 of 2018 (*G.P. Konar v Department of Agriculture and Farmers Welfare, Government of Haryana*) wherein the Commission relied on Case No. 69 of 2016 (*Suntec Energy Systems and National Dairy Development Board and Amul Dairy v. National Dairy Development Board*) wherein while dealing with the allegation that a tender condition resulted in making only one manufacturer a preferred supplier, the Commission observed as under:

> "*A procurer, as a consumer, can stipulate certain technical specifications/ conditions/ clauses in the tender document as per its requirements which by themselves cannot be deemed anticompetitive. It may be noted that the party floating the tender is a consumer and it has the right to decide on the appropriate eligibility conditions based on its requirements*." The Commission also stated that, "*in a market economy, consumers' choice is considered as sacrosanct and in such an economy, a consumer must be allowed to exercise its choice freely while purchasing goods and services in the market. It is expected that a consumer can decide what the best is for it and will exercise its choice in a manner which would maximise its utility that is derived from the consumption of a good/ service*."

33. OP-6 has also referred to Case No 38 of 2023 *(Harish Kumar v. S.B. Telecommunications & Ors.*) wherein the Commission held that:

> "22. *The Commission notes that OP-4 as a procurer has replied to the allegations made by the Informant, as briefly discussed above,*

*concerning the tender process and is of the view that the allegations are misconceived and a prima facie case is not made out under the provisions of Section 3(3) of the Act which may merit an investigation into the matter. Further, the Commission is also of the view that setting tender terms and conditions is largely within the domain of the procurer and generally does not call for any interference within the provisions of the Act.*"

34. OP-6 has stated that the Informant has neither substantiated the nature of the allegations against it nor the contraventions of the Act alleged to have been committed by it. It has stated that a perusal of the Information shows that the Informant is using the terms 'combination' and 'anticompetitive agreements' without any appreciation of the fact that the scope and ambit of a 'combination' is entirely different from an 'anticompetitive agreement'. With regard to the Informant's allegation that '*Respondent No 1 to 4 in combination with Respondent No 5 and 6 have abused their dominant position market position and involved in anti-competitive (sic) and malpractices*.', OP-6 has stated that there has been no acquisition by it of any enterprises or any amalgamation/ merger with any other enterprise, more so with the other OPs, so as to trigger Section 5 of the Act. It is stated that OP-6 is a REIA having the role of an intermediary procurer and it is absurd to presume any meeting of mind between an intermediary procurer and a project developer or between an intermediary procurer and the DISCOM which causes or is likely to cause appreciable adverse effect on competition within India.

35. Regarding the applicability of the provisions of Section 4 of the Act, OP-6 has stated that factors test of three needs to be proved, *i.e.* 'delineation of relevant market', 'dominance in the relevant market' and 'resultant abuse in the relevant market'. It is stated that the Information levels allegation on OP-6 of abuse of dominant position without delineating any relevant market in which OP-6 is alleged to be dominant so as to attract the rigors of Section 4. Further it is stated that the Information is completely bereft of data/ figures/ statistics to substantiate the dominance of OP-6 or any sort of market power exercised in any relevant market whatsoever. Hence, it is stated that since OP-6 is not in a dominant position in any relevant market, there is no question of abuse thereof.

36. OP-6 has further stated that the Commission has time and again stressed that dominance of an enterprise in the relevant market is something which needs to be established rather than merely relying on hearsay statements/ media reports/ social media content. The Commission has in Case No 22 of 2024 (*InstaAstro Technology Private Limited v Astrotalk Services Private Limited*) held that the dominance of any entity cannot be solely established on the basis of media statements.

37. OP-6 has stated that the facts and circumstances outlined in the Information and the nature of issues/ allegations agitated before the Commission, does not give rise to competition concerns. Hence, no case of contravention of Section 3 or Section 4 of the Act warranting intervention of the Commission is made out and the matter deserves to be closed forthwith u/s 26 (2) of the Act.

38. OP-6 has also given point wise reply to allegations with regard to specific clauses of the RfS document.

39. Regarding the allegation that the RfS document was prepared in contravention of the MoP guidelines in as much that the said guidelines do not allow clubbing of solar power plants with solar manufacturing plants, thus implying that the RfS document was designed in a manner to ensure participation of only big players, OP-6 has stated that the said tender was floated 3 times, after having been annulled twice in 2019. It is stated that this establishes the intent and objective of Government to promote domestic manufacturing and reduce export dependency. It is stated that unlike the Production linked Incentive (‘**PLI**’) Scheme offered at present, in the Manufacturing linked Solar Scheme launched during 2018 and 2019, the only incentive offered to the prospective bidders/ developers was by the means of offering Solar Power Plant capacity only corresponding to Solar Manufacturing Plant capacity.

40. In response to the allegation that the ‘Green Shoe Option’ was provided by OP-6 in contravention of MoP guidelines, OP-6 has stated that MoP guidelines do not provide any specific provision for allotment of Green Shoe option, it also never restricts such allocation. Moreover, the Green Shoe option was included based on the provisions of Scheme guidelines issued by MNRE.

41. With regard to allegations by the Informant with reference to the clauses detailing issue of LoAs and Addendum to LoAs, OP-6 has stated that the details mentioned are factual information only and OP-6 cannot comment on these. It has further stated that due processes were followed and approvals of competent authority(ies) were obtained for issuance of LoAs and Addendum to LoAs to both the successful bidders. Regarding the undertakings given by OP-2 *vide* letter dated 08.06.2020 and by OP-5 *vide* letter dated 16.07.2020, OP-6 has stated that *vide* the said undertakings the developers demonstrated their intent and commitment to set up the Solar Manufacturing Plants even in the absence of PPAs corresponding to setting up of Solar Power Plants by them. These undertakings are completely in line with the objectives of Govt. of India to promote domestic manufacturing.

42. Regarding the allegation by the Informant that *vide* letters dated 02.02.2021 and 18.02.2021, OP-2 and OP-5 reduced the quoted bid price against the spirit of MoP Guidelines and RfS, thus showing the intention of OP-2, OP-5 and OP-6 that the whole bidding process was designed to oust the other bidders and to curtail competition in the market, OP-6 has stated that *vide* the said undertakings, the developers unilaterally reduced their quoted tariffs in order to make power saleable and affordable to prospective buying entity(ies). Reducing the tariff is not at all contrary to any law, rather it is in larger public interest by means of offering lower tariff.

43. OP-6 has further stated that it executed PSAs with all the buying entity(ies) only after receipt of their consent and post approval from the respective SERCs as per the provisions of the Electricity Act, 2003 and that it executed PPAs with both the developers on back-to-back basis as per the provisions of RfS only.

44. With regard to the allegation that OP-5 did not even commence the basic activities related to awarded project capacity and OP-6 has not cross checked the development of project activities on the part of OP-5, OP-6 has stated that it monitors each and every project awarded by them not only on a monthly basis but as and when required.

45. Responding to the allegation that *vide* letter dated 02.03.2023, OP-5 have shown its intention that 2333 MW Projects' capacity which was awarded to them, shall be transferred to other bidder *i.e.* in the present case to OP-2 only, OP-6 has stated that it

had not received any such letter wherein OP-5 expressed its intention to transfer the capacity to OP-2. Further, in response to the Informant's allegation that on 06.07.2023, OP-2, OP-5 and OP-6 had a meeting where they have themselves decided to transfer the 2333 MW Project capacity which was awarded from OP-5 to OP-2, OP-6 has stated that no such decision was taken to transfer the 2333 MW Project from OP-5 to OP-2 in the joint meeting held on 06.07.2023. Rather the meeting was conducted to understand the concern of OP-5.

46. With regard to the allegation that OP-6 in a hurried manner without even looking for any other person or interested party, have signed PPA for 1799 MW capacity with OP-2 which again shows that the whole bidding process was just a cover to allocate the entire bidding capacity of 2000 MW solar power plant with 2000 MW manufacturing project to OP-2, OP-6 has stated that the PPAs for 1799 MW was executed as there was an unexecuted capacity available in the LoA of the developer for which PPAs were to be executed. Moreover, the decision was taken in consultation with the respective buying entity in order to fulfil their Renewable Purchase Obligation ('**RPO**') as well as to provide free electricity to the farmers and due legal process was also followed while reallocating this capacity.

47. Regarding the allegation that on 02.05.2024, OP-5 has surrendered the remaining capacity of 700 MW which was awarded under Package-I and same has also been reallocated to OP-2, OP-6 has stated that OP-5 surrendered the capacity of 700MW awarded under Package-I. However, the same was not re-allocated to OP-2. Hence, the aforementioned allegation is completely false.

48. On the allegations made by the Informant regarding other clauses of RfS/chain of events, OP-6 has stated that the same is part of factual information only and OP-6 cannot comment on these.

49. The Commission considered the Information, additional affidavits filed by the Informant, and the comments by OP-6 on the Information in its ordinary meeting held on 26.11.2025 and decided to pass an appropriate order in due course.

*Analysis of the Commission*

50. Regarding the first allegation that the RfS was issued by OP-6 in violation of the guidelines issued by MoP and was designed in a manner to favour OP-2 and OP-5 while ousting others from competition, the Commission observes that the same does not appear to be a competition issue to be covered under the Act. Further, the Informant has not been able to furnish any evidence in support of his allegation that OP-5 was only a cover bidder for OP-2.

51. Regarding the allegation of abuse of dominant position by the Adani Group, the Commission noted that power in India is generated through various sources such as coal, solar, wind, hydro, nuclear, *etc*. Further, in such power generation market, not only private power generation companies but also several major public power generation companies are operating. The Informant has also not placed on record any evidence which may suggest as to why solar power, or public and private power generation companies, ought to be treated as distinct markets.

52. As such and in view of the fact that power generation market in India is comprised of many significant players *viz.* National Thermal Power Corporation, Power Grid Corporation of India Ltd., Tata Power Co. Ltd., Torrent Power and Reliance Power *etc.,* the Adani Group, *prima facie*, does not seem to be a dominant player in the power generation market in India. Even in the '*power generation from renewable sources*' market, other prominent players like Tata Power, JSW Energy and Suzlon Energy are also operating.

53. Further, the Commission observes that allegation against OP-2 of deriving benefits like cross-subsidisation and economies of scale from other Adani Group entities does not substantiate that it is in a dominant position in terms of Section 4 of the Act. Regarding the Informant's other allegations of leveraging, exclusion, creation of entry barriers, bid-rigging discrimination *etc.* no cogent evidence has been produced by the Informant in this regard. As such, there is no clear evidence on record which may establish dominant position or its abuse by OP-2.

54. Further, the alleged conduct *i.e.* offering of bribes to government officials to enable OP-6 to enter into PSAs with buying utilities, in turn allowing OP-2 to enter into PPAs with

OP-6, also does not seem to qualify as an abusive conduct (exclusionary or exploitative), within the meaning of Section 4 of the Act.

55. With regard to the clause-specific allegations made by the Informant, the Commission observes that the Informant has not provided any cogent evidence of the RfS documents being designed in a manner that encourages participation of only big players in the market. It is noted that tender design is made according to specific requirements of the procurer. As stated by OP-6, the tender was floated thrice with an intent to attract participation according to the prevailing incentive scheme at the time. Further, the Informant has not been able to demonstrate how any clause of the RfS referred to in the Information or chain of events described therein is in contravention of the provisions of the Act.

56. Further, there appears to be no anti-competitive conduct in adopting a Green Shoe Option in terms of restriction of participation. The Commission noted that the said issue was also dealt with in a petition related to the same RfS (Petition No. 286/AT/2021) *vide* order dated 02.04.2022, by the CERC, in which it had observed:

> "*69…As regards objection regarding Green Shoe Option being against the Act and the Guidelines, we have already observed above that Section 63 of the Act does not prescribe the type of bid structure to be adopted by the Central Government. It has been left open to the Central Government to decide the provisions of the Guidelines and bid structure for procurement of power. Accordingly, the said incorporation of Green Shoe Option cannot be held as non-compliance of any specific provision of the Act. In the present case, MNRE, Government of India vide its letter dated 14.8.2019 directed SECI to incorporate 'Green Shoe Option' in the bid. The relevant extract of the said letter dated 14.8.2019 is extracted below.*
>
> > *"In refence to the subject RfS, the undersigned is directed to convey to SECI, that in line with discussions with industry stakeholders and further examination in MNRE, the following decision have been taken by MNRE:*
> >
> > *……………*
> >
> > *viii SECI to provide a "Green-Shoe Option" to successful bidder(s) equivalent to the capacity(ies) won by such successful bidder(s). The above decisions are in line with the approval from Hon'ble Minister (Power & NRE)"*
>
> *The said provision was reiterated in the letter dated 9.10.2019 issued by MNRE, Government of India as under:*

*"2. The following has been decided with regard to SECI's Manufacturing-Linked-PPA Tender:*

*(d) The earlier instructions to SECI, vide letter no. 336/39/2017-NSM (Part File) dated 14.08.2019, may accordingly be read as under :*

*………..*

*vi SECI to provide a "Green-Shoe Option" to successful bidder(s) equivalent to the capacity(ies) won by such successful bidder(s).*

*3. This issues with the approval from Hon'ble Minister (Power & NRE)"*

57. The Commission notes that the aforementioned order of the CERC also dealt with similar issues as raised in the Information such as a) Combining activity of generation with manufacturing of equipment used in generation **(**CERC observed that **"***56…contrary to the submissions made by the objector, there is no bar on linking Solar Manufacturing Plants with PPAs for Solar Power Plants.*); b) Reduction of quoted bid price by OP-2 and OP-5 (CERC observed that "*68…while any upward revision of tariff after conclusion of the e-reverse auction by the Petitioner shall be against the principle and objective of Guidelines leading to undue benefit to the successful bidders, any downward revision of tariff by the successful bidders benefits the consumers in terms of lower tariff. Therefore, the reduction of tariff by the successful bidders on voluntary basis does not violate the Guidelines*.").

58. Further, the Commission observed that stipulating capacity generation and financial eligibility criteria in tenders is a standard practice, and the same cannot be faulted with in the impugned RfS merely because the market may be having a large number of smaller players as well. Therefore, under the purview of the Act, the above clauses of the RfS cannot be stated to have been inserted with a view to oust competition.

59. Upon consideration of the facts and circumstances of the present case, the Commission is of the view that there is no *prima-facie* case of contravention of provisions of Sections 3 and 4 of the Act warranting an investigation into the matter. Therefore, the matter is directed to be closed forthwith under Section 26(2) of the Act.

60. The Secretary is directed to communicate the decision of the Commission to the Informant and OP-6, accordingly.

**Sd/-**
**(Ravneet Kaur)**
**Chairperson**

**Sd/-**
**(Anil Agrawal)**
**Member**

**Sd/-**
**(Sweta Kakkad)**
**Member**

**Sd/-**
**(Deepak Anurag)**
**Member**

**New Delhi**
**Date: 16/04/2026**

2026:DHC:1978-DB

$~98
* **IN THE HIGH COURT OF DELHI AT NEW DELHI**
% *Date of Decision : 10.03.2026*
\+ W.P.(C) 812/2026
RAVI SHARMA, ADVOCATE
.....PETITIONER
Through: Mr. Ravi Sharma, Mr. Aryan Chanda and Ms. Ayushi, Advs.

versus

UNION OF INDIA, MINISTRY OF NEW AND RENEWABLE ENERGY, THROUGH-SECRETARY & ORS.
.....RESPONDENTS
Through: Ms. Anushree Bardhan, Ms. Ritika Singh, Ms. Somya Sahni & Ms. Rashmi Vaish, Advs. for R2
Mr. Rajiv Nayyar, Sr. Adv. and Mr. Darpan Wadhwa, Sr. Adv. with Mr. Mahesh Aggarwal, Mr. Rishi Aggarwala, Mr. Arshit Anand, Ms. Vidisha Swamp and Mr. Daksh Arora, Advs. for R-4 and R-5.
Mr. Aniket Prasoon, Mr. Aman Sheikh, Ms. Arehita Kashyap, Advs. for R6 & R7.

**CORAM:**
**HON'BLE MR. JUSTICE DINESH MEHTA**
**HON'BLE MR. JUSTICE VINOD KUMAR**

**ORDER**

**DINESH MEHTA, J. (ORAL)**

1. The present petition in the name of Public Interest Litigation (PIL) has been filed with the following prayers :

> *"a. Issue appropriate writ in Mandamus / Certiorari and/ or any other appropriate Writ setting aside the reallocation of 2.3 GW portion of the Azure Power India Pvt Ltd to Adani Power vide PPA dated 26.12.2023 by SECI.*



Validity unknown
Signed By:PRAMOD KUMAR VATS
Signing Date:11.03.2026 19:47:45

*b. Issue an appropriate writ directing the appropriate investigative agencies to conduct detailed criminal and/or civil investigation.*

*c. to direct Union of India and State Governments and its instrumentalities to file periodical Compliance Reports pursuant to various directions issued by this Court"*

2. The petitioner submits that he is an advocate and practises before the Delhi High Court and claims to be an Advocate-on-Record in the Supreme court of India. He has alleged that grave irregularities have been committed in the competitive bidding process for solar power projects which has resulted in loss to public exchequer.

3. In a bid to satisfy that he is a vigilant citizen and whistle blower, the petitioner claims to have filed another PIL before the Supreme Court being W.P.(C) No. 848/2023.

4. The petitioner has approached this Court with the grievance that reallocation of 2.333 GW of power generation capacity from Azure Power India Pvt. Ltd. *(hereinafter referred to as 'Azure Power')* (R-6) to Adani Green Energy Four Ltd. *(hereinafter referred to as 'Adani Green')* (R-4) vide Power Purchase Agreement *(hereinafter referred to as 'PPA')* is illegal and contrary to norms and the same has been done in an improper manner.

5. Apprising the Court about the necessary facts, the petitioner submitted that on 25.06.2019, the Request for Selection (*hereinafter referred to as 'RfS'*) was issued for selection of Solar Power Developers for setting up of 6 GW ISTS connected Solar PV power plants linked with 2 GW (per annum) Solar Manufacturing Plant. As per the notice inviting bids, the last date for furnishing bids was 13.11.2019, by which date three bidders including Adani Green (R-4) and Azure Power (R-6), took part in the process.

6. Meanwhile, the quantity appears to have been increased to 7 GW and



Validity unknown
Signed By:PRAMOD KUMAR VATS
Signing Date:13.03.2026 19:47:45

accordingly, Adani Green (R-4) and Azure Power (R-6) succeeded in the bidding and out of 7 GW capacity of Solar PV Power Plant, 4.667 GW was allotted to Adani Green (R-4) and 2.333 GW was allotted to Azure Power (R-6), which was subsequently increased.

7. While contending that the capacity was increased without any fresh tender process, petitioner contended that PPA was entered into with Adani Green (R-4) on 26.12.2023, though as per the conditions of RfS and other terms and conditions of the bidding process, the PPA was to be signed within the period of ninety days from the date of Letter of Acceptance (*hereinafter referred to as 'LoA'*). He highlighted that the LoA came to be signed after a period of ninety days.

8. Petitioner further contended that with respect to tariff, though the price at the initial stage was Rs.2.92/kWh, the power purchase agreement was executed @ Rs. 2.42/kWh plus Rs.0.07 applicable margin (total Rs. 2.49/kWh).

9. The petitioner argued that these illegalities have been committed to favour Adani Green (R-4) and Azure Power (R-6) because of their clout and corrupt measures which were adopted by them which can be discerned from the indictment issued by the United States District Court, Eastern District Of New York and the Jury Report, both of which have been placed on record.

10. Having said so, he invited Court's attention towards the order dated 17.04.2025, more particularly para 25, 26 and 28 thereof which was passed by the Central Electricity Regulatory Commission, New Delhi *(hereinafter referred to as 'CERC')* in petition No. 202/MP/2024. He zealously pointed out that even CERC has noted in clear terms that there has been irregularity in the process, including the process of reallocation of the capacity and that



Validity unknown
Signed By:PRAMOD KUMAR VATS
Signing Date:13.03.2026 19:47:45

the decision to reallocate the 2.333 GW capacity was not placed for its approval.

11. In a bid to substantiate his argument that even re-allocation from Azure Power (R-6) to Adani Green (R-4) was done surreptitiously, petitioner submitted that as planned, Azure Power (R-6) later on expressed its inability to carry out the work and surrendered its capacity which was then allocated to Adani Green and resultantly, the entire offered capacity for power production and manufacturing of the component was given to a single entity, namely Adani Green (R-4), which otherwise could not have been granted to a single entity. Petitioner argued that the entire exercise is colourable and has been done by way of adopting corrupt practices.

12. On Court's query about involvement of public interest or loss to public exchequer or to the public, if any; the petitioner was not in a position to give any satisfactory answer. He tried to demonstrate that the process of tender has not been transparent.

13. *Per contra* Mr. Rajiv Nayyar, learned Senior Counsel at the outset contended that the petition is not *bona-fide* and the petitioner has not even disclosed the fact that a PIL on the same lines is pending before the Andhra Pradesh High Court.

14. He tried to satisfy the Court that the manner and process adopted in increasing the capacity and re-allocating the capacity from Azure Power to Adani Green was transparent and free from any doubt. However, we do not propose to enter into such arena, hence, we refrain from recording his submissions in this regard.

15. Learned Senior Counsel also contended that the petitioner, who claims to be a public spirited man and purportedly has an experience and



Validity unknown
Signed By:PRAMOD KUMAR VATS
Signing Date:13.03.2026 19:47:45

expertise in the field of Electricity Disputes has not even done minimum research and necessary homework. Therefore, the petition deserves to be dismissed with exemplary cost. He expressed an apprehension that the petition can be a sponsored one or motivated by oblique motives.

16. He also submitted that the re-allocation of the capacity was approved by Andhra Pradesh Electricity Regulatory Commission on 12.04.2024 and therefore, it cannot be alleged that there was an irregularity or infirmity.

17. Heard both the parties.

18. We are of the considered view that when it comes to public interest litigation, the first and foremost aspect to be considered by the Court, before or after being satisfied about the *bona-fide* of the petitioner, is – the element of involvement of public interest. In our opinion, unless a petitioner demonstrates that any loss or injury has been caused to the public or to public exchequer, the Courts should not interfere; that too, at the instance of a so-called public interest litigant. An already finalised process and a contract which was granted two years ago, cannot be interfered with or unsettled simply because there have been some irregularities, as alleged.

19. A look at the factual matrix shows that the bids were accepted with a stipulation that the electricity will be procured @ Rs.2.42/kWh, which rate has been approved by the competent authority namely CERC.

20. The High Court is not a panacea for all diseases or crusader for all the wrongs. In the present era, when the Courts are over-burdened with a number of cases and struggle to attend to the grievance of the individuals who have approached the Courts and find themselves unable to adjudicate the rights of all the affected parties, they cannot afford to undertake the fishing and roving enquiry at the behest of a busybody, especially when no



Validity unknown
Signed By:PRAMOD KUMAR VATS
Signing Date:13.03.2026 19:47:45

substantial material is brought on record. Simply because a petitioner claims himself to be *bona-fide* whistle blower, the High Court cannot undertake the exercise of finding fault with the decision and decision-making process in each case. There are enough remedies and fora and machinery provided by and under the law. The petitioner who is an advocate can approach them, if he feels so advised.

21. The Public Interest Litigation jurisdiction is meant to be exercised by the Supreme Court and High Courts essentially for giving a voice to the desolates, deprived, or less privileged class who have no mouthpiece and who form a large section of our society or for that matter, to any section of the society for whom it is not economically viable or otherwise feasible to bring their cause before the Courts. The Court can neither go on a wild chase on the basis of cursory accusation or allegations nor should the Court entertain such petitions, unless the allegations are clear, categoric, and supported by clinching evidence. Judgment of the Supreme Court in the case of **State of Jharkhand vs. Shiv Shankar Sharma and Ors.**, reported in **(2022) 19 SCC 626** may be relevant on this aspect.

22. Furthermore, the Supreme Court in the case of **State of Uttaranchal vs. Balwant Singh Chaufal and Ors.** reported in **(2010) 3 SCC 402** laid down certain guidelines, one of which is that the Courts should be absolutely satisfied with the substantial public interest involved in the petition before entertaining the petition. It will not be out of place to reproduce the directions laid down in the case of **Balwant Singh Chaufal (supra)**:

> *"181. We have carefully considered the facts of the present case. We have also examined the law declared by this Court and other courts in a number of judgments. In order to preserve the purity and sanctity of the PIL, it has become imperative to issue the following directions:*



Validity unknown
Signed By:PRAMOD KUMAR VATS
Signing Date:13.03.2026 19:47:45

*(1) The Courts must encourage genuine and bona fide PIL and effectively discourage and curb the PIL filed for extraneous considerations.*

*(2) Instead of every individual Judge devising his own procedure for dealing with the public interest litigation, it would be appropriate for each High Court to properly formulate rules for encouraging the genuine PIL and discouraging the PIL filed with oblique motives. Consequently, we request that the High Courts who have not yet framed the rules, should frame the rules within three months. The Registrar General of each High Court is directed to ensure that a copy of the rules prepared by the High Court is sent to the Secretary General of this Court immediately thereafter.*

*(3) The Courts should prima facie verify the credentials of the petitioner before entertaining a PIL.*

*(4) The Courts should be prima facie satisfied regarding the correctness of the contents of the petition before entertaining a PIL.*

***(5) The Courts should be fully satisfied that substantial public interest is involved before entertaining the petition.***

*(6) The Courts should ensure that the petition which involves larger public interest, gravity and urgency must be given priority over other petitions.*

*(7) The Courts before entertaining the PIL should ensure that the PIL is aimed at redressal of genuine public harm or public injury. The Court should also ensure that there is no personal gain, private motive or oblique motive behind filing the public interest litigation.*

*(8) The Courts should also ensure that the petitions filed by busybodies for extraneous and ulterior motives must be discouraged by imposing exemplary costs or by adopting similar novel methods to curb frivolous petitions and the petitions filed for extraneous considerations."*

***Emphasis Supplied***

23. Furthermore, the petitioner has not been able to show the loss or injury to the public or public exchequer. The price of power per unit, at which the Solar Energy Corporation of India will purchase has been reduced after the reallocation of the capacity. Hence, it cannot be said that public



Validity unknown
Signed By:PRAMOD KUMAR VATS
Signing Date:13.03.2026 19:47:45

exchequer has been made to suffer.

24. The so-called increase of capacity and allocation of Azure Power's capacity to Adani Green may at first blush appear to be an irregularity, but the same cannot be examined at the instance of the petitioner, who has no axe to grind so far as bidding process or competitive bidding is concerned. Such grievance, if at all is to be raised, can be raised by a bidder who had taken part in the bidding process. The loss (if any) has been caused to the competitive bidder or the prospective bidder, for whom the petitioner cannot be allowed to voice and litigate.

25. For the above stated reasons, we are not inclined to enter into the arena of investigation and fishing and roving enquiry, simply because the petitioner smells some irregularity in the process.

26. According to us, the Jury Trial demanded by the U.S. Securities and Exchange Commission, which the petitioner has placed before us (with a contention that it is a Jury Report), does not even indicate any loss to public or public exchequer.

27. We, therefore, refuse to entertain the present PIL. The petition is, therefore, dismissed, however without any cost.

**DINESH MEHTA, J**

**VINOD KUMAR, J**

**MARCH 10, 2026/*ss***



Validity unknown
Signed By:PRAMOD KUMAR VATS
Signing Date:13.03.2026 19:47:45

**IN THE HIGH COURT OF JUDICATURE AT BOMBAY**
**CRIMINAL APPELLATE JURISDICTION**

**CRIMINAL WRIT PETITION NO. 6214 OF 2025**

Jitendra Punamchand Maru .. Petitioner
Vs.
The Central Bureau of Investigation
& Ors. .. Respondents

...

Mr. Rajendra Desai a/w Mr. Kunal Bhanage i/by Mr. Akshay Pawar, Advocates for the Petitioner.
Mr. Amit Munde, SPP a/w Mr. Jai Vohra for Respondent No.1-CBI.
Mr. Anil C. Singh, Additional Solicitor General a/w Ms. Neha N. Patil, AOR a/w Mr. Aditya Thakkar, Mr. Krishnakant Deshmukh, Adarsh Vyas, Rama Gupta & Mr. Rajdatt Nagre for Respondent No.2-UoI.
Mr. S. V. Gavand, Additional Public Prosecutor for Respondent No.3-State.

...

**CORAM : SHREE CHANDRASHEKHAR, CJ &**
**SUMAN SHYAM, J.**

**Reserved on : 23rd March 2026**
**Pronounced on : 27th March 2026**

**<u>ORDER</u> :**

The petitioner has invoked the jurisdiction of this Court under Article 226 of the Constitution of India for a direction to the Central Bureau of Investigation (in short, CBI) to register a First Information Report and investigate the matter relating to the offence of bribery as disclosed by him in his letters dated 21st October 2025 and 29th October 2025.



This order is corrected by the speaking to minutes order dated 8th April 2026.

2. On 23rd March 2026, the following order was passed by this Court:-

> *"On 10th March 2026, we passed the following order:*
>
> *"Mr. Kunal Bhanage, the learned counsel for the petitioner seeks an adjournment on the ground that the arguing counsel is not available today.*
>
> *2. This is another petition filed by Jitendra Punamchand Maru, who simply states that he is a citizen of India and his right to set the criminal law in motion has been recognized by law. Except that, the petitioner does not say anything about him.*
>
> *3. Having regard to the fact that the petitioner has filed this writ petition without making any disclosure as per the Bombay High Court Rules, we hereby direct the petitioner to remain physically present in the Court on the next day.*
>
> *4. Post this matter on 23rd March 2026 together with Criminal Writ Petition No.5542 of 2025."*
>
> *2. The petitioner is present in the Court and states that previously he was engaged in the business of sale of plastics. But presently there is no business activity carried out by him. On a Court's query what is the source of information on the basis of which this writ petition has been filed, Mr.Rajendra Desai, the learned counsel for the petitioner, who is present in the Court, states that after the petitioner came to know about a decision rendered by the Eastern District Court of New York, he made an application for obtaining a true attested copy of the said judgment and the present writ petition has been filed.*
>
> *3. Mr. Anil C. Singh, the learned Additional Solicitor General raises objection to the maintainability of the writ petition. The learned Additional Solicitor General refers to an order passed by the High Court of Delhi in Writ Petition (C) 812/2026 tilted "Ravi Sharma, Advocate v. Union of India & Ors." and submits that a similar petition, though labelled as Public Interest Litigation, has been dismissed by the High Court of Delhi, a copy of which has been tendered in the Court.*
>
> *4. Judgment is reserved."*

3. The petitioner states that the Ministry of Renewable Energy formed a body in the name of Solar Energy Corporation of India to explore the possibility of increasing use of renewable energy in India and different State Governments entered into



This order is corrected by the speaking to minutes order dated 8th April 2026.



::: Uploaded on - 10/04/2026 ::: Downloaded on - 16/04/2026 11:41:42 :::

power purchase agreements for distribution of electricity to the consumers. It was around the year 2020 that an Indian Corporate group entered into a conspiracy with Azure Global Ltd. which also claimed to generate solar power to procure contracts by using unlawful means. He further states that these Corporate groups created a Multi Million Dollar Pension Funds for the purpose of bribing several unknown government officials. The petitioner refers to an order passed by the United States District Court, Eastern Court of New York and states that the Indian Corporate group proposed to pay incentives which was nothing but bribe. The petitioner has also referred to the order dated 24th November 2024 for Jury Trial whereunder a notice was proposed to be given to the defendants who are the Chairman, Executive Director, Managing Director etc. of the Indian Corporate group. However, there is no further information provided by the petitioner as to the continuance of any proceedings in the US Court.

4. Mr. Anil C. Singh, learned Additional Solicitor General raised an objection to maintainability of this writ petition and referred to an order passed by the Delhi High Court by which a similar petition against the same Corporate groups labelled as public interest litigation was dismissed.

5. In the order dated 10th March 2026, the Delhi High Court observed that the Jury Trial demanded by the US Securities and Exchange Commission does not even indicate any loss to public exchequer.

6. To begin with, we may indicate that this writ petition is







::: Uploaded on - 10/04/2026 ::: Downloaded on - 16/04/2026 11:41:42 :::

similar to Criminal Writ Petition No.5542 of 2025 wherein the petitioner has made a similar adventure seeking lodging of criminal case by the CBI against another Corporate group of India. This writ petition is clearly an abuse of the process of the Court. The petitioner who states that his right to put the criminal justice system in motion is recognized in law has failed to provide any justification for not approaching the Court in the last about one decade when someone had allegedly tried to indulge in some unethical practices. In course of the hearing, the petitioner who was present in the Court stated that previously he was engaged in the business of sale of plastic but, presently, he is not carrying on any business activity. The learned counsel for the petitioner stated that this writ petition has been filed on the basis of the newspaper report which published the order passed by the US Court.

7. In a writ petition of this nature, the High Court is required to examine whether the petitioner is seeking any personal gain or there is a private or oblique motive behind filing of the petition. The registration of a criminal case is a very serious matter and it entails drastic consequences to the proposed accused person. This is the duty of the High Court to examine the relevant materials and bestow its considerations as to whether the prayer if granted would serve any public cause. This is the experience across the High Courts that the writ petitions of this kind or a petition masked as a public interest litigation is filed at the behest of the failed competitors or a rival business house or a disgruntled person.

8. In our opinion, the petitioner has failed to establish his



This order is corrected by the speaking to minutes order dated 8th April 2026.

Panchal



::: Uploaded on - 10/04/2026 ::: Downloaded on - 16/04/2026 11:41:42 :::

*bona fide*. The petitioner has no locus to file this writ petition and he has not approached the Court with clean hands. This writ petition does not serve any public purpose. Rather, a petition like the present one causes serious harms and is likely to cause harm to the reputation and business prospects of any Corporate group.

9. For the aforesaid reasons, we do not find any merit in this writ petition which is, accordingly, dismissed.

**[SUMAN SHYAM, J.]** **[CHIEF JUSTICE]**

PRAVIN DASHARATH PANDIT Digitally signed by PRAVIN DASHARATH PANDIT Date: 2026.04.10 13:01:49 +0530



This order is corrected by the speaking to minutes order dated 8th April 2026.

Panchal



::: Uploaded on - 10/04/2026 ::: Downloaded on - 16/04/2026 11:41:42 :::

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>GAUTAM S. ADANI, SAGAR R. ADANI, VNEET S. JAAIN, RANJIT GUPTA, CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, and RUPESH AGARWAL,<br><br>Defendants. | **ORDER**<br>**24-CR-0433 (NGG)** |

NICHOLAS G. GARAUFIS, United States District Judge.

The court is in receipt of Mr. McCotter's letter responding to the court's June 26, 2026 Memorandum & Order directing the Government to advise the court of each reason for dismissing the Indictment with prejudice as against all Defendants. (Dkt. 37.) In his letter, Mr. McCotter—who states that he "was the final and sole decisionmaker to seek dismissal of the charges here," (*id.* at 3 n.1)—explains his reasons for "why [he] moved to dismiss all charges," (*id.* at 5). He also identifies "Non-Considerations"—namely, "some promise by those defendants to invest money in the United States" that was raised, but that Mr. McCotter evidently did not take into account, when seeking dismissal of the charges in this case. (*Id.* at 9.)

In describing these "Non-Considerations," Mr. McCotter raises "stories in the media about the Department's motion to dismiss the securities charges in this case." (*Id.*) Addressing these news articles, Mr. McCotter states in full:

> The current or former Department attorneys who unethically fed those stories have suggested that I sought dismissal of the securities charges at least in part because of some promise by those defendants to invest money in the United States. That is false. Before that

> topic first arose, I had already firmly concluded I would seek dismissal of the securities charges no matter what, because they were so indefensible. To put a finer point on it: I would have sought dismissal of the securities charges regardless of any mentions of investments, regardless of whether the civil case (or any other matter) was settled or otherwise resolved, regardless of whether the other defendants consented, and regardless of what leakers might try to spin up in the media.
>
> Also, even setting that aside, it is risible to suggest that the Managing Partner of Sullivan & Cromwell, who is perhaps the most respected and experienced securities attorney in the country, would propose any kind of improper resolution, let alone one crafted in a meeting with over a dozen attorneys present, including from other law firms. In a pitch to have charges dismissed, it would have been entirely fair to point out that the defendants have been effectively frozen out of the United States and its financial system for 18 months because of the pending indictment, and also that they had publicly and expressly indicated a desire to invest in the United States even before the prior Administration publicly unveiled its name-and-shame indictment. But again, although such a factor would be entirely fair to consider, I had already resolved beforehand to dismiss the securities charges, and accordingly the mention of potential investments could not have played any role.

(*Id.*) In other words, Mr. McCotter's response to the court's June 26, 2026 Memorandum & Order raises—for the first time—the specter of a possible agreement (involving one or multiple Defendants) in connection with the dismissal of the Indictment that has neither been memorialized nor previously brought to the

attention of this court. Here, the court once again notes its appreciation of counsel for Defendant Gautam Adani's June 24, 2026 letter describing the three appearing Defendants' reasons for consenting to the Government's motion to dismiss. (Dkt. 35.) That letter, however, made no mention of any agreement to abandon this case—let alone an agreement to drop the charges in exchange for a defendant's promise "to invest money in the United States." (Dkt. 37 at 9.)

To grant a Rule 48(a) motion—even with the defendant's consent—the court "should be satisfied that the reasons advanced [by the Government] for the proposed dismissal are substantial and the real grounds upon which the application is based." *United States v. Adams*, 777 F. Supp. 3d 185, 208 (S.D.N.Y. 2025) (first quoting *United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486 (S.D.N.Y. 1964); and then citing *United States v. Rosenberg*, 108 F. Supp. 2d 191, 204-05 (S.D.N.Y. 2000)); *see also United States v. Blaszczak*, 56 F.4th 230, 240 (2d Cir. 2022) ("Rule 48(a) was not promulgated to shift absolute power from the Executive to the Judicial Branch. Rather, it was intended as a power to check power.").

Case: 26-2730, 10/30/2026, DktEntry: 22.1, (118 of 142)

Consequently, to fulfill its obligations under Rule 48(a) and satisfy itself that no agreement exists in connection with the dismissal of the Indictment, the court DIRECTS Defendant Gautam Adani to respond to the following questions by sworn affidavit no later than **Wednesday, July 15, 2026:**

1. Are you aware of anything promised, offered, sought, received, agreed to, or accepted, by anyone, in connection with the dismissal of the Indictment?
2. Are you aware of any agreement exchanging anything for the dismissal of the Indictment?

SO ORDERED.

Dated: Brooklyn, New York
July 8, 2026

s/Nicholas G. Garaufis, USDJ
NICHOLAS G. GARAUFIS
United States District Judge

SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

125 Broad Street
New York, New York 10004-2498

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

July 15, 2026

Via ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States* v. *Gautam Adani et al.*, No. 24-cr-00433 (E.D.N.Y.)

Dear Judge Garaufis:

On behalf of Gautam Adani and in response to the Court's July 8 order directing Mr. Adani to respond to two questions by sworn affidavit (ECF No. 38), I attach the sworn affidavit of Gautam Adani (Ex. A). I also attach a declaration from me providing additional information in response to the Court's questions (Ex. B).

Respectfully,

Robert J. Giuffra, Jr.
Nicolas Bourtin
Suhana S. Han
Andrew J. DeFilippis
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Gautam Adani*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>- against -<br>GAUTAM ADANI, ET AL.,<br>Defendants. | Case No. 1:24-cr-00433 (NGG) |

**AFFIDAVIT OF GAUTAM ADANI**
**IN RESPONSE TO THE COURT'S JULY 8, 2026 ORDER**

I, GAUTAM ADANI, being duly sworn, hereby depose and state as follows in response to the Court's questions set forth in its July 8, 2026 Order:

1. I am the Chairman of the Adani Group, which I founded in 1988. The Adani Group is incorporated and headquartered in India. The Adani Group includes businesses relating to transportation, ports, real estate, urban development, data centers, and energy.

2. In response to the Court's first question, I am not aware of anything promised, offered, sought, received, agreed to, or accepted by anyone in connection with the dismissal of the Indictment in this action, other than that my counsel, Sullivan & Cromwell LLP, had discussions with the U.S. Department of Justice (DOJ) regarding the settlement terms eventually agreed upon in connection with (i) the pending Amended Consent Judgment in the Securities and Exchange Commission (SEC) action, dated May 30, 2026, and (ii) the Settlement Agreement between the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) and Adani Enterprises Limited, dated May 18, 2026.

3. The July 4, 2026 letter from Principal Associate Deputy Attorney General R. Trent McCotter and the Court's July 8, 2026 Order refer to press reports that the Adani Group offered

NOTARY
DEVENDRA K. PRAJAPATI
AHMEDABAD DIST
GUJARAT STATE
GOVERNMENT OF INDIA

to invest in the United States in exchange for the dismissal of the Indictment. Here is the background of those discussions. On November 13, 2024, I posted the following message, in part, on the social media platform X: "As the partnership between India and the United States deepens, the Adani Group is committed to leveraging its global expertise and invest $10 billion in US energy security and resilient infrastructure projects, aiming to create up to 15,000 jobs." When I made this post, the Indictment and SEC Complaint had not yet been unsealed and made public, and I was unaware of their existence.

4. Earlier this year, my counsel Sullivan & Cromwell LLP held a number of meetings with the DOJ and SEC to discuss resolution of the DOJ and SEC cases. My counsel provided a comprehensive white paper, made extensive submissions, and provided expert reports to the DOJ and SEC. During these settlement discussions, I understand that my counsel suggested that my publicly stated intent to invest $10 billion in the United States might be part of a resolution of these matters if that was what the DOJ or SEC wanted. I also understand that the DOJ later informed my counsel that it would not consider this potential investment in determining whether to seek dismissal of the Indictment. To my knowledge, the Adani Group's interest in investing in the United States had no role in the DOJ's decision to seek the dismissal of the Indictment.

5. In response to this Court's second question, I am not aware of any agreement involving any person or entity exchanging anything for the dismissal of the Indictment.

NOTARY
DEVENDRA K. PRAJAPATI
AHMEDABAD DIST
GUJARAT STATE
REGD.NO.18130/2020
Exp.Dt.
02/02/2030
GOVERNMENT OF INDIA

I declare that the foregoing is true and correct to the best of my knowledge.

Dated: 14th July 14th, 2026

Ahmedabad, India

14 JUL 2026

Gautam Adani

Subscribed and sworn to before me
this 14th day of July, 2026.

Notary Public

NOTARY
DEVENDRA K. PRAJAPATI
AHMEDABAD GUJARAT STATE REG.NO. 18130/2020
GOVENMENT OF INDIA

Serial No. 1016/2026
Book No. A
Page No. 59
DEVENDRA K. PRAJAPATI
NOTARY
GOVT. OF INDIA

14 JUL 2026

My Commission expires on 02/02/2030
DEVENDRA K. PRAJAPATI
NOTARY
GOVT. OF INDIA

14 JUL 2026

NOTARIAL NOTARIAL NOTARIAL NOTARIAL NOTARIAL
NOTARIAL NOTARIAL NOTARIAL NOTARIAL NOTARIAL

SOLEMNLY AFFIRMDE BEFORE ME
DEVENDRA K. PRAJAPATI
NOTARY
GOVT. OF INDIA

14 JUL 2026

NOTARY
DEVENDRA K. PRAJAPATI
AHMEDABAD DIST GUJARAT STATE REGD.NO.18130/2020 Exp.Dt. 02/02/2030
GOVERNMENT OF INDIA

-3-

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>- against -<br>GAUTAM ADANI, ET AL.,<br>Defendants. | Case No. 1:24-cr-00433 (NGG) |

**DECLARATION OF ROBERT J. GIUFFRA, JR.**
**IN RESPONSE TO THE COURT'S JULY 8, 2026 ORDER**

I, Robert J. Giuffra, Jr., hereby declare as follows in connection with the Court's questions set forth in its July 8, 2026 Order and the related July 14, 2026 Affidavit of Gautam Adani:

**Background**

1. I am the Co-Chair of Sullivan & Cromwell LLP (S&C). In August 2025, S&C was retained to represent Gautam Adani in this criminal case, as well as the related SEC case, also pending in this Court. I am submitting this declaration in order to provide additional context related to S&C's representation of Gautam Adani, and to explain why this Court should have no concerns whatsoever about granting the DOJ's motion to dismiss the Indictment here.

2. In short, there is no basis for the Court to depart from its customary and narrowly-prescribed role in providing "leave" to dismiss an indictment under Federal Rule of Criminal Procedure 48(a). That is because Defendants Gautam Adani, Sagar R. Adani, and Vneet S. Jaain (collectively, the "Adani Defendants") sought and received a decision that was

not affected by factors prejudicial to the defendants or clearly contrary to the public interest—the only two circumstances that courts have identified that would arguably support court intervention. *See, e.g.*, *United States* v. *Salinas*, 693 F.2d 348, 351 (5th Cir. 1982) (protection of defendant); *United States* v. *Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486 (S.D.N.Y. 1964) (public interest).

3. After being retained in these matters, S&C determined, based on our extensive review of the law and facts and our experience litigating many criminal and civil securities cases, that the cases brought by the DOJ and the SEC suffered from numerous fatal legal and factual deficiencies. As explained in my June 24, 2026 letter to the Court, the Indictment (i) sought to punish wholly extraterritorial securities transactions through an unprecedented application of U.S. criminal laws; (ii) challenged various statements that were each nonactionable under well-settled Second Circuit precedent; (iii) incorrectly asserted that the Adani Defendants were "makers" of the challenged statements; and (iv) advanced factual theories of bribery that were implausible, internally inconsistent, and highly dependent on potential testimony that would lack credibility.

4. At the time that the Indictment was unsealed, and contrary to the DOJ's typical practice in cases like this, the DOJ had not heard any substantive arguments from prior counsel for the Adani Defendants about the legal and factual merits of the charges. As a result, from the start, our approach was to engage in an extensive and exhaustive analysis of the law and facts; to enlist the assistance of highly qualified experts concerning U.S. and Indian law; to identify and explain the Indictment's weaknesses to the DOJ; and to obtain a final decision on the merits that was based on the facts and the law relevant to this case.

### Our Advocacy

5. Our team spent many thousands of hours analyzing documents and information related to this case, conducting careful legal analysis of relevant and controlling caselaw, and engaging in extensive and substantive discussions and meetings with representatives of the DOJ, the SEC, and the Treasury Department's Office of Foreign Assets Control (OFAC) regarding the securities and loan-related allegations against the Adani Defendants and a separate economic sanctions-related investigation involving one of the Adani Group companies.

6. In our meetings and calls with each of these agencies, which occurred over many hours, we sought to negotiate resolutions that would conclude all three pending matters. Nearly all of our discussions and advocacy focused on the extensive legal and factual analyses and written submissions that we and four highly-qualified experts had prepared, including our analysis of the numerous deficiencies we had identified in the DOJ's Indictment and SEC complaint.

7. Specifically, we provided: (i) a 118-page letter submission to the DOJ, accompanied by a nine-page cover letter; (ii) a 12-page supplemental submission; (iii) a 95-page slide deck presented in February 2026; and (iv) an additional 35-page slide deck presented in April 2026.[1] Along with those submissions, we also provided the DOJ with expert reports from distinguished U.S. and Indian subject matter experts, who wrote and submitted another approximately 200 pages of expert reports in total.

8. Those experts are: (1) a securities law professor at Harvard Law School, who opined that the DOJ would not be able to prove that the generic statements challenged by the

[1] We also provided to the DOJ a copy of a separate 151-page slide deck presented to the SEC in March 2026.

Government were material to the sophisticated qualified institutional buyers who purchased the bonds, and that the bond price reactions following the unveiling of the Government's allegations do not demonstrate that the alleged misstatements were material; (2) a former SEC Commissioner and Acting Chairman, who opined that, based on her experience and expertise, this case is unprecedented and programmatically misaligned with the U.S. regulatory priorities of the current Administration and most prior administrations in its focus on overwhelmingly foreign conduct and generic, immaterial statements; (3) a former Chief Justice for the Supreme Court of India, who opined on the robust anti-corruption and transparency regime in India and explained how Indian authorities are well equipped to investigate and address allegations of bribery in India; and (4) a former Chairperson of the Indian Central Electricity Authority and former ex-Officio Member of the Central Electricity Regulatory Commission, who described the renewable energy procurement regulatory processes in India, explained the transparent bidding process in this case, and explained that the Adani Defendants' references to financial "incentives" and "motivation" in their communications could refer to lawful energy price reductions that Adani Green indisputably offered, rather than to the supposed bribes as alleged by the Government.

9. In total, the Adani Defendants submitted approximately 600 pages of law, facts, expert testimony, and argument to the DOJ in ten weeks, between February 3, 2026 and April 17, 2026. On two occasions during our discussions with the DOJ, we stated that as part of any resolution of these matters on the merits, the Adani Group would be amenable to following through on a public statement by Gautam Adani regarding the Group's willingness to invest $10 billion in the United States as a means of promoting the U.S.-India trade relationship. This statement regarding the Group's willingness to invest in the United States

was made in a social media post by Mr. Adani on November 13, 2024, prior to the unsealing of the Indictment in this case, which read in part: "As the partnership between India and the United States deepens, the Adani Group is committed to leveraging its global expertise and invest $10 billion in US energy security and resilient infrastructure projects, aiming to create up to 15,000 jobs." We referenced the Adani Group's willingness to invest to underscore that a collateral consequence of the pendency of these charges was the adverse impact on the Group's ability to invest in the United States and on the U.S.-India trade relationship.

10. My firm and I have represented many major corporations and individuals in criminal cases before the DOJ. In seeking to revolve such cases, it is routine for defense counsel to advocate based on the collateral consequences of criminal proceedings on their clients, "including whether there is disproportionate harm to shareholders, pension holders, employees, and others not proven personally culpable, as well as impact on the public arising from the prosecution." U.S. Dep't of Just., Just. Manual § 9-28.300 (2018).

11. The DOJ will often cite such collateral consequences in explaining a more lenient resolution, such as a deferred prosecution agreement. *See, e.g.*, Government's Memorandum in Support of the Deferred Prosecution Agreement at 9-10, *United States* v. *HSBC Bank USA, N.A.*, No. 1:12-cr-00763-AMD (E.D.N.Y. Jan. 30, 2013), Dkt. No. 14 ("The resolution of the government's investigation through this DPA . . . reflects a careful weighing of the factors that the government must consider in determining the appropriate disposition in cases involving wrongdoing by business entities: . . . collateral consequences, including whether there is a disproportionate harm to shareholders, pension holders, employees, and others not proven personally culpable, as well as the impact on the public arising from the prosecution . . . ."); Memorandum in Support of Deferred Prosecution Agreement at 8, *United*

*States* v. *WakeMed*, No. 5:12-cr-398-BO-1 (E.D.N.C. Jan. 31, 2013), Dkt. No. 13 ("[T]he Department of Justice regularly utilizes Non-Prosecution Agreements (NPAs) and Deferred Prosecution Agreements (DPAs) to deter, punish, and reform corporate behavior while limiting the collateral consequences to the innocent and the community resulting from a corporate conviction."); Deferred Prosecution Agreement at 4, *United States* v. *Teva Pharms. USA, Inc.*, No. 2:20-cr-00200-RBS-2 (E.D. Pa. Aug. 21, 2023), Dkt. No. 186 (citing the "substantial consequences" that a guilty plea would likely have for "the Company's customers and employees outside the federal health care programs"); Deferred Prosecution Agreement at 6, *United States* v. *Genzyme Corp.*, No. 8:15-cr-00352-JSM-AEP (M.D. Fla. Sept. 3, 2015), Dkt. No. 2-1 (citing as a relevant consideration the "potential collateral consequences of proceeding with a prosecution, which may cause undue harm to innocent individuals including current . . . employees and shareholders").

12. Ultimately, the DOJ advised us that it would not consider the Adani Group's willingness to invest in the United States as a part of any resolution. Specifically, in a May 11, 2026 email to me, Joseph Nocella (United States Attorney for the Eastern District of New York), copying Trent McCotter (Principal Associate Deputy Attorney General) and Tysen Duva (Assistant Attorney General, Criminal Division), advised that:

> [T]he portion of the joint defense offer made by Gautam Adani, represented by Sullivan & Cromwell, Sagar R. Adani, represented by Nixon Peabody LLP and Hecker Fink LLP, and Vneet S. Jaain, represented by Norton Rose Fulbright US LLP, to resolve the criminal charges against them by, in part, a general proposal to invest $10 billion in the United States is categorically rejected by this Office.
>
> We understand that other grounds for resolution of the pending criminal charges with the Department of Justice are being explored. However, please know that the above-referenced

> proposal, which appeared in your April 17, 2026, slide deck presentation, will not be considered by this Office.
>
> While we are aware of, and appreciate, your client's initiation of simultaneous resolutions of charges brought, or contemplated, by the SEC and the Treasury Department Office of Foreign Assets Control we would also like to clarify that resolutions of such charges are independent of the resolution of the pending criminal charges.

13. Following the receipt of this email, we did not raise the subject of the proposed $10 billion investment with the DOJ again, and it was not incorporated in any way into, or made a condition of, the resolutions that we subsequently reached with the DOJ, SEC, and OFAC.

**The Resolutions**

14. As a result of our advocacy, on May 18, 2026, the DOJ filed the motion to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 48(a). Criminal Dkt. 23. Meanwhile, on May 14, 2026, the SEC filed proposed Consent Judgments with Gautam Adani and Sagar Adani. *See* Civil Dkt. 34. In those proposed Consent Judgments, Gautam Adani and Sagar Adani agreed to pay civil penalties of $6,000,000 and $12,000,000, respectively, and to be enjoined from certain future U.S. securities law violations, among other settlement commitments. *Id.* at 1. On May 30, 2026, the SEC filed revised proposed Consent Judgments, which it modified to align with the SEC's recent rescission of Rule 202.5(e), which previously required defendants to agree not to publicly deny complaint allegations as a condition of settlement. Civil Dkt. 37.

15. Also on May 18, 2026, Adani Enterprises Limited (AEL) agreed with OFAC to settle for $275 million its potential civil liability related to apparent violations of OFAC's Iran sanctions. OFAC, Settlement Agreement at 4 (May 18, 2026), https://ofac.treasury.gov/media/935636/download?inline. The Settlement Agreement stated that "AEL extensively cooperated with OFAC's investigation, including by proactively disclosing the findings of its investigation, producing large volumes of documentation, meaningfully answering all the agency's questions, and promptly resolving its potential liability." *Id.* AEL produced almost 30,000 pages to OFAC.

16. At no time did I discuss the resolution of this criminal case with any officer, employee, or representative of the U.S. Government other than those working for the DOJ, SEC, and OFAC on the criminal case, the SEC case, and the OFAC investigation. Except as stated herein, I am not aware of anything promised, offered, sought, received, agreed to, or accepted, by anyone, in connection with the dismissal of the Indictment in this action. I am also not aware of any agreement involving any person or entity exchanging anything for the dismissal of the Indictment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 14, 2026 in New York, New York.

Robert J. Giuffra, Jr.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

GAUTAM S. ADANI, SAGAR R. ADANI, VNEET S. JAAIN, RANJIT GUPTA, CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, and RUPESH AGARWAL,

Defendants.

**ORDER**
**24-CR-0433 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

The court is in receipt, earlier today, of Defendant Gautam Adani's submission responding to the court's July 8, 2026 Order directing the Defendant to respond to two questions by sworn affidavit. The submission includes the requested affidavit, (Dkt. 40-1), as well as an unsolicited declaration from counsel for Defendant, Robert J. Giuffra, Jr., (Dkt. 40-2). Mr. Giuffra's declaration provides additional context for statements in Defendant's affidavit. It also introduces new documents and new information not previously disclosed to this court. As a result, the court now requires additional information to fulfill its obligations under Federal Rule of Criminal Procedure 48(a).

The court has sought, and continues to seek, a speedy resolution to the Government's pending Motion to Dismiss the Indictment, (Dkt. 23). In furtherance of this goal, the court has carefully considered the parties' filings and sought only the additional information necessary to fulfill its obligations under Rule 48(a). On June 26, 2026, the court ordered the Government to comply with *its* obligations under the rule by providing the court with "each reason for dismissing the Indictment with prejudice as against all Defendants" and "sufficient factual support for each basis." (Dkt. 36 at 5.) On July 8, 2026, the court ordered Defendant to respond by sworn affidavit to just two questions raised by

new, unsolicited information volunteered in Mr. McCotter's July 4, 2026 letter. (Dkt. 38.)

As the court's previous orders illustrate, the parties continue to provide information regarding the Government's dismissal determination in piecemeal fashion. What's more, the parties continue to *volunteer* information not requested by this court, prompting new questions and appearing to contradict previous representations made to this court. The court's June 26, 2026 Order requested only the Government's reasons for dismissal. Mr. McCotter provided an accounting of his reasons for dismissal and also offered up his "Non-Considerations." Mr. McCotter's unsolicited disclosure included new information not yet brought to the court's attention; namely, the existence of a possible agreement to drop the charges in exchange for Defendant's promise to "invest money in the United States." (Dkt. 37 at 9.) The court's July 8, 2026 Order requested only Defendant's sworn assurances that there was no such agreement. In addition to the requested affidavit, Mr. Giuffra has now opted to include his own declaration.

Just as Mr. McCotter's July 4 letter introduced new, unsolicited information, so too does Mr. Giuffra's declaration. As a result (and just as it did following Mr. McCotter's volunteered disclosures), the court now requires additional information under Rule 48(a) in order to "be satisfied that the reasons advanced [by the Government] for the proposed dismissal are . . . the real grounds upon which the application is based." *United States v. Adams*, 777 F. Supp. 3d 185, 208 (S.D.N.Y. 2025) (internal citations omitted).

Mr. Giuffra's declaration states that:

> Ultimately, the DOJ advised us that it would not consider the Adani Group's willingness to invest in the United States as a part of any resolution. Specifically, in a May 11, 2026 email to me, Joseph Nocella (United States Attorney for the Eastern District of New York), copying Trent McCotter (Principal Associate Deputy Attorney General) and Tysen Duva (Assistant Attorney General, Criminal Division), advised that:
>
> > [T]he portion of the joint defense offer made by Gautam Adani, represented by Sullivan & Cromwell, Sagar R. Adani, represented by Nixon Peabody LLP and Hecker Fink LLP, and Vneet S. Jaain, represented by Norton Rose Fulbright US LLP, to resolve the criminal charges against them by, in part, a general proposal to invest $10 billion in the United States is **categorically rejected by this Office.**
> >
> > We understand that other grounds for resolution of the pending criminal charges with the Department of Justice are being explored. However, please know that the above-referenced proposal, which appeared in your April 17, 2026, slide deck presentation, **will not be considered by this Office.**
> >
> > While we are aware of, and appreciate, your client's initiation of simultaneous resolutions of charges brought, or contemplated, by the SEC and the Treasury Department Office of Foreign Assets Control we would also like to clarify that resolutions of such charges are independent of the resolution of the pending criminal charges.

(Dkt. 40-2 ¶ 12 (emphases added).)

This statement, and the May 11, 2026 email from U.S. Attorney Nocella it purports to quote, raise yet more questions the court must answer. Consequently, and for the reasons explained below, the court requires additional information.

***First***, the court was not previously made aware of U.S. Attorney Nocella's role in the decision to dismiss the Indictment. Instead, Mr. McCotter's July 4 letter states that he was the "final and **sole decisionmaker** to seek dismissal of the charges here." (Dkt. 37 at 3 (emphasis added).) The representations made in Mr. Giuffra's declaration and the quoted portions of U.S. Attorney Nocella's email appear to directly contradict that claim and to call into doubt whether Mr. McCotter's professed reasons for seeking dismissal of the Indictment are the "real" and complete reasons on which the Government's motion is based. *Adams*, 777 F. Supp. 3d at 208. The excerpt suggests that, in fact, U.S. Attorney Nocella was also a decisionmaker and involved in the process to resolve the charges against Defendants—including the determination of the "grounds for resolution of the pending criminal charges with the Department of Justice"—as recently as May 11, 2026. (Dkt. 40-2 ¶ 12.) In other words, Mr. Giuffra's declaration appears to show that U.S. Attorney Nocella made specific representations to defense counsel regarding the terms and reasons for any resolution of this case just one week prior to the filing of the Government's pending motion to dismiss. While the U.S. Attorney signed the Government's pending motion, (Dkt. 23), he did not sign Mr. McCotter's July 4 letter. In fact, Mr. McCotter did "not ask[] the U.S. Attorney or any other attorney to sign th[e] submission." (Dkt. 37 at 10 n.3.) Under the circumstances, the court finds it necessary for the U.S. Attorney to provide his assurances that "the reasons advanced [by Mr. McCotter] for the proposed dismissal are . . . the real grounds upon which the application is based." *Adams*, 777 F. Supp. 3d at 208.

Furthermore, Mr. Giuffra's representations regarding the U.S. Attorney's May 11, 2026 email also appear to contradict Mr. McCotter's prior representations to this court that he alone "made the decision to dismiss these charges" and did so only "after conducting numerous meetings with defense counsel" and "separate meetings with only Department counsel." (Dkt. 37 at 6.) More pointedly, nowhere did Mr. McCotter even suggest that he had consulted the U.S. Attorney. To clarify the record, the court requires a statement from U.S. Attorney Nocella before it can resolve the pending motion. Under Rule 48(a), the court must now be sure that *all* decisionmakers have the opportunity to provide the Government's real and exhaustive reasons for dismissal of all charges as alleged against all Defendants in this case.

***Second***, the court was not previously made aware of U.S. Attorney Nocella's email nor has the complete email been previously provided to this court. In order to evaluate the significance of the statements on which Mr. Giuffra relies, the court requires the full email, of which the quoted text above appears to be only a part.

For the reasons explained above, the court ORDERS as follows:

1. The court DIRECTS U.S. Attorney Nocella to submit a sworn statement addressing the following two questions no later than **Friday, July 17, 2026**:
   a. whether he agrees (or disagrees) with each enumerated basis for dismissing the charges as set forth on pages 6-9 of Mr. McCotter's July 4 letter, (Dkt. 37); and
   b. whether any additional bases exist for the Government's decision to dismiss the Indictment, and if so, what those bases are, including sufficient factual support.
2. The court DIRECTS Mr. Giuffra to submit the full document quoted in Paragraph 12 of his declaration by **noon, tomorrow, Thursday, July 16, 2026**.

SO ORDERED.

Dated: Brooklyn, New York
July 15, 2026

s/Nicholas G. Garaufis, USDJ
NICHOLAS G. GARAUFIS
United States District Judge

SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

July 15, 2026

Via ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States* v. *Gautam Adani et al.*, No. 24-cr-00433 (E.D.N.Y.)

Dear Judge Garaufis:

I respond to the Court's July 15 Order (Dkt. 45) directing me to submit the full May 11, 2026 email from Joseph Nocella to me, along with counsel for Sagar Adani and Vneet Jaain. As shown in the attached exhibit, my declaration (Dkt. 40-2) reproduced fully Mr. Nocella's entire email, except for a handful of introductory words at the beginning of his email. The attached exhibit also shows my complete email response sent on May 11, 2026, which is the final email in this thread.

Respectfully,

Robert J. Giuffra, Jr.
Nicolas Bourtin
Suhana S. Han
Andrew J. DeFilippis
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Gautam Adani*

(Attachment)

**From:** Giuffra Jr., Robert J.
**Sent:** Monday, May 11, 2026 5:02 PM
**To:** 'Nocella, Joseph (USANYE)' <Joseph.Nocella@usdoj.gov>; zzExt-shecker <shecker@heckerfink.com>; tsini@nixonpeabody.com; andrey.spektor@nortonrosefulbright.com
**Cc:** McCotter, Trent (ODAG) <Trent.McCotter@usdoj.gov>; Duva, Tysen (CRM) <Tysen.Duva2@usdoj.gov>
**Subject:** RE: Adani, et al.

Joe,

Understood. Please let us know if you have any further questions. Thank you.

Bob

**Robert J. Giuffra Jr.: Co-Chair** (Bio)
**SULLIVAN & CROMWELL LLP**
125 Broad Street | New York, NY 10004-2498
+1 212 558 3121 (T) | +1 917-882-8929 (M)
giuffrar@sullcrom.com | www.sullcrom.com

**From:** Nocella, Joseph (USANYE) <Joseph.Nocella@usdoj.gov>
**Sent:** Monday, May 11, 2026 3:49 PM
**To:** Giuffra Jr., Robert J. <giuffrar@sullcrom.com>; zzExt-shecker <shecker@heckerfink.com>; tsini@nixonpeabody.com; andrey.spektor@nortonrosefulbright.com
**Cc:** McCotter, Trent (ODAG) <Trent.McCotter@usdoj.gov>; Duva, Tysen (CRM) <Tysen.Duva2@usdoj.gov>
**Subject:** [EXTERNAL] Adani, et al.

Counsel:

This email is to confirm that the portion of the joint defense offer made by Gautam Adani, represented by Sullivan & Cromwell, Sagar R. Adani, represented by Nixon Peabody LLP and Hecker Fink LLP, and Vneet S. Jaain, represented by Norton Rose Fulbright US LLP, to resolve the criminal charges against them by, in part, a general proposal to invest $10 billion in the United States is categorically rejected by this Office.

We understand that other grounds for resolution of the pending criminal charges with the Department of Justice are being explored. However, please know that the above-referenced proposal, which appeared in your April 17, 2026, slide deck presentation, will not be considered by this Office.

While we are aware of, and appreciate, your clients' initiation of simultaneous resolutions of charges brought, or contemplated, by the SEC and the Treasury Department Office of Foreign Assets Control we would also like to clarify that resolutions of such charges are independent of the resolution of the pending criminal charges.

Regards,
Joe Nocella

Joseph Nocella, Jr.
United States Attorney
Eastern District of New York

271 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6393

---

****This is an external message from:** Joseph.Nocella@usdoj.gov ******

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

Docket No. <u>24-CR-433 (NGG)</u>

<u>DECLARATION</u>

GAUTAM S. ADANI,
SAGAR R. ADANI,
VNEET S. JAAIN,
RANJIT GUPTA,
CYRIL CABANES,
SAURABH AGARWAL,
DEEPAK MALHOTRA and
RUPESH AGARWAL,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

1. I am the United States Attorney for the Eastern District of New York ("EDNY"). I submit this Declaration in accordance with this Court's July 15, 2026 Order (the "Order"), which followed the July 4, 2026 letter submission of Trent McCotter ("McCotter Letter"), Principal Associate Deputy Attorney General ("PADAG") of the United States. As a United States Attorney, I report to the Office of the Deputy Attorney General, which oversees all United States Attorney's Offices, and Mr. McCotter is my direct supervisor.

2. I attended several of the meetings referred to in the McCotter Letter, including both the meetings where defense counsel were present and the separate meetings with only Justice Department counsel. <u>See</u> McCotter Letter at 6 ("I [Trent McCotter] made the decision to dismiss these charges after conducting numerous meetings with defense counsel (two of which featured a dozen-plus attorneys) and also separate meetings with only Department counsel").

3. Ultimately, after various arguments were presented, including at the meetings referred to above, Mr. McCotter exercised his authority as PADAG and determined that further

resources should not be deployed in this prosecution and that the indictment should be dismissed. See May 18, 2026 motion to dismiss.

4. In response to this Court's June 26, 2026 Order, PADAG McCotter set forth his rationale for dismissal in the McCotter Letter.

5. I was not the decisionmaker for the motion to dismiss and I had no participation in drafting the McCotter Letter.

6. Indeed, my sending the May 11, 2026 email and my signing the May 18, 2026 motion to dismiss, both referred to by the Court in its Order, were at the direction, or authorization, of Mr. McCotter.

7. This Court stated that: "the court finds it necessary for the U.S. Attorney to provide his assurances that the reasons advanced by [Mr. McCotter] for the proposed dismissal are … the real grounds upon which the application is based." Order at 4.

8. I have no basis to believe that the reasons advanced by Mr. McCotter for the proposed dismissal are not the real grounds upon which the application is based.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Central Islip, New York
July 17, 2026

/s/ Joseph Nocella, Jr.
JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| 08/10/2026 | 49 | MEMORANDUM & ORDER as to Gautam S. Adani (1), Sagar R. Adani (2), Vneet S. Jaain (3), Ranjit Gupta (4), Cyril Cabanes (5), Saurabh Agarwal (6), Deepak Malhotra (7), Rupesh Agarwal (8).<br><br>The court GRANTS IN PART the Department's Rule 48(a) Motion to dismiss the Indictment against all Defendants with prejudice. Counts Two, Three, and Four of the Indictment as alleged against Appearing Defendants Gautam Adani, Sagar Adani, and Vneet Jaain are DISMISSED WITH PREJUDICE. 1 However, the court RESERVES JUDGMENT as to the portions of the Motion regarding Counts One and Five as alleged against Non-Appearing Defendants Ranjit Gupta, Cyril Cabanes, Saurabh Agarwal, Deepak Malhotra, and Rupesh Agarwal, pending the Department's fulfillment of its Rule 48(a) obligations as to these Counts.<br><br>Pursuant to Rule 48(a), the Department is DIRECTED to advise the court of each reason for dismissing Counts One and Five with prejudice as against Non-Appearing Defendants and to provide the court with sufficient factual support for each reason. The Department is ORDERED to do so no later than **August 31, 2026**.<br><br>Finally, the court has been told that counsel for Non-Appearing Defendants have "engaged in several meetings" with McCotter, (McCotter Ltr. at 8), and that "[c]ounsel for all defendants consent" to the Rule 48(a) Motion, (Rule 48(a) Mot.). The court requires the direct assurances of Non-Appearing Defendants' consent on the record. Thus, counsel for Non-Appearing Defendants Ranjit Gupta, Cyril Cabanes, Saurabh Agarwal, Deepak Malhotra, and Rupesh Agarwal must advise the court of their client's consent by **August 31, 2026**. The Department is DIRECTED to advise counsel for Non-Appearing Defendants of this obligation.<br><br>So Ordered by Judge Nicholas G. Garaufis on 8/10/2026. (TLH) (Entered: 08/10/2026) |
| 08/10/2026 | | DISMISSAL OF COUNTS (2,3 and 4) on Government Motion as to Gautam S. Adani, Sagar R. Adani, Vneet S. Jaain, *See* 49 Memorandum & Order. (TLH) (Entered: 08/10/2026) |
| 08/11/2026 | 50 | NOTICE as to Gautam S. Adani, Sagar R. Adani, Vneet S. Jaain, Ranjit Gupta, Cyril Cabanes, Saurabh Agarwal, Deepak Malhotra, Rupesh Agarwal (McCotter, R. Trent) (Entered: 08/11/2026) |
| 08/12/2026 | | ORDER: McCotter's 50 letter states that it is "in response" to the court's 49 August 10, 2026 Memorandum and Order. However, it provides neither "factual support for each [proffered] reason" for the decision to dismiss Counts One and Five with prejudice, nor confirmation that the Department "advise[d] counsel for Non-Appearing Defendants of [their] obligation" to provide "the direct assurances of Non-Appearing Defendants' consent [to the Rule 48(a) Motion] on the record." Thus, it does not satisfy the 49 August 10 Order. Therefore, the Government is DIRECTED to review the 49 Order and to comply with the requirements set forth on pages 46-47 by August 31, 2026. So Ordered by Judge Nicholas G. Garaufis on 8/12/2026. (OSY) (Entered: 08/12/2026) |
| 08/12/2026 | 51 | Letter *concerning Courts August 10, 2026 Order* as to Saurabh Agarwal (Paes, Winston) (Entered: 08/12/2026) |
| 08/12/2026 | 52 | Letter *re Court's August 10, 2026 Order* as to Ranjit Gupta (Schoeman, Paul) (Entered: 08/12/2026) |
| 08/12/2026 | 53 | Letter *in response to the Court's August 10, 2026 Order* as to Cyril Cabanes (Richman, Jonathan) (Entered: 08/12/2026) |